# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| DAVID AIELLO, MICHAEL BALZER, GREGORY DEANGELO, SEAN and KRISTINE ELY, JOCELYN and DANIEL GRENIER, MICHAEL and KATHY HARTWEGER, WILLIAM DENNIS, KELLY GAUDREAU, VERONICA PETTIS, ABBEY ROBSON, CHRISTOPHER SCHROBILGEN, and DARREN WOLBERG on behalf of themselves and all those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FCA US, LLC,<br><br>Defendant. | Case No. _____<br><br><br>Related Case No. 2:24-cv-10546-BRM<br><br><br><br>**JURY TRIAL DEMANDED** |

# CLASS ACTION COMPLAINT
# AND DEMAND FOR JURY TRIAL

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................ 1

II.   JURISDICTION ............................................................... 10

III.  VENUE ......................................................................... 11

IV.  PARTIES ....................................................................... 11

     A.    Plaintiffs ............................................................... 11

          Jocelyn and Daniel Grenier (Florida)..................................... 11

          William Dennis (Illinois) ................................................ 14

          Darren Wolberg (Maryland)................................................ 17

          Kelly Gaudreau (Massachusetts)........................................... 21

          Michael and Kathy Hartweger (Missouri) ................................... 25

          Gregory DeAngelo (New York)............................................... 28

          Veronica Pettis (North Carolina).......................................... 32

          Michael Balzer (Oregon).................................................. 36

          Abbey Marie Robson (Pennsylvania) ....................................... 39

          David Aiello (Tennessee).................................................. 42

          Sean Ely and Kristine Ely (Utah).......................................... 46

          Christopher Schrobilgen (Washington)...................................... 50

     B.    Defendant ............................................................... 54

V.    FACTUAL ALLEGATIONS ................................................ 55

     A.    FCA marketed the Jeep Wrangler 4xe and Grand Cherokee 4xe as safe, dependable, rugged, high-performing, and emissions-friendly hybrid-electric vehicles. .................................................... 55

1.    FCA marketed the Class Vehicles as an environmentally-friendly evolution of its historic SUV lines. ...........................55

2.    FCA represented that Class Vehicles were not only more efficient, but also better performing than their gas-powered predecessors. ................................................................61

3.    FCA marketed the Class Vehicles as a no-compromises, best of all worlds plug-in hybrid vehicle. .............................64

4.    FCA's marketing made frequent charging and use of the all-electric mode essential to the value proposition of Class Vehicles, for which consumers paid a hefty premium. ............72

5.    FCA's marketing advertised the enhanced safety features of the Class Vehicles, but failed to disclose the danger of fire or explosion while charging. ........................................................79

6.    FCA's representations regarding safety, emissions, performance, all-electric mode, and other key features were consistent and pervasive. .......................................................83

7.    Unable or Unwilling to Remedy the Fire Risk Defect, FCA Abruptly Discontinues the Jeep Wrangler 4xe and Jeep Grand Cherokee 4xe...................................................................85

B.    The Fire Risk Defect is likely the result of defective high-voltage lithium-ion battery systems............................................ 86

C.    FCA knew or should have known of the Fire Risk Defect long before it disclosed the problem to Plaintiffs. ............................. 89

1.    Lithium-ion batteries are dangerous without appropriate safeguards................................................................90

2.    FCA knew or should have known that the Nickel-Magnesium-Cobalt (NMC) batteries that it used in Class Vehicles are at greater risk of separator damage and violent explosion. ..........94

3.    NHTSA issued warnings about lithium-ion battery safety and the dangerous risk of thermal runaway and the industry was aware of how to control this risk. ..........................................103

4.    FCA had notice of the Fire Risk Defect before any Class Vehicle was sold because of its accumulated knowledge

regarding the Samsung-manufactured HV Battery in Class Vehicles and similar defects in FCA's Chrysler Pacifica plug-in ................................................................................ 110

5.    FCA launches the Class Vehicles, and fires result. ................ 119

6.    FCA was slow to issue the 2023 Recall, deficiently administered the 2023 Recall, and now admits that the 2023 Recall was "ineffective." ....................................................... 135

7.    FCA's admittedly "ineffective" 2023 B9A and 2024 95B Recall remedies and 2025 68C remedy leave Plaintiffs and Class Members with vehicles that continue to pose an unreasonable fire risk. ................................................................................. 140

8.    FCA knew or should have known that its 2023 and 2024 attempted and failed recall procedures would be ineffective to address the Fire Risk Defect. ................................................. 143

9.    FCA's expanded 2025 Recall seems likely to face the same issues of ineffectiveness and underinclusiveness as the 2023 and 2024 Recalls, and has already prompted complaints from Class Vehicle owners. ........................................................... 147

10.    FCA's 2024 and 2025 Recall understated the widespread nature of the Fire Risk Defect and misled the public regarding the Fire Risk Defect ............................................................................... 149

VI.    FRAUDULENT CONCEALMENT ........................................................ 152

VII.    DISCOVERY RULE TOLLING OF THE STATUTE OF LIMITATIONS ........................................................................................ 157

VIII.    CLASS ALLEGATIONS ........................................................................ 158

A.    Numerosity ................................................................................... 160

B.    Commonality and Predominance ................................................. 160

C.    Typicality ...................................................................................... 161

D.    Adequacy ...................................................................................... 162

E.    Superiority .................................................................................... 162

IX.  NATIONWIDE CLAIMS .......................................................................... 163

      COUNT I VIOLATION OF THE MAGNUSON-MOSS
          WARRANTY ACT (15 U.S.C. § 2301, *et seq.*) (Alleged
          by all Plaintiffs on behalf of the Nationwide Class  or, in
          the alternative, the State Subclasses) ..................................... 163

X.  STATE-SPECIFIC CLAIMS ...................................................................... 168

    A.  Florida................................................................................................ 168

      COUNT II VIOLATION OF FLORIDA'S  DECEPTIVE &
          UNFAIR TRADE PRACTICES ACT (Fla. Stat.
          § 501.201, *et seq.*) (Alleged by Plaintiffs Jocelyn and
          Daniel Grenier on behalf of the Florida Subclass) ................ 168

      COUNT III BREACH OF IMPLIED WARRANTY OF
          MERCHANTABILITY UNDER FLORIDA LAW (Fla.
          Stat. § 672.314)  (Alleged by Plaintiffs Jocelyn and
          Daniel Grenier on behalf of the Florida Subclass) ................ 172

      COUNT IV UNJUST ENRICHMENT (Common Law)
          (Alleged by Plaintiff Jocelyn and Daniel Grenier on
          behalf of the Florida Subclass) ............................................. 175

    B.  Illinois................................................................................................ 177

      COUNT V BREACH OF IMPLIED WARRANTY OF
          MERCHANTABILITY UNDER ILLINOIS LAW (810
          ILCS 5/2-314 and 5/2A-212) (Alleged by Plaintiff
          William Dennis on behalf of the Illinois Subclass)............... 177

      COUNT VI VIOLATION OF THE ILLINOIS CONSUMER
          FRAUD  AND DECEPTIVE BUSINESS PRACTICES
          ACT (815 ILCS § 505/1 *et seq.*) (Alleged by Plaintiff
          William Dennis on behalf of the Illinois Subclass)............... 180

      COUNT VII UNJUST ENRICHMENT (Common Law)
          (Alleged by Plaintiff William Dennis on behalf of the
          Illinois Subclass).................................................................. 184

    C.  Maryland ............................................................................................ 187

      COUNT VIII VIOLATIONS OF THE MARYLAND
          CONSUMER PROTECTION ACT (Md. Code Ann.,

Com. Law § 13-101, *et seq.*) (Alleged by Plaintiff Darren Wolberg on behalf of the Maryland Subclass) ...................... 187

COUNT IX BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY  UNDER MARYLAND LAW (Md. Code Ann., Com. Law § 2-314) (Alleged by Plaintiff Darren Wolberg on behalf of the Maryland Subclass) ................................................................ 191

COUNT X UNJUST ENRICHMENT (Common Law) (Alleged by Plaintiff Darren Wolberg on behalf of the Maryland Subclass) ................................................................ 192

D.   Massachusetts .................................................................. 195

COUNT XI BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY  UNDER MASSACHUSETTS LAW (Mass. Gen. Laws Ann. ch. 106, § 2-314) (Alleged by Plaintiff Kelly Gaudreau on behalf of the Massachusetts Subclass) ......................................... 195

COUNT XII UNJUST ENRICHMENT (Common Law) (Alleged by Plaintiff Kelly Gaudreau on behalf of the Massachusetts Subclass) ......................................... 197

E.   Missouri .......................................................................... 199

COUNT XIII VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT (Mo. Rev. Stat. § 407.010, *et seq.*) (Alleged by Plaintiffs Michael and Kathy Hartweger  on behalf of the Missouri Subclass) ......... 199

COUNT XIV BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER MISSOURI LAW (Mo. Stat. § 400.2-314) (Alleged by Plaintiffs Michael and Kathy Hartweger  on behalf of the Missouri Subclass) ......... 203

COUNT XV UNJUST ENRICHMENT (Common Law) (Alleged by Plaintiffs Michael and Kathy Hartweger  on behalf of the Missouri Subclass) ............................................ 206

F.   New York ......................................................................... 208

COUNT XVI VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349 (N.Y. Gen. Bus. Law § 349 et

seq.) (Alleged by Plaintiff Gregory DeAngelo  on behalf of the New York Subclass) .................................................. 208

COUNT XVII VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 350 (N.Y. Gen. Bus. Law § 350, *et seq.*) (Alleged by Plaintiff Gregory DeAngelo  on behalf of the New York Subclass) .................................................. 212

COUNT XVIII BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (N.Y. U.C.C. §§ 2-314 and 2A-212) (Alleged by Plaintiff Gregory DeAngelo on behalf of the New York Subclass) .................................................. 215

G.   North Carolina ................................................................. 219

COUNT XIX VIOLATION OF NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (N.C. Gen. State §§ 75-1.1, *et seq.*) (Alleged by Plaintiff Veronica Pettis on behalf of the North Carolina Subclass) ............................................................... 219

COUNT XX BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER NORTH CAROLINA LAW (N.C. Gen. Stat. §§ 25-2-314 and 25-2A-212) (Alleged by Plaintiff Veronica Pettis on Behalf of  the North Carolina Subclass) .................................................. 222

COUNT XXI UNJUST ENRICHMENT (Common Law) (Alleged by Plaintiff Veronica Pettis on behalf of the North Carolina Subclass) .................................................. 225

H.   Oregon ............................................................................ 228

COUNT XXII VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT (Or. Rev. Stat. §§ 646.605, *et seq.*) (Alleged by Plaintiff Michael Balzer on behalf of the Oregon Subclass) ........................................................... 228

COUNT XXIII BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Or. Rev. Stat. §§ 72.3140 and 72A.2120) (Alleged by Plaintiff Michael Balzer on behalf of the Oregon Subclass) ................................................. 231

COUNT XXIV UNJUST ENRICHMENT (Common Law) (Alleged by Plaintiff Michael Balzer on behalf of the Oregon Subclass) ................................................................ 234

I.    Pennsylvania.................................................................... 237

COUNT XXV VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 Pa. Cons. Stat. § 201-1, *et seq*.) (Alleged by Plaintiff Robson on behalf of the Pennsylvania Subclass) ........................................................... 237

COUNT XXVI BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER PENNSYLVANIA LAW (13 Pa. Cons. Stat. Ann. §§ 2314 and 2A212) (Alleged by Plaintiff Robson on behalf of the Pennsylvania Subclass) ........................................................... 241

COUNT XXVII UNJUST ENRICHMENT (Common Law) (Alleged by Plaintiff Robson on behalf of the Pennsylvania Subclass) ........................................................... 244

J.    Tennessee ........................................................................ 246

COUNT XXVIII VIOLATIONS OF THE TENNESSEE CONSUMER PROTECTION ACT (Tenn. Code Ann. § 47-18-101, *et seq*.) (Alleged by Plaintiff David Aiello on behalf of the Tennessee Subclass) ......................................... 246

COUNT XXIX BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER TENNESSEE LAW (Tenn. Code Ann. §§ 47-2-314, 47-2A-212) (Alleged by Plaintiff David Aiello on behalf of the Tennessee Subclass) ........................................................... 251

COUNT XXX UNJUST ENRICHMENT (Common Law) (Alleged by Plaintiff David Aiello on behalf of the Tennessee Subclass)................................................. 253

K.    Utah ................................................................................. 256

COUNT XXXI VIOLATIONS OF THE UTAH CONSUMER SALES PRACTICES ACT (Utah Code Ann. § 13-11-1, *et seq*.) (Alleged by Plaintiffs Sean Ely and Kristine Ely on behalf of the Utah Subclass) ........................................... 256

COUNT XXXII BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER UTAH LAW (Utah Code Ann. § 70A-2-314) (Alleged by Plaintiffs Sean Ely and Kristine Ely on behalf of the Utah Subclass) ................. 260

COUNT XXXIII UNJUST ENRICHMENT (Common Law) (Alleged by Plaintiffs Sean Ely and Kristine Ely on behalf of the Utah Subclass) .................................................. 262

L. Washington ................................................................... 265

COUNT XXXIV VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT (RCW § 19.86.010, *et seq.*) (Alleged by Plaintiff Christopher Schrobilgen on behalf of the Washington Subclass) ...................................... 265

COUNT XXXV BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY UNDER WASHINGTON LAW (RCW § 62A.2-314) (Alleged by Plaintiff Christopher Schrobilgen on behalf of the Washington Subclass) .................................................................... 269

COUNT XXXVI UNJUST ENRICHMENT OR QUASI CONTRACT (Common Law) (Alleged by Plaintiff Christopher Schrobilgen on behalf of the Washington Subclass) .............................................................. 272

XI. REQUEST FOR RELIEF ......................................................... 274

XII. DEMAND FOR JURY TRIAL ................................................. 275

Plaintiffs DAVID AIELLO, MICHAEL BALZER, GREGORY DEANGELO, SEAN and KRISTINE ELY, JOCELYN and DANIEL GRENIER, MICHAEL and KATHY HARTWEGER, WILLIAM DENNIS, KELLY GAUDREAU, VERONICA PETTIS, ABBEY ROBSON, CHRISTOPHER SCHROBILGEN, and DARREN WOLBERG ("Plaintiffs") file this lawsuit individually and on behalf of a proposed nationwide class and statewide classes. Plaintiffs allege the following based on personal knowledge as to their own acts and experiences and, as to all other matters, based on the investigation of counsel:

## I.   INTRODUCTION

1.    This case concerns a dangerous hidden defect in approximately 320,065 Jeep "4xe" plug-in hybrid electric vehicles equipped with a 400-volt, 17-kwh high voltage battery ("HV Battery") that can suddenly catch on fire while charging.

2.    What began in the fall of 2023 as a recall involving approximately 32,000 Jeep Wrangler 4xes that could catch fire and explode has now expanded into three recalls that encompass more than 320,000 vehicles, two distinct plug-in hybrid models, and a collective eleven model years. Even one vehicle that could catastrophically explode is a safety risk; hundreds of thousands of these potentially explosive vehicles are a public safety hazard.

3.    The defective vehicles at issue include Model Year 2020-2025 Jeep Wrangler 4xe and Model Year 2022-2026 Jeep Grand Cherokee 4xe plug-in hybrid

- 1 -

electric vehicles (the "Class Vehicles") that were designed, manufactured, marketed, and sold by Defendant FCA US, LLC ("FCA").

4.      FCA promoted these plug-in hybrid Class Vehicles as safe, reliable, and high performing vehicles that remained true to the rugged Jeep brand image and performance, while avoiding the gas guzzling propensities of other SUVs before it.

5.      What FCA concealed and failed to disclose, however, is that the Class Vehicles have a dangerous and defective high-voltage hybrid battery system that can cause, and has in fact caused, vehicle fires and explosions (the "Fire Risk Defect"). The Fire Risk Defect exposes Plaintiffs and putative Class Members, as well as the public at large, to an unreasonable risk of accident, injury, death, or property damage from Class Vehicles that can catch fire while driving or, more commonly, while parked and charging.

6.      The serious and ongoing danger from the Fire Risk Defect began soon after the launch of Class Vehicles in the U.S. market. In April 2023, a Jeep Wrangler 4xe Class Vehicle caught fire and exploded in a garage located in Erie, Colorado. The flames clearly originated near the back seat of the car where the HV battery is located. The resulting explosion was so powerful that it sent the garage door flying some thirty feet through the air, striking a responding firefighter in the helmet.[1]

---

[1] Ex. 1, YouTube, StacheD Training, Close Call: Jeep 4xe Hybrid Explosion Nearly Hits Fire Captain in Erie, Colorado! (Aug. 4, 2023), https://www.youtube.com/watch?v=en3PuyWQ_7g.



Video footage of the Jeep Wrangler 4xe fire and explosion in Erie, Coloardo.

7.      Other owners and lessors experienced Class Vehicle fires shortly thereafter, including two Plaintiffs in the related action *Frisch et al. v. FCA US LLC* in April and May of 2024. *See Frisch et al. v. FCA US LLC*, No. 2:24-cv-10546 (E.D. Mich.) (ECF No. 61 ¶¶ 6-8.).

8.      These catastrophic fires could have been avoided. FCA had all the knowledge it needed to anticipate, test for, and prevent the Fire Risk Defect before the Class Vehicles went to market. This knowledge came from, among other things, industry and scientific studies on the fire risks of lithium-ion battery packs (including the specific battery chemistry used by FCA in the Wrangler 4xe and Grand Cherokee 4xe Class Vehicles); rigorous pre-launch testing of the HV Battery and hybrid propulsion system that any responsible manufacturer would have

conducted; industry insights on the appropriate specifications and control systems for lithium-ion batteries; and known fire issues arising in other vehicles with lithium-ion battery packs, including FCA's own Chrysler Pacifica PHEV.

9.     Despite FCA's knowledge of the Fire Risk Defect, FCA continued to sell hundreds of thousands of defective Class Vehicles, placing consumers and the public at danger from the Fire Risk Defect. Over the past three years, FCA issued three ineffective safety recalls for the Fire Risk Defect. These recalls have the same constituent elements. First, FCA instructed Class Vehicle owners and lessors to "refrain from recharging" and to "park away from structures or other vehicles until the remedy is obtained." Second, FCA promised a remedy to repair the defect, despite disclaiming any knowledge of the "root cause" of the defect. Third, FCA claimed that its new software update would remedy the Fire Risk Defect, despite the failure of the software remedy initiated the prior year. Even after three recalls, however, FCA still has not provided an effective remedy for the Fire Risk Defect.

10.     Troublingly, the scope of FCA's recalls has also expanded every year. FCA's first safety recall notice in November 2023 (recall number B9A or the "2023 Recall") only applied to a limited set of 30,000 vehicles. FCA's second recall in late September 2024 (recall number 95B or the "2024 Recall") that expanded the scope of the 2023 Recall by nearly five times to include over 150,000 vehicles—118,230 Wrangler 4xes and 35,802 Grand Cherokee 4xe Class Vehicles.

11.     FCA's third and latest recall, issued in late 2025 (recall number 68C or the "2025 Recall") covers *all* 2020-2025 Jeep Wrangler 4xe and 2022-2026 Jeep Grand Cherokee 4xe vehicles, and FCA has given instruction *for the third time* to *all* of the owners or lessees of those Class Vehicles to "refrain from recharging" the Fire Risk Defect Class Vehicles and to "park away from structures or other vehicles until the remedy is obtained."

12.     This is *déjà vu* for Class Members who purchased or leased the 2021-2024 model year Class Vehicles. In fact, much of FCA's language of the 2025 68C Part 573 Recall Report appears to be identical to what owners were told in FCA's 2024 95B Part 573 Recall Report.

13.     FCA once again admits it does not know the "root cause" of the issue other than the fact that the HV "Battery Pack … may be susceptible to separator damage."

14.     Just as it did in its 2023 Recall, "FCA US has," once again, "determined the [prior year's recall] remedy is *ineffective* at detecting certain abnormalities within the HV battery which may lead to a fire." (Emphasis added.)

15.     In January 2026, FCA announced its latest remedy, which is a software remedy described in practically the same terms as the two recalls that preceded it. It

instructs dealers to "Perform the 68C PHEV HV Battery Analysis routine" and to "Update the Battery Pack Control Module (BPCM) Software if needed."[2]

16.     Plaintiffs understand this "remedy" to be diagnostic in nature, followed by replacement with *identical* HV Batteries that are thereby likely to maintain the *identical* defect for those Class Vehicles FCA determines to be in the worst shape. In other words, like the last two attempted and failed remedies, this is not a real "remedy" for the Class Vehicles.

17.     FCA has now abandoned these "4xe" models altogether. In January 2026, FCA announced that it was discontinuing the Jeep Wrangler 4xe and Jeep Grand Cherokee 4xe plug-in hybrids.[3] With dozens of reported fires and no foreseeable fix, FCA appears to have decided to cut its losses.

18.     As FCA cuts its losses and exits the plug-in hybrid market, quite predictably, battery fires in Class Vehicles have continued. These latest fires in Class Vehicles include those that received the most recent 2025 68C Recall "remedy", calling into serious doubt whether that already-dubious "remedy" will be effective.

---

[2] Ex. 85, FCA, Notice to Dealers, RCRIT-25V741-6153, https://www.nhtsa.gov/recalls?nhtsaId=25V741 (on file with NHTSA).
[3] Ex. 86, Caleb Miller, *Stellantis Axes Its Traditional Plug-In Hybrid Models for 2026*, Car & Driver (Jan. 6, 2026), https://www.caranddriver.com/news/a69958232/stellantis-traditional-plug-in-hybrids-discontinued-2026/.

19.     Another NHTSA complaint filed on January 28, 2026 asserts that the vehicle has "undergone three unsuccessful repair attempts," implying that the 2025 68C Recall remedy had already been completed. Nevertheless, the Class Vehicle began emitting smoke and "a burning smell … like met[a]l". As a result, the owner reported that (s)he would not "attempt to start, charge, or drive the vehicle" and that it would have to be towed to the nearest dealership.

20.     On February 12, 2026, another NHTSA contact reported yet another fire:

> I have a 2024 Jeep Wrangler Rubicon 4xe that was caught on fire at 2am 2/10/26 when parked in my garage. Jeep issed 68C recall for its defective EV battery, and I had finished the recall on 1/20/26 in Fremont CDJR in CA, but it was still caught on fire.  I have every thing saved, Ring footage and invoices from the dealer about recall. Just want to report that the remedy from Jeep does not help at all.

21.     The 2025 68C Recall is only several months old, but these reports suggest that this software remedy will be ineffective like the prior recalls, and leave the Class Vehicles vulnerable to catastrophic battery as well and the fires will continue. Given FCA's annually-renewed cycle of ineffective recalls, Plaintiffs and Class Members have little reason to believe that this third software remedy from the 2025 68C Recall will work, given FCA's track record of unsuccessful "fixes" that fail to address the fundamental design defects.

22.     Throughout the saga of the 2023 B9A, 2024 95B, and 2025 68C Recalls, FCA has never explained to Class Vehicle owners and lessees what constitutes a "safe" distance from an exploding vehicle. Nor has it explained what owners and lessees should do with their vehicles if they have no such place to park and charge their vehicles. As such, FCA has put Plaintiffs and putative Class Members in an untenable situation where they cannot realistically follow FCA's directive to park their Class Vehicles a "safe" distance from structures or other vehicles, and could not use the plug-in hybrid electric features for which they paid a hefty premium.

23.     Without the ability to safely recharge their Class Vehicles, Plaintiffs and putative Class Members are stuck with a plug-in hybrid electric vehicle that can only be driven as a gasoline-powered vehicle. This lack of battery charging actually renders the hybrid propulsion system in the Class Vehicles worse than useless—it becomes dead weight. The 800-lb hybrid propulsion system adds significant weight to the Class Vehicles, which leads them to consume more fuel than a gas-powered Wrangler when the hybrid electric features are underutilized. A plug-in electric hybrid vehicle that cannot be operated in electric mode and is less efficient than its gas-powered equivalent is not fit for its ordinary purpose.

24.     Owners and lessees of Class Vehicles have been injured in fact, incurred damages, and suffered ascertainable losses in money and property because

of the Fire Risk Defect. They paid thousands of dollars for a plug-in hybrid electric propulsion system that they cannot use, and will continue to incur damages until the Fire Risk Defect is actually fixed. Had Plaintiffs and putative Class Members known of the Fire Risk Defect, they would not have purchased or leased those vehicles; paid substantially less for them; or purchased non-hybrid versions of the vehicles, which are significantly less expensive.

25. As described above, FCA's multiple and delayed recall procedures have neither addressed the root cause of the Fire Risk Defect (which FCA still has not identified) nor remediated the harm to Plaintiffs and the putative Class Members. Instead, the poor implementation and lack of effectiveness of FCA's 2023, 2024 Recalls and, now the 2025 Recall, have merely contributed to the damages that Plaintiffs and putative Class Members suffered by lengthening their years-long loss of use of their Class Vehicles.

26. Notably, FCA's instruction not to charge the Class Vehicles actually conflicts with its own use guidelines for these HV Batteries, which state not to leave the HV Battery in a depleted state of charge for more than 30 days. In other words, by following FCA's Recall instructions, Plaintiffs risk degrading their already defective HV Batteries even further.

27. FCA has not only put Plaintiffs and putative Class Members in danger because it sold vehicles with the Fire Risk Defect, FCA has also deprived Class

- 9 -

Vehicle owners and lessees of the use of their vehicles and of the very fuel efficiency and other benefits FCA touted.

28.     Plaintiffs bring this class action on behalf of themselves and a proposed Class of all owners or lessees of a Class Vehicle to hold FCA accountable for its defective Class Vehicles and the damages these consumers have incurred as a result. Plaintiffs seek damages and a repair under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301-2312. Plaintiffs also seek damages and all available remedies for FCA's violations of state consumer protection acts, breaches of implied warranties, and unjust enrichment.

## II.     JURISDICTION

29.     This Court has original jurisdiction over this lawsuit under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) and (6), because Plaintiffs and Defendant are citizens of different states; there are more than 100 members of the Class and each Subclass (as defined herein); the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest, and costs; and Class Members reside across the United States. The citizenship of each party is described further below in the "Parties" section.

30.     This Court has personal jurisdiction over the Defendant by virtue of its transactions and business conducted in this judicial district, and because Defendant is headquartered in Michigan. Defendant has transacted and done business, and

violated statutory and common law, in the State of Michigan and in this judicial district.

### III. VENUE

31. Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendant transacts substantial business and is headquartered in this district.

### IV. PARTIES

**A.    Plaintiffs**

**Jocelyn and Daniel Grenier (Florida)**

32. Plaintiffs and proposed class representatives Jocelyn and Daniel Grenier (for purposes of this section, "Plaintiffs") are citizens of Florida, residing in Coral Springs, Florida. Plaintiffs purchased a 2024 Jeep Wrangler 4xe on or around October 17, 2024, from an authorized FCA dealer in Naples, Florida. Plaintiffs purchased the vehicle for personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or otherwise operating under ordinary use.

33. Before acquiring the Class Vehicle, Plaintiffs conducted extensive research, including reviewing the vehicle's features on the Jeep website. Based on this research, Plaintiffs believed FCA's representations (including implicit representations) regarding the dependability and safety of the Class Vehicle, as well as FCA's representations regarding the fuel economy savings and benefits of a hybrid vehicle with the ability to be driven in full electric mode. Plaintiff also

believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery indoors or at home. These were material reasons why Plaintiff purchased the Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles and the benefits of using the vehicle in its electric mode, at no point did FCA or its agents or other representatives disclose to Plaintiffs the Fire Risk Defect. Had FCA not concealed and instead properly disclosed the Fire Risk Defect, Plaintiffs would have known about the Fire Risk Defect.

34.     Plaintiffs also believed FCA's representations that the prior recall remedies had resolved the Fire Risk Defect, and that there was no ongoing risk of the HV Battery catching fire.

35.     Within days or weeks of purchasing their Class Vehicle, FCA announced the 2024 95B Recall and acknowledged that the 2023 Recall was "ineffective" in addressing the Fire Risk Defect. As with the prior recall notice, the 2024 Recall notice instructed consumers to refrain from charging their Class Vehicles and avoid parking indoors or near other vehicles due to the risk of an HV battery fire. Again, FCA launched a new "repair" that was another software update.

36.     Predictably, in October 2025, FCA announced a third battery recall for Plaintiff's Class Vehicle and acknowledged that the 2024 Recall was "ineffective" in addressing the Fire Risk Defect. FCA for the ***third time*** in as many years

- 12 -

instructed consumers to refrain from recharging their Class Vehicles and to avoid parking near other vehicles or structures due to the dangerous risk of HV battery fire.

37.     Like its preceding 2023 and 2024 Recalls, FCA promises a remedy that addresses the root cause of the Fire Risk Defect. FCA admits that it still does not know the root cause of the defect, even after purportedly conducting two full years of investigation following the 2023 and 2024 Recalls. Yet, FCA's third attempt at a remedy is yet another software flash. Given FCA's repeated representations regarding the safety of the vehicle, there is little reason to believe that this "remedy" will be effective. As a result, Plaintiff has limited driving and charging, and still cannot use the full functionality of its electric mode due to the ongoing risk of battery fire. Nor can Plaintiff take advantage of promised fuel savings or park near home.

38.     Had Plaintiffs known of the Fire Risk Defect, they would not have purchased the Jeep Wrangler 4xe, but would have instead chosen a safer vehicle. Plaintiffs have lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for its ordinary and advertised purposes, and Plaintiff cannot operate the vehicle in a manner in which it was intended to be used. FCA has put Plaintiff in the untenable position of having to drive an unsafe vehicle and has not provided any effective repair to address the actual cause of the Fire Risk Defect.

39.     Plaintiffs' Class Vehicle did not come with a warranty booklet from FCA. They neither saw, nor were informed of, any arbitration provision contained

- 13 -

in FCA's warranty booklet before or during the lease transaction for their Class Vehicle. Furthermore, Plaintiffs did not sign any agreement with FCA or otherwise consent to be bound by the terms of any arbitration provision within FCA's Warranty Booklet.

**William Dennis (Illinois)**

40.   Plaintiff and proposed class representative William Dennis (for purposes of this section, "Plaintiff") is a citizen of Illinois, residing in Matteson, Illinois. Plaintiff leased a 2024 Jeep Wrangler 4xe on or around February 23, 2024, from an authorized FCA dealer in Naperville, Illinois. Mr. Dennis leased the car for personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or operating under ordinary use.

41.   Before acquiring the Class Vehicle, Plaintiff conducted extensive research, which included reading literature on the FCA website, reviewing a set of buyback disclosure notices from FCA regarding the vehicle, discussions with the dealer sales representative, and reading other materials regarding the vehicle. Based on this research, Plaintiff believed FCA's representations (including implicit representations) regarding the dependability and safety of the Class Vehicle, as well as FCA's representations regarding the fuel economy savings and benefits of a hybrid vehicle with the ability to be driven in full electric mode. Plaintiff also believed that the Class Vehicle's plug-in functionality could be used to safely

recharge the Class Vehicle's electric battery indoors or at home. These were material reasons why Plaintiff purchased the Class Vehicle. However, despite touting the safety and dependability of the Class Vehicle and the benefits of using the vehicle in its electric mode, at no point did FCA or its agents or other representatives disclose the Fire Risk Defect to Plaintiff. Had FCA not concealed and instead properly disclosed the Fire Risk Defect, Plaintiff would have known about the Fire Risk Defect.

42.    Plaintiff also believed FCA's representations that the prior recall remedies had resolved the Fire Risk Defect, and that there was no ongoing risk of the HV Battery catching fire.

43.    Within a few months of leasing the Class Vehicle, FCA announced the 2024 95B Recall and acknowledged that the 2023 Recall was "ineffective" in addressing the Fire Risk Defect. As with the prior recall notice, the 2024 Recall notice instructed consumers to refrain from charging their Class Vehicles and avoid parking indoors or near other vehicles due to the risk of an HV battery fire. Again, FCA launched a new "repair" that was another software update.

44.    Predictably, in October 2025, FCA announced a third battery recall for Plaintiff's Class Vehicle and acknowledged that the 2024 Recall was "ineffective" in addressing the Fire Risk Defect. FCA for the ***third time*** in as many years

instructed consumers to refrain from recharging their Class Vehicles and to avoid parking near other vehicles or structures due to the dangerous risk of HV battery fire.

45.     Like its preceding 2023 and 2024 Recalls, FCA promises a remedy that addresses the root cause of the Fire Risk Defect. FCA admits that it still does not know the root cause of the defect, even after purportedly conducting two full years of investigation following the 2023 and 2024 Recalls. Yet, FCA's third attempt at a remedy is yet another software flash. Given FCA's repeated representations regarding the safety of the vehicle, there is little reason to believe that this "remedy" will be effective. As a result, Plaintiff has limited driving and charging, and still cannot use the full functionality of its electric mode due to the ongoing risk of battery fire. Nor can Plaintiff take advantage of promised fuel savings or park near home.

46.     Had Plaintiff known of the Fire Risk Defect, he would not have leased the Jeep Wrangler 4xe, but would have instead chosen a safer vehicle. Plaintiff has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiff cannot operate the vehicle in a manner in which it was intended to be used. FCA has put Plaintiff in the untenable position of having to drive an unsafe vehicle and has not provided any effective repair to address the actual cause of the Fire Risk Defect.

47.     Plaintiff's Class Vehicle did not come with a warranty booklet from FCA. He neither saw, nor was informed of, any arbitration provision contained in

FCA's warranty booklet before or during the lease transaction for his Class Vehicle. Furthermore, Plaintiff did not sign any agreement with FCA or otherwise consent to be bound by the terms of any arbitration provision within FCA's Warranty Booklet.

**Darren Wolberg (Maryland)**

48.     Plaintiff and proposed class representative Darren Wolberg (for the purposes of this section, "Plaintiff") is a citizen of Maryland, residing in Reisterstown, Maryland. Plaintiff leased a 2021 Jeep Wrangler 4xe on or around July 21, 2021, from an authorized FCA dealer. Plaintiff leased the vehicle for personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or otherwise operating under ordinary use.

49.     Before acquiring the Class Vehicle, Plaintiff conducted extensive research, including reviewing the vehicle's features on the Jeep website. Based on this research, Plaintiff believed FCA's representations (including implicit representations) regarding the dependability and safety of the Class Vehicle, as well as FCA's representations regarding the fuel economy savings and benefits of a hybrid vehicle with the ability to be driven in full electric mode. Plaintiff also believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery indoors and at home. These were material reasons why Plaintiff purchased the Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles and the benefits of using

- 17 -

the vehicle in its all electric mode, at no point did FCA or its agents or other representatives disclose the Fire Risk Defect to Plaintiff. Had FCA not concealed and instead properly disclosed the Fire Risk Defect, Plaintiff would have known about the Fire Risk Defect.

50.     After learning of FCA's 2023 Recall for the Fire Risk Defect, Plaintiff limited his use of the Class Vehicle and refrained from parking it indoors or near other vehicles. Plaintiff was also unable to use the Class Vehicle's fully electric drive mode for her regular commute due to charging restrictions from the recall. Moreover, because Plaintiff could no longer charge the battery for his plug-in hybrid vehicle as he ordinarily would, Plaintiff had to pay for additional gasoline that he otherwise would not have needed if the hybrid propulsion system was able to operate as intended. FCA has not compensated Plaintiff for the lost use of the Class Vehicle and other associated damages she sustained due to the Fire Risk Defect.

51.     FCA did not have any recall procedure available when it announced the 2023 Recall for the Fire Risk Defect. As a result, Plaintiff had to wait for several months before an FCA dealer was actually able to perform the attempted recall servicing on her Class Vehicle. When Plaintiff was finally able to get the attempted recall servicing performed, she was forced to leave the vehicle with the dealership overnight and did not receive a loaner vehicle.

52.    Even after the attempted recall servicing from the 2023 Recall was performed, Plaintiff remained concerned about driving, charging, and parking the Class Vehicle due to the ongoing dangers resulting from the Fire Risk Defect. FCA still has not identified the root cause of the Fire Risk Defect, and its supposed recall "fix" for the 2023 Recall involved a mere software update to the Class Vehicle's battery pack control module and a battery integrity test. FCA did not redesign or replace the dangerous and defective high voltage battery system at issue in Plaintiff's Class Vehicle.

53.    Plaintiff's concerns were not alleviated by FCA's software "fix", rather they were prolonged not once, but twice. In October 2024, FCA announced another battery recall for Plaintiff's Class Vehicle and acknowledged that the 2023 Recall was "ineffective" in addressing the Fire Risk Defect. As with the prior recall notice, the 2024 Recall notice instructed consumers to refrain from charging their Class Vehicles and avoid parking indoors or near other vehicles due to the risk of an HV battery fire. Again, FCA launched a new "repair" that was another software update. Again, FCA neither redesigned nor replaced the faulty HV Battery system in Plaintiff's Class Vehicle.

54.    Predictably, in October 2025, FCA announced a third battery recall for Plaintiff's Class Vehicle and acknowledged that the 2024 Recall was "ineffective" in addressing the Fire Risk Defect. FCA for the *third time* in as many years

- 19 -

instructed consumers to refrain from recharging their Class Vehicles and to avoid parking near other vehicles or structures due to the dangerous risk of HV battery fire.

55.     Like its preceding 2023 and 2024 Recalls, FCA promises a remedy that addresses the root cause of the Fire Risk Defect. FCA admits that it still does not know the root cause of the defect, even after purportedly conducting two full years of investigation following the 2023 and 2024 Recalls. Yet, FCA's third attempt at a remedy is yet another software flash. Given FCA's repeated representations regarding the safety of the vehicle, there is little reason to believe that this "remedy" will be effective. As a result, Plaintiff has limited driving and charging, and still cannot use the full functionality of its electric mode due to the ongoing risk of battery fire. Nor can Plaintiff take advantage of promised fuel savings or park near home.

56.     Had Plaintiff known of the Fire Risk Defect, he would not have purchased the Jeep Wrangler 4xe, but would have instead chosen a safer vehicle. Plaintiff has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiff cannot operate the vehicle in a manner in which it was intended to be used. FCA has put Plaintiff in the untenable position of having to drive an unsafe vehicle and has not provided any effective repair to address the actual cause of the Fire Risk Defect.

57.     Plaintiff's Class Vehicle did not come with a warranty booklet from FCA. He neither saw, nor was informed of, any arbitration provision contained in

FCA's warranty booklet before or during the lease transaction for his Class Vehicle. Furthermore, Plaintiff did not sign any agreement with FCA or otherwise consent to be bound by the terms of any arbitration provision within FCA's Warranty Booklet.

**Kelly Gaudreau (Massachusetts)**

58. Plaintiff and proposed class representative Kelly Gaudreau (for the purposes of this section, "Plaintiff") is a citizen of Massachusetts, residing in Hudson, Massachusetts. Plaintiff leased a 2023 Jeep Wrangler 4xe on or around April 25, 2023, from a an authorized FCA dealer in Natick, Massachusetts. Plaintiff leased the vehicle for personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or otherwise operating under ordinary use.

59. Before acquiring the Class Vehicle, Plaintiff conducted extensive research, including reviewing the vehicle's features on the Jeep website. Based on this research, Plaintiff believed FCA's representations (including implicit representations) regarding the dependability and safety of the Class Vehicle, as well as FCA's representations regarding the fuel economy savings and benefits of a hybrid vehicle with the ability to be driven in full electric mode, especially for her short commutes. Plaintiff also believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery indoors and at home. These were material reasons why Plaintiff purchased the Class Vehicle.

However, despite touting the safety and dependability of the Class Vehicles and the benefits of using the vehicle in its all electric mode, at no point did FCA or its agents or other representatives disclose the Fire Risk Defect to Plaintiff. Had FCA not concealed and instead properly disclosed the Fire Risk Defect, Plaintiff would have known about the Fire Risk Defect.

60.     After learning of FCA's 2023 Recall for the Fire Risk Defect, Plaintiff limited her use of the Class Vehicle and refrained from parking it indoors or near other vehicles. Plaintiff was also unable to use the Class Vehicle's fully electric drive mode for her regular commute due to charging restrictions from the recall. Moreover, because Plaintiff could no longer charge the battery for her plug-in hybrid vehicle as she ordinarily would, Plaintiff had to pay for additional gasoline that she otherwise would not have needed if the hybrid propulsion system was able to operate as intended. FCA has not compensated Plaintiff for the lost use of the Class Vehicle and other associated damages she sustained due to the Fire Risk Defect.

61.     FCA did not have any recall procedure available when it announced the 2023 Recall for the Fire Risk Defect. As a result, Plaintiff had to wait for several months before an FCA dealer was actually able to perform the attempted recall servicing on her Class Vehicle. When Plaintiff was finally able to get the attempted recall servicing performed, she was forced to leave the vehicle with the dealership overnight and did not receive a loaner vehicle.

- 22 -

62.     Even after the attempted recall servicing from the 2023 Recall was performed, Plaintiff remained concerned about driving, charging, and parking the Class Vehicle due to the ongoing dangers resulting from the Fire Risk Defect. FCA still has not identified the root cause of the Fire Risk Defect, and its supposed recall "fix" for the 2023 Recall involved a mere software update to the Class Vehicle's battery pack control module and a battery integrity test. FCA did not redesign or replace the dangerous and defective high voltage battery system at issue in Plaintiff's Class Vehicle.

63.     Plaintiff's concerns were not alleviated by FCA's software "fix", rather they were prolonged not once, but twice. In October 2024, FCA announced another battery recall for Plaintiff's Class Vehicle and acknowledged that the 2023 Recall was "ineffective" in addressing the Fire Risk Defect. As with the prior recall notice, the 2024 Recall notice instructed consumers to refrain from charging their Class Vehicles and avoid parking indoors or near other vehicles due to the risk of an HV battery fire. Again, FCA launched a new "repair" that was another software update. Again, FCA neither redesigned nor replaced the faulty HV Battery system in Plaintiff's Class Vehicle.

64.     Predictably, in October 2025, FCA announced a third battery recall for Plaintiff's Class Vehicle and acknowledged that the 2024 Recall was "ineffective" in addressing the Fire Risk Defect. FCA for the ***third time*** in as many years

instructed consumers to refrain from recharging their Class Vehicles and to avoid parking near other vehicles or structures due to the dangerous risk of HV battery fire.

65.     Like its preceding 2023 and 2024 Recalls, FCA promises a remedy that addresses the root cause of the Fire Risk Defect. FCA admits that it still does not know the root cause of the defect, even after purportedly conducting two full years of investigation following the 2023 and 2024 Recalls. Yet, FCA's third attempt at a remedy is yet another software flash. Given FCA's repeated representations regarding the safety of the vehicle, there is little reason to believe that this "remedy" will be effective. As a result, Plaintiff has limited driving and charging, and still cannot use the full functionality of its electric mode due to the ongoing risk of battery fire. Nor can Plaintiff take advantage of promised fuel savings or park near home.

66.     Had Plaintiff known of the Fire Risk Defect, she would not have leased the Jeep Wrangler 4xe, but would have instead chosen a safer vehicle. Plaintiff has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiff cannot operate the vehicle in a manner in which it was intended to be used. FCA has put Plaintiff in the untenable position of having to drive an unsafe vehicle and has not provided any effective repair to address the actual cause of the Fire Risk Defect.

67.     Plaintiff's Class Vehicle did not come with a warranty booklet from FCA. She neither saw, nor was informed of, any arbitration provision contained in

- 24 -

FCA's warranty booklet before or during the lease transaction for her Class Vehicle. Furthermore, Plaintiff did not sign any agreement with FCA or otherwise consent to be bound by the terms of any arbitration provision within FCA's Warranty Booklet.

**Michael and Kathy Hartweger (Missouri)**

68.    Plaintiffs and proposed class representatives Michael and Kathy Hartweger (for the purposes of this section, "Plaintiffs") are citizens of Illinois, residing in Bethalto, Illinois. Plaintiffs purchased a 2023 Jeep Grand Cherokee 4xe on or around July 23, 2025, from an authorized FCA dealer in Glendale, Missouri. Plaintiffs purchased the vehicle for personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or otherwise operating under ordinary use.

69.    Before acquiring the Class Vehicle, Plaintiffs conducted extensive research, including viewing the Jeep brand website and discussing the vehicle with the FCA dealership sales representative. Based on this research, Plaintiffs believed FCA's representations (including implicit representations) regarding the dependability and safety of the Class Vehicle, as well as FCA's representations regarding the fuel economy savings and benefits of a hybrid vehicle with the ability to be driven in full electric mode. Plaintiffs also believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery indoors and at home. These were material reasons why Plaintiffs purchased

the Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles and the benefits of using the vehicle in its all electric mode, at no point did FCA or its agents or other representatives disclose to Plaintiffs the Fire Risk Defect. Had FCA not concealed and instead properly disclosed the Fire Risk Defect, Plaintiffs would have known about the Fire Risk Defect.

70. Plaintiffs also believed FCA's representations that the prior recall remedies had resolved the Fire Risk Defect, and that there was no ongoing risk of the HV Battery catching fire.

71. Within a few months of purchasing the Class Vehicle, FCA announced the 2024 95B Recall and acknowledged that the 2023 Recall was "ineffective" in addressing the Fire Risk Defect. As with the prior recall notice, the 2024 Recall notice instructed consumers to refrain from charging their Class Vehicles and avoid parking indoors or near other vehicles due to the risk of an HV battery fire. Again, FCA launched a new "repair" that was another software update.

72. Predictably, in October 2025, FCA announced a third battery recall for Plaintiffs' Class Vehicle and acknowledged that the 2024 Recall was "ineffective" in addressing the Fire Risk Defect. FCA for the *third time* in as many years instructed consumers to refrain from recharging their Class Vehicles and to avoid parking near other vehicles or structures due to the dangerous risk of HV battery fire.

73.    Like its preceding 2023 and 2024 Recalls, FCA promises a remedy that addresses the root cause of the Fire Risk Defect. FCA admits that it still does not know the root cause of the defect, even after purportedly conducting two full years of investigation following the 2023 and 2024 Recalls. Yet, it has already proposed another software flash. Given FCA's repeated representations regarding the safety of the vehicle, there is little reason to believe that a fix is coming. As a result, Plaintiffs have limited driving and charging, and still cannot use the full functionality of its electric mode due to the ongoing risk of battery fire. Nor can Plaintiffs take advantage of promised fuel savings or park at home.

74.    Had Plaintiffs known of the Fire Risk Defect, they would not have purchased their Class Vehicle, but would have instead chosen a safer vehicle. Plaintiffs have lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiffs cannot operate the vehicle in a manner in which it was intended to be used. FCA has put Plaintiffs in the untenable position of having to drive an unsafe vehicle and has not provided any effective repair to address the actual cause of the Fire Risk Defect.

75.    Plaintiffs' Class Vehicle did not come with a warranty booklet from FCA. They neither saw, nor were informed of, any arbitration provision contained in FCA's warranty booklet before or during the purchase transaction for their Class Vehicle. Furthermore, Plaintiffs did not sign any agreement with FCA or otherwise

- 27 -

consent to be bound by the terms of any arbitration provision within FCA's Warranty Booklet.

### Gregory DeAngelo (New York)

76.    Plaintiff and proposed class representative Gregory DeAngelo (for the purposes of this section, "Plaintiff") is a citizen of New York, residing in Greenfield Center, New York. Plaintiff leased a 2024 Jeep Wrangler 4xe on or around August 16, 2023, from an authorized FCA dealer in Clifton Park, New York. Plaintiff leased the vehicle for personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or otherwise operating under ordinary use.

77.    Before acquiring the Class Vehicle, Plaintiff conducted extensive research, including reviewing the Jeep website, viewing advertisements regarding the plug-in hybrid Class Vehicle,  and discussing the plug-in hybrid capabilities of the Class Vehicle with an FCA dealership representative. Based on this research, Plaintiff believed FCA's representations (including implicit representations) regarding the dependability and safety of the Class Vehicle, as well as FCA's representations regarding the fuel economy savings and benefits of a hybrid vehicle with the ability to be driven in full electric mode, especially for short commutes. Plaintiff also believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery indoors and at home. These were

material reasons why Plaintiff leased the Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles and the benefits of using the vehicle in its all electric mode, at no point did FCA or its agents, or other representatives disclose the Fire Risk Defect to Plaintiff.

78.    Plaintiff also believed FCA's representations that the prior recall remedies had resolved the Fire Risk Defect, and that there was no ongoing risk of the HV Battery catching fire.

79.    After learning of FCA's 2023 Recall for the Fire Risk Defect, Plaintiff limited his family's use of the Class Vehicle and refrained from parking it indoors or near other vehicles. Plaintiff and/or Plaintiff's family member(s) were also unable to use the Class Vehicle's fully electric drive mode for their regular commute(s) due to charging restrictions from the recall. Moreover, because Plaintiff and/or Plaintiff's family members could no longer charge the battery in his plug-in hybrid vehicle as they ordinarily would, Plaintiff and Plaintiff's family member(s) had to pay for additional gasoline that they otherwise would not have needed if the hybrid propulsion system was operable as intended. FCA has not compensated Plaintiff for the lost use of the Class Vehicle and other associated damages sustained due to the Fire Risk Defect.

80.    FCA did not have any recall procedure available when it announced the 2023 Recall for the Fire Risk Defect. As a result, Plaintiff had to wait for several

months before an FCA dealer was actually able to perform the attempted recall servicing on his Class Vehicle.

81.    Even after the attempted recall servicing from the 2023 Recall was performed, Plaintiff remained concerned about driving, charging, and parking the Class Vehicle due to the ongoing dangers resulting from the Fire Risk Defect. FCA still has not identified the root cause of the Fire Risk Defect, and its supposed recall "fix" for the 2023 Recall involved a mere software update to the Class Vehicle's battery pack control module and a battery integrity test. FCA did not redesign or replace the dangerous and defective high voltage battery system at issue in Plaintiff's Class Vehicle

82.    Plaintiff's concerns were not alleviated by FCA's software "fix", rather they were prolonged not once, but twice. In October 2024, FCA announced another battery recall for Plaintiff's Class Vehicle and acknowledged that the 2023 Recall was "ineffective" in addressing the Fire Risk Defect. As with the prior recall notice, the 2024 Recall notice instructed consumers to refrain from charging their Class Vehicles and avoid parking indoors or near other vehicles due to the risk of an HV battery fire. Again, FCA launched a new "repair" that was another software update. Again, FCA neither redesigned nor replaced the faulty HV Battery system in Plaintiff's Class Vehicle.

83.    Predictably, in October 2025, FCA announced a third battery recall for Plaintiff's Class Vehicle and acknowledged that the 2024 Recall was "ineffective" in addressing the Fire Risk Defect. FCA for the ***third time*** in as many years instructed consumers to refrain from recharging their Class Vehicles and to avoid parking near other vehicles or structures due to the dangerous risk of HV battery fire.

84.    Like its preceding 2023 and 2024 Recalls, FCA promises a remedy that addresses the root cause of the Fire Risk Defect. FCA admits that it still does not know the root cause of the defect, even after purportedly conducting two full years of investigation following the 2023 and 2024 Recalls. Yet, it has already proposed another software flash. Given FCA's repeated representations regarding the safety of the vehicle, there is little reason to believe that a fix is coming. As a result, Plaintiff has limited driving and charging, and still cannot use the full functionality of its electric mode due to the ongoing risk of battery fire. Nor can Plaintiff take advantage of promised fuel savings or park at home

85.    Had Plaintiff known of the Fire Risk Defect, he would not have leased the Jeep Wrangler 4xe, but would have instead chosen a safer vehicle. Plaintiff has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes for him and his family members, and Plaintiff cannot operate the vehicle in a manner in which it was intended to be used. FCA has put Plaintiff in the untenable position of having to drive an unsafe

vehicle and has failed to provide any effective repair to address the actual cause of the Fire Risk Defect.

86.     Plaintiff's Class Vehicle did not come with a warranty booklet from FCA. He neither saw, nor was informed of, any arbitration provision contained in FCA's warranty booklet before or during the lease transaction for his Class Vehicle. Furthermore, Plaintiff did not sign any agreement with FCA or otherwise consent to be bound by the terms of any arbitration provision within FCA's Warranty Booklet.

**Veronica Pettis (North Carolina)**

87.     Plaintiff and proposed class representative Veronica Pettis (for purposes of this section, "Plaintiff") is a citizen of North Carolina, residing in Charlotte, North Carolina. Plaintiff purchased a 2021 Jeep Wrangler 4xe on April 29, 2023, from an used car dealer in Winston-Salem, North Carolina. Ms. Pettis purchased the vehicle for business, personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or otherwise operating under ordinary use.

88.     Before acquiring the Class Vehicle, Plaintiff conducted extensive research, including reading online reviews of the Class Vehicle, the Carfax report, the dealership website, and speaking with the dealership sales representative. Based on this research, Plaintiff believed FCA's representations (including implicit representations) regarding the dependability and safety of the Class Vehicle, as well

as FCA's representations regarding the fuel economy savings and benefits of a hybrid vehicle with the ability to be driven in full electric mode. Plaintiff also believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery indoors or at home. These were material reasons why Plaintiff purchased the Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles and the benefits of using the vehicle in its electric mode, at no point did FCA or its agents, dealers, or other representatives disclose the Fire Risk Defect to Plaintiff. Had FCA not concealed and instead properly disclosed the Fire Risk Defect, Plaintiff would have known about the Fire Risk Defect.

89.   After learning of FCA's 2023 Recall for the Fire Risk Defect, Plaintiff limited her use and charging of the Class Vehicle. Plaintiff has been unable to use the Class Vehicle's fully electric drive mode and has stopped driving the vehicle for her regular commute due to charging restrictions from the recall. In addition, it has been impossible for Plaintiff to park the Class Vehicle away from structures and other vehicles as FCA instructed. Moreover, because Plaintiff can no longer charge the battery for her plug-in hybrid vehicle as she ordinarily would, Plaintiff had to pay for additional gasoline that she otherwise would not have needed if the hybrid propulsion system operated as intended. FCA has not compensated Plaintiff for the

lost use of the Class Vehicle and other associated damages she sustained due to the Fire Risk Defect.

90.     Even after the attempted recall servicing from the 2023 Recall was performed, Plaintiff remained concerned about driving, charging, and parking the Class Vehicle due to the ongoing dangers resulting from the Fire Risk Defect. FCA still has not identified the root cause of the Fire Risk Defect, and its supposed recall "fix" for the 2023 Recall involved a mere software update to the Class Vehicle's battery pack control module and a battery integrity test. FCA did not redesign or replace the dangerous and defective high voltage battery system at issue in Plaintiff's Class Vehicle.

91.     Plaintiff's concerns were not alleviated by FCA's software "fix", rather they were prolonged not once, but twice. In October 2024, FCA announced another battery recall for Plaintiff's Class Vehicle and acknowledged that the 2023 Recall was "ineffective" in addressing the Fire Risk Defect. As with the prior recall notice, the 2024 Recall notice instructed consumers to refrain from charging their Class Vehicles and avoid parking indoors or near other vehicles due to the risk of an HV battery fire. Again, FCA launched a new "repair" that was another software update. Again, FCA neither redesigned nor replaced the faulty HV Battery system in Plaintiff's Class Vehicle.

92.     Predictably, in October 2025, FCA announced a third battery recall for Plaintiff's Class Vehicle and acknowledged that the 2024 Recall was "ineffective" in addressing the Fire Risk Defect. FCA for the ***third time*** in as many years instructed consumers to refrain from recharging their Class Vehicles and to avoid parking near other vehicles or structures due to the dangerous risk of HV battery fire.

93.     Like its preceding 2023 and 2024 Recalls, FCA promises a remedy that addresses the root cause of the Fire Risk Defect. FCA admits that it still does not know the root cause of the defect, even after purportedly conducting two full years of investigation following the 2023 and 2024 Recalls. Yet, it has already proposed another software flash. Given FCA's repeated representations regarding the safety of the vehicle, there is little reason to believe that a fix is coming. As a result, Plaintiff has limited driving and charging, and still cannot use the full functionality of its electric mode due to the ongoing risk of battery fire. Nor can Plaintiff take advantage of promised fuel savings or park at home.

94.     Had Plaintiff known of the Fire Risk Defect, she would not have purchased her Class vehicle, but would have instead chosen a safer vehicle. Plaintiff has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiff cannot operate the vehicle in a manner in which it was intended to be used. FCA has put Plaintiff in the

untenable position of having to drive an unsafe vehicle and has not provided any effective repair to address the actual cause of the Fire Risk Defect.

95. Plaintiff's Class Vehicle did not come with a warranty booklet from FCA. She neither saw, nor was informed of, any arbitration provision contained in FCA's warranty booklet before or during the lease transaction for her Class Vehicle. Furthermore, Plaintiff did not sign any agreement with FCA or otherwise consent to be bound by the terms of any arbitration provision within FCA's Warranty Booklet.

**Michael Balzer (Oregon)**

96. Plaintiff and proposed class representative Michael Balzer (for the purposes of this section, "Plaintiff") is a citizen of Washington, residing in Camas, Washington. Plaintiff leased a 2023 Jeep Wrangler 4xe on or around July 24, 2023, from an authorized FCA dealer in Klamath Falls, Oregon. Plaintiff purchased the vehicle for personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or otherwise operating under ordinary use.

97. Before acquiring the Class Vehicle, Plaintiff conducted extensive research, including reading reviews of the Class vehicle, reviewing the vehicle's features on the Jeep website, speaking with the salesperson at the FCA dealership about the vehicle. Based on this research, Plaintiff believed FCA's representations (including implicit representations) regarding the dependability and safety of the

Class Vehicle, as well as FCA's representations regarding the fuel economy savings and benefits of a hybrid vehicle with the ability to be driven in full electric mode. Plaintiff also believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery indoors or at home. These were material reasons why Plaintiff purchased the Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles and the benefits of using the vehicle in its electric mode, at no point did FCA or its agents or other representatives disclose the Fire Risk Defect to Plaintiff. Had FCA not concealed and instead properly disclosed the Fire Risk Defect, Plaintiff would have known about the Fire Risk Defect.

98.     After learning of FCA's 2024 Recall for the Fire Risk Defect, Plaintiff limited his use of the Class Vehicle and refrained from parking it indoors or near other vehicles. Moreover, because Plaintiff could no longer charge the plug-in hybrid vehicle as he ordinarily would, Plaintiff had to pay for additional gas that he otherwise would not have needed if the hybrid propulsion system was able to operate as intended. FCA has not compensated Plaintiff for the lost use of the Class Vehicle and other associated damages he sustained due to the Fire Risk Defect.

99.     FCA did not have any recall procedure available when it announced the 2024 Recall for the Fire Risk Defect. As a result, Plaintiff had to wait for months

before an FCA dealer was actually able to perform the attempted recall servicing on his Class Vehicle.

100. Even after the attempted recall servicing from the 2024 Recall was performed, Plaintiff remained concerned about driving, charging, and parking the Class Vehicle due to the ongoing dangers resulting from the Fire Risk Defect. FCA still has not identified the root cause of the Fire Risk Defect, and its supposed recall "fix" for the 2024 Recall involved a mere software update to the Class Vehicle's battery pack control module and a battery integrity test. FCA did not redesign or replace the dangerous and defective high voltage battery system at issue in Plaintiff's Class Vehicle.

101. Predictably, in October 2025, FCA announced a third battery recall for Plaintiff's Class Vehicle and acknowledged that the 2024 Recall was "ineffective" in addressing the Fire Risk Defect. FCA for the *third time* in as many years instructed consumers to refrain from recharging their Class Vehicles and to avoid parking near other vehicles or structures due to the dangerous risk of HV battery fire.

102. Like its preceding 2023 and 2024 Recalls, FCA promises a remedy that addresses the root cause of the Fire Risk Defect. FCA admits that it still does not know the root cause of the defect, even after purportedly conducting two full years of investigation following the 2023 and 2024 Recalls. Yet, it has already proposed another software flash. Given FCA's repeated representations regarding the safety

of the vehicle, there is little reason to believe that a fix is coming. As a result, Plaintiffs have limited driving and charging, and still cannot use the full functionality of its electric mode due to the ongoing risk of battery fire. Nor can Plaintiffs take advantage of promised fuel savings or park at home.

103.    Had Plaintiff known of the Fire Risk Defect, he would not have purchased his Class Vehicle, but would have instead chosen a safer vehicle. Plaintiff has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiff cannot operate the vehicle in a manner in which it was intended to be used. FCA has put Plaintiff in the untenable position of having to drive an unsafe vehicle and has not provided any effective repair to address the actual cause of the Fire Risk Defect.

104.    Plaintiff's Class Vehicle did not come with a warranty booklet from FCA. He neither saw, nor was informed of, any arbitration provision contained in FCA's warranty booklet before or during the lease transaction for his Class Vehicle. Furthermore, Plaintiff did not sign any agreement with FCA or otherwise consent to be bound by the terms of any arbitration provision within FCA's Warranty Booklet.

**Abbey Marie Robson (Pennsylvania)**

105.    Plaintiff and proposed class representative Abbey Marie Robson (for purposes of this section, "Plaintiff") is a citizen of Pennsylvania, residing in Fairview, Pennsylvania. Plaintiff Robson purchased a 2024 Jeep Grand Cherokee

- 39 -

4xe on or around February 24, 2024, from an authorized FCA dealer in Edinboro, Pennsylvania. Plaintiff purchased the car for personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or operating under ordinary use.

106. Before acquiring the Class Vehicle, Plaintiff conducted extensive research, which included test driving the vehicle, reading literature on the FCA website, speaking with the FCA dealer sales representative, and reading other materials regarding the vehicle. Based on this research, Plaintiff believed FCA's representations (including implicit representations) regarding the dependability and safety of the Class Vehicle, as well as FCA's representations regarding the fuel economy savings and benefits of a hybrid vehicle with the ability to be driven in full electric mode. Plaintiff also believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery indoors or at home. These were material reasons why Plaintiff purchased the Class Vehicle. However, despite touting the safety and dependability of the Class Vehicle and the benefits of using the vehicle in its electric mode, at no point did FCA or its agents or other representatives disclose the Fire Risk Defect to Plaintiff. Had FCA not concealed and instead properly disclosed the Fire Risk Defect, Plaintiff would have known about the Fire Risk Defect.

107. Plaintiff also believed FCA's representations that the prior recall remedies had resolved the Fire Risk Defect, and that there was no ongoing risk of the HV Battery catching fire.

108. Within a few months of leasing the Class Vehicle, FCA announced the 2024 95B Recall and acknowledged that the 2023 Recall was "ineffective" in addressing the Fire Risk Defect. As with the prior recall notice, the 2024 Recall notice instructed consumers to refrain from charging their Class Vehicles and avoid parking indoors or near other vehicles due to the risk of an HV battery fire. Again, FCA launched a new "repair" that was another software update. Predictably, in October 2025, FCA announced a third battery recall for Plaintiff's Class Vehicle and acknowledged that the 2024 Recall was "ineffective" in addressing the Fire Risk Defect. FCA for the ***third time*** in as many years instructed consumers to refrain from recharging their Class Vehicles and to avoid parking near other vehicles or structures due to the dangerous risk of HV battery fire.

109. Like its preceding 2023 and 2024 Recalls, FCA promises a remedy that addresses the root cause of the Fire Risk Defect. FCA admits that it still does not know the root cause of the defect, even after purportedly conducting two full years of investigation following the 2023 and 2024 Recalls. Yet, it has already proposed another software flash. Given FCA's repeated representations regarding the safety of the vehicle, there is little reason to believe that a fix is coming. As a result, Plaintiff

has limited driving and charging, and still cannot use the full functionality of its electric mode due to the ongoing risk of battery fire. Nor can Plaintiff take advantage of promised fuel savings or park at home.

110.   Had Plaintiff known of the Fire Risk Defect, she would not have purchased her Class Vehicle but would have instead chosen a safer vehicle. Plaintiff has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiff cannot operate the vehicle in a manner in which it was intended to be used. FCA has put Plaintiff in the untenable position of having to drive an unsafe vehicle and has not provided any effective repair to address the actual cause of the Fire Risk Defect.

111.   Plaintiff's Class Vehicle did not come with a warranty booklet from FCA. She neither saw, nor was informed of, any arbitration provision contained in FCA's warranty booklet before or during the lease transaction for her Class Vehicle. Furthermore, Plaintiff did not sign any agreement with FCA or otherwise consent to be bound by the terms of any arbitration provision within FCA's Warranty Booklet.

**David Aiello (Tennessee)**

112.   Plaintiff and proposed class representative David Aiello (for purposes of this section, "Plaintiff") is a citizen of Tennessee, currently residing in Mount Juliet, Tennessee. Plaintiff purchased a 2022 Jeep Wrangler 4xe on or around June 29, 2023, from a dealer in Franklin, Tennessee. Mr. Aiello purchased the vehicle for

personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or operating under ordinary use.

113. Before acquiring the Class Vehicle, Plaintiff conducted extensive research, which included reading literature on the FCA website, reviewing a set of buyback disclosure notices from FCA regarding the vehicle, discussions with the dealer sales representative, and reading other materials regarding the vehicle. Based on this research, Plaintiff believed FCA's representations (including implicit representations) regarding the dependability and safety of the Class Vehicle, as well as FCA's representations regarding the fuel economy savings and benefits of a hybrid vehicle with the ability to be driven in full electric mode. Plaintiff also believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery indoors or at home. These were material reasons why Plaintiff leased the Class Vehicle. However, despite touting the safety and dependability of the Class Vehicle and the benefits of using the vehicle in its electric mode, at no point did FCA or its agents or other representatives disclose the Fire Risk Defect to Plaintiff. Had FCA not concealed and instead properly disclosed the Fire Risk Defect, Plaintiff would have known about the Fire Risk Defect.

114. After learning of FCA's 2023 Recall for the Fire Risk Defect, Plaintiff limited his use of the Class Vehicle and was unable to park the car in his garage or charge the vehicle due to the risk of fire. Plaintiff was unable to use the vehicle

charger that was installed in his home to charge the Class Vehicle, and he was also unable to use the vehicle's fully electric drive mode for short excursions due to charging restrictions from the recall. Moreover, because Plaintiff could no longer charge the plug-in hybrid vehicle as he ordinarily would, Plaintiff had to pay for additional gas that he otherwise would not have needed if the hybrid propulsion system was able to operate as intended. FCA has not compensated Plaintiff for the lost use of the Class Vehicle and other associated damages he sustained due to the Fire Risk Defect.

115. Even after the attempted recall servicing from the 2023 Recall was performed, Plaintiff remained concerned about driving, charging, and parking the Class Vehicle due to the ongoing dangers resulting from the Fire Risk Defect. FCA still has not identified the root cause of the Fire Risk Defect, and its supposed recall "fix" for the 2023 Recall involved a mere software update to the Class Vehicle's battery pack control module and a battery integrity test. FCA did not redesign or replace the dangerous and defective high voltage battery system at issue in Plaintiff's Class Vehicle.

116. Plaintiff's concerns were not alleviated by FCA's software "fix", rather they were prolonged not once, but twice. In October 2024, FCA announced another battery recall for Plaintiff's Class Vehicle and acknowledged that the 2023 Recall was "ineffective" in addressing the Fire Risk Defect. As with the prior recall notice,

the 2024 Recall notice instructed consumers to refrain from charging their Class Vehicles and avoid parking indoors or near other vehicles due to the risk of an HV battery fire. Again, FCA launched a new "repair" that was another software update. Again, FCA neither redesigned nor replaced the faulty HV Battery system in Plaintiff's Class Vehicle.

117.   Predictably, in October 2025, FCA announced a third battery recall for Plaintiff's Class Vehicle and acknowledged that the 2024 Recall was "ineffective" in addressing the Fire Risk Defect. FCA for the *third time* in as many years instructed consumers to refrain from recharging their Class Vehicles and to avoid parking near other vehicles or structures due to the dangerous risk of HV battery fire.

118.   Like its preceding 2023 and 2024 Recalls, FCA promises a remedy that addresses the root cause of the Fire Risk Defect. FCA admits that it still does not know the root cause of the defect, even after purportedly conducting two full years of investigation following the 2023 and 2024 Recalls. Yet, FCA's third attempt at a remedy is yet another software flash. Given FCA's repeated representations regarding the safety of the vehicle, there is little reason to believe that this "remedy" will be effective. As a result, Plaintiff has limited driving and charging, and still cannot use the full functionality of its electric mode due to the ongoing risk of battery fire. Nor can Plaintiff take advantage of promised fuel savings or park near home.

119. Had Plaintiff known of the Fire Risk Defect, he would not have purchased the Jeep Wrangler 4xe, but would have instead chosen a safer vehicle. Plaintiff has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiff cannot operate the vehicle in a manner in which it was intended to be used. FCA has put Plaintiff in the untenable position of having to drive an unsafe vehicle and has not provided any effective repair to address the actual cause of the Fire Risk Defect.

120. Plaintiff's Class Vehicle did not come with a warranty booklet from FCA. He neither saw, nor was informed of, any arbitration provision contained in FCA's warranty booklet before or during the lease transaction for his Class Vehicle. Furthermore, Plaintiff did not sign any agreement with FCA or otherwise consent to be bound by the terms of any arbitration provision within FCA's Warranty Booklet.

**Sean Ely and Kristine Ely (Utah)**

121. Plaintiffs and proposed class representatives Sean Ely and Kristine Ely (for the purposes of this section, "Plaintiffs") are citizens of Wisconsin, residing in Appleton, Wisconsin. Plaintiffs purchased a 2021 Jeep Wrangler 4xe on or around February 18, 2022, from an authorized FCA dealer in Bountiful, Utah. Plaintiffs purchased the vehicle for personal, family, and household use, and had a reasonable expectation that the Class Vehicle would not catch on fire while charging or otherwise operating under ordinary use.

- 46 -

122. Before acquiring the Class Vehicle, Plaintiffs conducted extensive research, including going on the Jeep website and building out his individual vehicle for purchase, looking at the reported mileage and the specifics of the hybrid engine, and test driving the car itself. Based on this research, Plaintiffs believed FCA's representations (including implicit representations) regarding the dependability and safety of the Class Vehicle, as well as FCA's representations regarding the fuel economy savings and benefits of a hybrid vehicle with the ability to be driven in full electric mode. Plaintiffs also believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery indoors and at home. These were material reasons why Plaintiffs purchased the Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles and the benefits of using the vehicle in its all electric mode, at no point did FCA or its agents or other representatives disclose to Plaintiffs the Fire Risk Defect. Had FCA not concealed and instead properly disclosed the Fire Risk Defect, Plaintiff would have known about the Fire Risk Defect.

123. After learning of FCA's 2023 Recall for the Fire Risk Defect, Plaintiffs refrained from using the electric mode of the Class Vehicle and avoided parking it inside his garage at home or near other cars he owned. Moreover, because Plaintiffs could no longer charge the battery on the plug-in hybrid vehicle as he ordinarily would, Plaintiffs had to pay for additional gasoline that he otherwise would not have

- 47 -

needed if the hybrid propulsion system was able to operate as intended. FCA has not compensated Plaintiffs for the lost use of the Class Vehicle and other associated damages he sustained due to the Fire Risk Defect.

124.   FCA did not have any recall procedure available when it announced the 2023 Recall for the Fire Risk Defect. As a result, Plaintiff had to wait for several months before an FCA dealer was actually able to perform the attempted recall servicing on his Class Vehicle. When Plaintiff was finally able to get the attempted recall servicing performed, he was forced to leave the vehicle with the dealership for several days and did not receive a loaner vehicle.

125.   Even after the attempted recall servicing from the 2023 Recall was performed, Plaintiffs remained concerned about driving, charging, and parking the Class Vehicle due to the ongoing dangers resulting from the Fire Risk Defect. FCA still has not identified the root cause of the Fire Risk Defect, and its supposed recall "fix" for the 2023 Recall involved a mere software update to the Class Vehicle's battery pack control module and a battery integrity test. FCA did not redesign or replace the dangerous and defective high voltage battery system at issue in Plaintiff's Class Vehicle.

126.   Plaintiffs' concerns were not alleviated by FCA's software "fix", rather they were prolonged not once, but twice. In October 2024, FCA announced another battery recall for Plaintiff's Class Vehicle and acknowledged that the 2023 Recall

was "ineffective" in addressing the Fire Risk Defect. As with the prior recall notice, the 2024 Recall notice instructed consumers to refrain from charging their Class Vehicles and avoid parking indoors or near other vehicles due to the risk of an HV battery fire. Again, FCA launched a new "repair" that was another software update. Again, FCA neither redesigned nor replaced the faulty HV Battery system in Plaintiff's Class Vehicle.

127.   Predictably, in October 2025, FCA announced a third battery recall for Plaintiff's Class Vehicle and acknowledged that the 2024 Recall was "ineffective" in addressing the Fire Risk Defect. FCA for the *third time* in as many years instructed consumers to refrain from recharging their Class Vehicles and to avoid parking near other vehicles or structures due to the dangerous risk of HV battery fire.

128.   Like its preceding 2023 and 2024 Recalls, FCA promises a remedy that addresses the root cause of the Fire Risk Defect. FCA admits that it still does not know the root cause of the defect, even after purportedly conducting two full years of investigation following the 2023 and 2024 Recalls. Yet, FCA's third attempt at a remedy is yet another software flash. Given FCA's repeated representations regarding the safety of the vehicle, there is little reason to believe that this "remedy" will be effective. As a result, Plaintiff has limited driving and charging, and still cannot use the full functionality of its electric mode due to the ongoing risk of battery fire. Nor can Plaintiff take advantage of promised fuel savings or park near home.

129. Had Plaintiffs known of the Fire Risk Defect, they would not have purchased the Jeep Wrangler 4xe, but would have instead chosen a safer vehicle. Plaintiff has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiff cannot operate the vehicle in a manner in which it was intended to be used. FCA has put Plaintiff in the untenable position of having to drive an unsafe vehicle and has not provided any effective repair to address the actual cause of the Fire Risk Defect.

130. Plaintiffs' Class Vehicle did not come with a warranty booklet from FCA. They neither saw, nor were informed of, any arbitration provision contained in FCA's warranty booklet before or during the lease transaction for their Class Vehicle. Furthermore, Plaintiffs did not sign any agreement with FCA or otherwise consent to be bound by the terms of any arbitration provision within FCA's Warranty Booklet.

**Christopher Schrobilgen (Washington)**

131. Plaintiff and proposed class representative Christopher Schrobilgen (for the purposes of this section, "Plaintiff") is a citizen of Washington, residing in Gig Harbor, Washington. Plaintiff leased a 2023 Jeep Wrangler 4xe on or around January 31, 2023, from an authorized FCA dealer in Bremerton, Washington. Plaintiff leased the vehicle for personal, family, and household use, and had a

reasonable expectation that the Class Vehicle would not catch on fire while charging or otherwise operating under ordinary use.

132. Before acquiring the Class Vehicle, Plaintiff conducted extensive research, including reviewing the vehicle's features and specifications on the Jeep website and speaking with the FCA dealership salesperson about the vehicle. Based on this research, Plaintiff believed FCA's representations (including implicit representations) regarding the dependability and safety of the Class Vehicle, as well as FCA's representations regarding the fuel economy savings and benefits of a hybrid vehicle with the ability to be driven in full electric mode. Plaintiff also believed that the Class Vehicle's plug-in functionality could be used to safely recharge the Class Vehicle's electric battery indoors and at home. These were material reasons why Plaintiff leased the Class Vehicle. However, despite touting the safety and dependability of the Class Vehicles and the benefits of using the vehicle in its all electric mode, at no point did FCA or its agents, dealers, or other representatives disclose the Fire Risk Defect to Plaintiff. Had FCA not concealed and instead properly disclosed the Fire Risk Defect, Plaintiff would have known about the Fire Risk Defect.

133. After learning of FCA's 2023 Recall for the Fire Risk Defect, Plaintiff no longer charges his Class Vehicle. Plaintiff has been unable to use the Class Vehicle's fully electric drive mode and has stopped driving the vehicle for his regular

commute due to charging restrictions from the recall. In addition, it has been impossible for Plaintiff to park the Class Vehicle away from structures and other vehicles as FCA instructed. Moreover, because Plaintiff can no longer charge the battery for his plug-in hybrid vehicle as he ordinarily would, Plaintiff had to pay for additional gasoline that he otherwise would not have needed if the hybrid propulsion system operated as intended. FCA has not compensated Plaintiff for the lost use of the Class Vehicle and other associated damages he sustained due to the Fire Risk Defect.

134.   Even after the attempted recall servicing from the 2023 Recall was performed, Plaintiff remained concerned about driving, charging, and parking the Class Vehicle due to the ongoing dangers resulting from the Fire Risk Defect. FCA still has not identified the root cause of the Fire Risk Defect, and its supposed recall "fix" for the 2023 Recall involved a mere software update to the Class Vehicle's battery pack control module and a battery integrity test. FCA did not redesign or replace the dangerous and defective high voltage battery system at issue in Plaintiff's Class Vehicle.

135.   Plaintiff's concerns were not alleviated by FCA's software "fix," rather they were prolonged not once, but twice. In October 2024, FCA announced another battery recall for Plaintiff's Class Vehicle and acknowledged that the 2023 Recall was "ineffective" in addressing the Fire Risk Defect. As with the prior recall notice,

the 2024 Recall notice instructed consumers to refrain from charging their Class Vehicles and avoid parking indoors or near other vehicles due to the risk of an HV battery fire. Again, FCA launched a new "repair" that was another software update. Again, FCA neither redesigned nor replaced the faulty HV Battery system in Plaintiff's Class Vehicle.

136. Predictably, in October 2025, FCA announced a third battery recall for Plaintiff's Class Vehicle and acknowledged that the 2024 Recall was again "ineffective" in addressing the Fire Risk Defect. FCA for the *third time* in as many years instructed consumers to refrain from recharging their Class Vehicles and to avoid parking near other vehicles or structures due to the dangerous risk of HV battery fire.

137. Like its preceding 2023 and 2024 Recalls, FCA promises a remedy that addresses the root cause of the Fire Risk Defect. FCA admits that it still does not know the root cause of the defect, even after purportedly conducting two full years of investigation following the 2023 and 2024 Recalls. Yet it has already proposed another software flash. Given FCA's repeated representations regarding the safety of the vehicle, there is little reason to believe that a fix is coming. As a result, Plaintiff has limited driving and stopped charging, and still cannot use the full functionality of its electric mode due to the ongoing risk of battery fire. Nor can Plaintiff take advantage of promised fuel savings or park at home.

138. Had Plaintiff known of the Fire Risk Defect, he would not have leased the Jeep Grand Cherokee 4xe, but would have instead chosen a safer vehicle. Plaintiff has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes, and Plaintiff cannot operate the vehicle in the manner in which it was intended to be used. FCA has put Plaintiff in the untenable position of having to drive an unsafe vehicle and has not provided any effective repair to address the actual cause of the Fire Risk Defect.

139. Plaintiff's Class Vehicle did not come with a warranty booklet from FCA. He neither saw, nor was informed of, any arbitration provision contained in FCA's warranty booklet before or during the lease transaction for his Class Vehicle. Furthermore, Plaintiff did not sign any agreement with FCA or otherwise consent to be bound by the terms of any arbitration provision within FCA's Warranty Booklet.

### B.     Defendant

140. Defendant FCA US, LLC ("FCA"), formerly known as Chrysler Group, is a Delaware limited liability company organized and existing under the laws of the State of Delaware, and is wholly owned by Stellantis N.V., a Dutch corporation headquartered in Amsterdam, Netherlands. FCA's principal place of business and headquarters is at 1000 Chrysler Drive, Auburn Hills, Michigan 48326.

141. FCA is a motor vehicle manufacturer and a licensed distributor of new, previously untitled Chrysler, Dodge, Jeep, and Ram brand motor vehicles. FCA's

Chrysler brand is one of the "Big Three" American automobile brands. FCA engages in commerce by distributing and selling new and used passenger cars and motor vehicles under its Chrysler, Dodge, Jeep, and Ram brands.

142.   FCA, through its various entities, designs, manufactures, markets, distributes, and sells automobiles throughout the United States and worldwide. FCA and/or its agents designed and manufactured the Class Vehicles. FCA also developed and disseminated the owner's manuals and warranty booklets, advertisements, brochures, and other promotional materials relating to the Class Vehicles, with the intent that such documents be purposely distributed throughout all fifty states. FCA is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

## V.   FACTUAL ALLEGATIONS

**A.   FCA marketed the Jeep Wrangler 4xe and Grand Cherokee 4xe as safe, dependable, rugged, high-performing, and emissions-friendly hybrid-electric vehicles.**

### 1.   FCA marketed the Class Vehicles as an environmentally-friendly evolution of its historic SUV lines.

143.   The Jeep Wrangler and Jeep Grand Cherokee are popular sport utility vehicles that FCA designs, manufactures, and sells under the Jeep brand. The Jeep brand traces its lineage to the original U.S. military Jeeps that were produced during World War II. According to the Jeep Brand's website, "Born in the heat of battle,

the . . . Jeep® Brand 4x4 emerged a hero to thousands of Allied soldiers around the world."[4]



144.    These original military Jeeps were "4x4" or "four-by-four" because they had a four-wheel drivetrain. A 4x4 drivetrain sends torque to all four of its wheels simultaneously, as opposed to two-wheel drive vehicles, which are solely front- or rear-wheel drive. This increases the performance and capability off-road and on rough terrain like mud, snow, or rocks, where two-wheel drive vehicles might become stuck.

145.    The iconic styling of the Jeep Brand and its image as a tough and capable 4x4 proved to be successful at marketing civilian vehicles as well. The original Jeep Cherokee was introduced in 1975 as a "a sporty, two-door version of the Wagoneer and featured bucket seats, a sports steering wheel, and racy detailing

---

[4] Ex. 3, Jeep.com, *History: 1940-1949*, https://www.jeep.com/history/1940s.html (last visited June 13, 2024).

designed to appeal to younger, more adventurous drivers."[5] In 1984, the "all-new" Jeep Cherokee was re-introduced as "the first compact four-door SUV, first uniframe construction, and first full-time 4x4 system with shift-on-the-fly capability."[6]

146.   In the 1990s, the Jeep brand continued to introduce vehicles that met consumer desires for "sporty" and "capable" sport utility vehicles (SUVs), including several iterations of the Jeep Wrangler and Grand Cherokee models. In 1993, Jeep introduced the Jeep Grand Cherokee as a mid-sized luxury SUV,[7] which FCA claimed "set a new industry benchmark thanks to its unique balance of on- and off-road capability." A few years later in 1999, the Jeep Brand also released the "the new Grand Cherokee (WJ)," which it "marketed as the most capable SUV ever." [8]

147.   In 1997, the Jeep brand added the "super-capable Wrangler (TJ) with its new coil suspension" to its lineup. FCA followed on the success of the original Wrangler with "[t]he radical 2003 Jeep® Wrangler Rubicon," which FCA represents "was the most capable vehicle ever produced by the Jeep Brand."[9]

---

[5] Ex. 4, Jeep History, 1970s, https://www.jeep.com/history/1970s.html#willys-overlands (last visited October 28, 2024).

[6] Ex. 5, Jeep History, 1980s, https://www.jeep.com/history/1980s.html#willys-overland (last visited October 28, 2024).

[7] Ex. 6, Jeep History, 1990s, https://www.jeep.com/history/1990s.html (last visited October 28, 2024).

[8] Ex. 7, Jeep.com, *The Jeep Brand: The Story of the Legend*, https://www.jeep.com/history.html (last visited June 13, 2024).

[9] Ex. 7, Jeep.com, *The Jeep Brand: The Story of the Legend*, https://www.jeep.com/history.html (last visited June 13, 2024).



A recent tweet by the Jeep Brand using its "go anywhere, do anything" slogan.

148.   In the past two decades, sensitivity to higher fuel prices and increased concern about the negative environmental effects of gas-powered vehicle emissions have resulted in a trend away from the gas-guzzling, SUV-heavy vehicle lineups that dominated the end of the 20th century. In response, manufacturers shifted towards electrification and production of hybrid-electric vehicles, which offer greater gas mileage and less emissions.

149.   In 2020, FCA announced the 2021 Jeep plug-in hybrid Wrangler 4xe in response to these trends and in an effort to mitigate the poor gas mileage caused in part by its past designs. In 2022, FCA added the Jeep Grand Cherokee 4xe to its lineup, using the same 4xe moniker it used with the Wrangler 4xe. The 4xe (or "four-

- 58 -

by-e") name is a play on the Jeep brand's reputation for 4x4 vehicles that highlights the Class Vehicles' rugged four-wheel drive and modern electric capabilities.

150. FCA pervasively advertised the Jeep Wrangler 4xe and Jeep Grand Cherokee 4xe as offering similar performance and capability as the gas-powered equivalents, but with all the environmental and mileage benefits of a plug-in hybrid electric battery.

151. FCA also pervasively represented that plug-in hybrid-electric vehicles like the Class Vehicles have significant environmental advantages over conventional vehicles with internal combustion engines. While operating in electric mode, the Class Vehicles do not produce any of the noxious tailpipe emissions (such as nitrogen oxides and other smog-forming pollutants that are harmful to human health, and greenhouse gases, such as carbon dioxide and methane) that vehicles with internal combustion engines produce.

152. FCA knew that one of its largest customer bases are outdoor enthusiasts, who are often invested in issues such as climate change and environmental protection. It explicitly sought to exploit these consumer desires for a greener vehicle in their marketing. As explained by an FCA marketing executive: "With Jeep, you have the DNA of adventure and freedom, meaning that our customer already is in a relationship with the planet. . . . But some are maybe 'cheating' in the sense that they don't want to think about the fact that internal-combustion vehicles

pollute. Some are in an open relationship with the planet but like combustion cars. And some are in true love with the planet and nature, and these are the consumers we want to start with" in promoting the Wrangler 4xe.[10]

153. FCA also announced the Wrangler 4xe with a broadly disseminated advertisement narrated by Carl Sagan, a noted science educator and climate change activist. It concluded by showing the 4xe climbing a mountain and describing it as "the first-ever electric Wrangler."[11]



_____

[10] Ex. 8, Dale Buss, Forbes, *Jeep's Wrangler 4xe Proves Worthy Of Sagan's Seminal 'Pale Blue Dot'* (Sept. 15, 2020 12:00 PM EDT), https://www.forbes.com/sites/dalebuss/2020/09/15/jeeps-4xe-hybrid-proves-worthy-of-sagans-seminal-pale-blue-dot/.

[11] Ex. 9, Twitter, @Jeep, *To explore and cherish the only home we've ever known. The first-ever Wrangler 4xe* (Sept. 4, 2020 10:42 AM), https://x.com/Jeep/status/1301938665044750337.

**2.      FCA represented that Class Vehicles were not only more efficient, but also better performing than their gas-powered predecessors.**

154.   In addition to embracing the environmental benefits of reduced gas consumption, Jeep also pervasively advertised the plug-in hybrid-electric design as a performance enhancer. When working together, the hybrid and electric power sources are supposed to provide more power and torque than Jeeps with traditional internal combustion engines, giving the Class Vehicles faster acceleration and better performance.

155.   For instance, FCA advertised that the 2021 Jeep Wrangler 4xe total powertrain output was advertised as capable of 470 pound-feet (lb.-ft.) of torque at 3,000 revolutions per minute (rpm) and 375 horsepower (hp) at 5,250 revolutions per minute, all while achieving 49 MPGe.[12] By comparison, the lower-cost, gas-powered 2021 Jeep Wrangler with a 2.0 liter turbocharged four-cylinder gas engine could only put out a relatively meager 295 lb.-ft. of torque and 270 hp, with a combined city and highway gas mileage of 21 mpg.[13]

---

[12] Ex. 10, Stellantis Media, 2021 Jeep Wrangler 4xe Specifications, https://s3.amazonaws.com/chryslermedia.iconicweb.com/mediasite/specs/2021_JP_Wrangler_4xe_SP3oj78skon97eivshempg1eg8in.pdf (last visited June 23, 2024).
[13] Ex. 11, Stellantis Media, 2021 Jeep Wrangler Specifications, https://s3.amazonaws.com/chryslermedia.iconicweb.com/mediasite/specs/2021_JP_Wrangler_SPpr9cq0ipusqbj1krgeoq0pu45s.pdf (last visited June 23, 2024).



156.    FCA similarly touted the powertrain of the Jeep Grand Cherokee 4xe with fantastic performance and range numbers. At release, FCA represented that: "Overall, the 4xe system delivers 375 horsepower (280 kW) and 470 lb.-ft. (637 Nm) of torque. The Grand Cherokee 4xe, targeting an estimated 25 miles (40 km) of all-electric range, returns an estimated 57 MPGe and has an estimated total range of more than 440 miles (708 km)."[14]  FCA reassured consumers, "Don't let the near-silence of all-electric operation fool you—the legendary capabilities of Grand Cherokee still roar beneath this hood."

157.    FCA also represented that the Grand Cherokee 4xe was all of what its gas-powered predecessor was and more because it was "designed and engineered to deliver even more of what has made the Grand Cherokee a true global icon in the premium SUV segment, including legendary Jeep 4x4 capability, class-leading space and versatility and advanced safety features."

---

[14] Ex. 12,
https://media.stellantisnorthamerica.com/newsrelease.do?id=23154&mid=

158.   Similar representations have continued with the already-recalled 2026 Grand Cherokee 4xe, which was discontinued along with the entire model altogether. Prior to removing the 2026 Grand Cherokee 4xe from its website, FCA's website claimed that "The new 2026 Jeep® Grand Cherokee 4xe isn't just an efficient plug-in hybrid SUV that's good for your wallet—it's also the most capable Grand Cherokee we've ever built."[15]



[15] Ex. 74, 2026 Jeep Grand Cherokee 4xe, JEEP.COM, https://www.jeep.com/2026/grand-cherokee/grand-cherokee-4xe.html (last visited Nov. 24, 2025).

### 3. FCA marketed the Class Vehicles as a no-compromises, best of all worlds plug-in hybrid vehicle.

159. In introducing the Class Vehicles, Christian Meunier, the then-Global President of the Jeep Brand, stated: "Our Jeep 4xe vehicles will be the most efficient, responsible and capable that the brand has ever created."[16] FCA's pervasive marketing messaging for the Class Vehicles effectively conveyed to consumers that they could have the best of all worlds—an adventurous 4x4 vehicle that was also emissions friendly and technology driven. Or, as FCA puts it: "Yes, you can have both."



160. The idea that Class vehicles represented the best of all worlds was repeated in literature directed at potential buyers. For example, the vehicle brochure for the 2021 Jeep Wrangler 4xe states that the vehicle includes a "17-kwh Battery" and "is a shining example of hybrid innovation, handing you tomorrow's progressive

---

[16] Ex. 13, Press Release, Stellantis North America, New Jeep® Wrangler 4xe Joins Renegade and Compass 4xe Models in Brand's Global Electric Vehicle Lineup (Sept. 3, 2020), https://media.stellantisnorthamerica.com/newsrelease.do?id=22016&mid=1535.

technology, today," while also providing "the rugged, open-air freedom and legendary capability that Jeep Wrangler is revered for, the world over":



161. The brochure also boasted that the vehicle was "strong," "quick," "expansive," and "easy on the planet":

- 65 -



162. In addition to highlighting the off-road capabilities of the Jeep Wrangler 4xe, FCA also pervasively marketed the vehicle as fit for city driving, especially in all-electric mode. For example, the vehicle brochure for the 2021 Jeep Wrangler 4xe highlighted how the driver could choose between different modes of the hybrid drivetrain under the banner of "POWER x2," including an electric-only mode and an "E-SAVE" mode for "low-emission zones in cities."

- 66 -



163.   FCA's more technical consumer-facing literature also projected a similar "no compromise" image of the Wrangler 4xe. According to the manual for the 2023 Wrangler 4xe Hybrid, "Wrangler 4xe plug-in hybrid electric vehicle technology enhances the fun, freedom, and adventure Wrangler is known for, while providing unprecedented performance, fuel economy, and environmental friendliness. Wrangler 4xe makes it more capable off-road and on-road with no

compromise to the top down and doors off fun and freedom customers expect from the Jeep® icon."[17]

164.   FCA published similarly misleading messaging and advertising about the Grand Cherokee 4xe, which likewise features a 17-kwh HV Battery and dual electric motor setup like the Wrangler 4xe. FCA again advanced the notion that the Jeep Grand Cherokee 4xe, like the Wrangler 4xe before it, was the best of all worlds.



165.   As it did with the Wrangler 4xe, FCA marketed the Grand Cherokee 4xe as building on the experience offered by the luxury-minded, gas-powered Grand Cherokee. According to FCA, the new 4xe "[b]uild[s] on Grand Cherokee's legacy as the most awarded SUV ever [and] brings an advanced architecture, plug-in hybrid

---

[17] Ex. 14, Jeep, 2023 Wrangler 4xe Hybrid Supplement, https://cdn.dealereprocess.org/cdn/servicemanuals/jeep/ca/2023-wrangler4xe.pdf (last visited Jun. 13, 2024).

powertrain and premium exterior and interior design, with world-class craftsmanship and first-to-market technologies to the full-size SUV segment."[18]

166.    Similar to the Wrangler 4xe, FCA marketed the Grand Cherokee 4xe's off-road and all-terrain abilities in electric and hybrid modes. In doing so, FCA has repeatedly advanced that these class vehicles can perform in strenuous conditions, such as those pictured below.[19]

---

[18] Ex. 15, Stellantis Press Release, *What's New for 2024: Jeep Grand Cherokee 4xe* (August 10, 2023), https://media.stellantisnorthamerica.com/newsrelease.do?id=25103&mid=&search result=true&searchTerms=4xe. Jeep Grand Cherokee, available at https://www.jeep.com/grand-cherokee/grand-cherokee-4xe.html.

[19] Ex. 16, Post on Jeep's X account, dated January 12, 2022. Available at https://x.com/Jeep/status/1481264739548385281. Jeep Technology, available at https://www.jeep.com/ev.html.
Ex. 17, Jeep Grand Cherokee 4xe, available at https://web.archive.org/web/20220810014330/https://www.jeep.com/grand-cherokee/grand-cherokee-4xe.html (last visited Nov. 24, 2025).
Ex. 18, Stellantis media video of the Grand Cherokee 4xe, available at https://media.stellantisnorthamerica.com/search.do?org.apache.struts.taglib.html.T OKEN=c44351431e29ee665bf6117e0e4932b0&pageSize=24&sortBy=PUBLISH EDDATE&searchTerms=4xe&saveSearch=true#.



167.   In press releases, FCA also bragged that, "[i]n fact, the all-new Grand Cherokee Trailhawk 4xe conquered the formidable Rubicon Trail and did so under all-electric power using electric mode."[20]

168.   Once they were both on the market, FCA advertised the Class Vehicles as a tandem of high-performance, no-compromise vehicles. For example, it aired a commercial featuring the Jeep Wrangler 4xe and Jeep Grand Cherokee 4xe during Super Bowl LVII, the most-watched US telecast in history with 115.1 million

---

[20] Ex. 12, *Press Kit: 2022 Jeep Grand Cherokee*, STELLANTIS (Sept. 29, 2021), https://media.stellantisnorthamerica.com/newsrelease.do?id=23154&mid=.

viewers.[21] After conspicuously switching to all-electric mode, a Wrangler 4xe raced a Grand Cherokee 4xe around dirt trails before stopping to re-charge in the shadow of mountain tops. It concluded with a new tagline: "Jeep: Freedom is Electric."[22]



169.   Prior to FCA's cancellation of the Wrangler and Grand Cherokee models entirely, FCA seemed intent on continuing its successful marketing streak. It had already published website materials for the 2026 Grand Cherokee 4xe, and received coverage from automotive publications that touted the capability of these vehicles. For example, *Motor Trend* wrote that, "Despite being a plug-in hybrid, the

---

[21] Ex. 19, Ben Morse, *Super Bowl LVII most-watched US telecast ever after updated figures*, CNN (May 3, 2023 11:28 EDT), https://www.cnn.com/2023/05/03/sport/super-bowl-lvii-most-watched-us-telecast-ever-spt-intl/index.html.

[22] Ex. 20, AdAge, Jeep: "Electric Boogie" (Oct. 22, 2023), https://adage.com/video/jeep-electric-boogie.

Jeep Wrangler 4xe is just as capable as its gas-powered sibling, if not more so, thanks to its added power and torque. It retains the classic boxy design, serious off-road hardware, and rugged appeal Jeep fans expect."[23] *Car and Driver* also wrote that "The Jeep's four-cylinder hybrid setup delivers a whopping 470 pound-feet of torque to the wheels—matching the borderline-crazy V-8 Wrangler Rubicon 392 in low-end power."[24]

> **4.      FCA's marketing made frequent charging and use of the all-electric mode essential to the value proposition of Class Vehicles, for which consumers paid a hefty premium.**

170. FCA continually marketed the Class Vehicles to gas-conscious consumers by making representations about the efficiency of both vehicles compared with their gas-powered equivalents. This includes, among other things, claiming that the Jeep Grand Cherokee 4xe "has the lowest estimated annual fuel cost of any Grand Cherokee ever,"[25] and that by buying the vehicle, they could bid "goodbye to the gas light."

---

[23] Ex. 75, 2026 Jeep Wrangler 4xe, MOTORTREND, https://www.motortrend.com/cars/jeep/wrangler-4xe/2026 (last visited Nov. 24, 2025).

[24] Ex. 76, 2026 Jeep Wrangler 4xe Hybrid, CAR AND DRIVER, https://www.caranddriver.com/jeep/wrangler-4xe-2026 (last visited Nov. 24, 2025).

[25] Ex. 21, Jeep Grand Cherokee, available at https://www.jeep.com/grand-cherokee/grand-cherokee-4xe.html.  Ex. 22, Jeep Grand Cherokee 4xe, available at https://web.archive.org/web/20220810014330/https://www.jeep.com/grand-cherokee/grand-cherokee-4xe.html.

 

**GOODBYE TO THE GAS LIGHT**

Daily commuters and neighborhood drivers may never have to gas up again. With an all-electric range of 25 miles⑦ and professionally-installed home chargers available⑧, the Jeep® Grand Cherokee 4xe has the lowest estimated annual fuel cost of any Grand Cherokee ever⑨. Give back to your world—and your wallet.

171.  FCA also repeatedly emphasized in its marketing and other pervasive statements the performance capabilities of the Jeep Wrangler 4xe in all-electric mode. In 2021, FCA announced plans to install Jeep-branded EV charging stations at popular off-road trailheads, including in Moab, Utah; Big Bear, California; and the Rubicon Trail in Pollock Pines—the namesake of one of the 4xe trim levels. Alongside this announcement, FCA touted that, "[w]ith 49 MPGe and 21 miles of all-electric range, the Jeep Wrangler 4xe can conquer even the toughest trails with zero emissions."[26]

---

[26] Ex. 23, Press Release, Stellantis, Jeep® Brand Creates Jeep 4xe Charging Network, Works With Electrify America to Provide EV Charging at Off-road Trailheads Throughout the United States (March 26, 2021), https://media.stellantisnorthamerica.com/newsrelease.do?id=22622&mid=1535.



172. Notably, the advertised 49 eMPG is only achievable in all-electric mode. Without the ability to charge the vehicle, the 2023 Jeep Wrangler 4xe can achieve only 20 MPG in hybrid mode and the Grand Cherokee only 23 MPG in hybrid mode. Thus, the all-electric mode and convenience of charging at home are central to the value proposition of the Class Vehicles.

173. To that end, FCA highlighted the convenience of charging inside or near the home. FCA included a 25-foot 110v charger in the purchase of every 4xe vehicle. The relatively limited range of the cord implied that the vehicle was safe to charge within or near the owner's home. FCA also impliedly represented to each consumer that frequent charging was safe to do over and over, by stating in the manual that "[l]ithium-ion batteries can be recharged and discharged thousands of times."

174. FCA also sold additional products to owners and lessees of Class Vehicles to facilitate charging at home. In 2022, FCA's subsidiary Mopar, the parts

supplier for Jeep vehicles, began sales of its own "at-home" chargers. According to a Mopar North America spokesperson, FCA's "new, factory-backed, at-home, Level 2, plug-in charging units offer a quick, seamless charging solution for Jeep 4xe and Chrysler Pacifica Hybrid owners." The new chargers were touted as "[p]ortable, lightweight, lockable and weatherproof for indoor/outdoor charging."[27] Press photos featured a Jeep 4xe charging indoors with FCA's new Jeep branded charger.[28]



175.   The purported benefits of the plug-in hybrid-electric design came at a hefty premium to consumers: the Jeep Wrangler and Grand Cherokee 4xe models

---

[27] Ex. 24, Press Release, Stellantis North America, Mopar Introduces New At-home Plug-in Wall Chargers for Jeep® 4xe Models and Chrysler Pacifica (Jan. 18, 2022), https://media.stellantisnorthamerica.com/newsrelease.do?id=23467&mid=1.
[28] Ex. 25, Stellantis North America, Images for Mopar Introduces New At-home Plug-in Wall Chargers for Jeep® 4xe Models and Chrysler Pacifica, https://s3.amazonaws.com/chryslermedia.iconicweb.com/mediasite/libraryImages/MP022_002JPbhqi9bn8hav39bfcvidndje59s__mid.jpg (last visited June 13, 2024).

cost thousands of dollars more than similarly equipped Jeep Wranglers and Grand Cherokees with conventional, non-hybrid internal combustion engines. And while FCA highlighted the electric battery features to justify this premium cost, FCA's marketing never disclosed to consumers that the Class Vehicles were equipped with dangerous batteries susceptible to fire, even when the vehicle is turned off.

176. Indeed, even after issuing a stop sale for 2026 Jeep Grand Cherokee 4xes in October 2025, the Jeep Brand website continued to falsely advertise the unique "benefits" of "three driving modes with the Grand Cherokee 4xe: Hybrid, Electric or eSave" even as it advised owners that they cannot safely charge their Class vehicles.[29]



**Electric Capability Served Three Ways**

Urban explorers can experience three driving modes with the Grand Cherokee 4xe: Hybrid, Electric or eSave. There are benefits to each, but don't worry—that legendary Jeep® Brand capability comes standard with each one.

---

[29] Ex. 74, 2026 Jeep Grand Cherokee 4xe, JEEP.COM.

177. Nor did FCA's marketing disclose to consumers that they would not be able to park or charge their vehicles indoors due to battery fire risk. Instead, FCA advertised the high-tech and convenient at-home charging features of the Class Vehicles, and even described the vehicle interiors as "a place to recharge."



178. Instead of being a "place to recharge," Plaintiffs and Class Members are justifiably afraid to be anywhere near their Jeep Wrangler 4xe, much less inside of it.

179. Further, by depriving Plaintiffs and members of the Class of their ability to charge their vehicles frequently and conveniently, FCA deprived them of a major value-proposition for the Class Vehicles: less fuel consumption.

180.   Without the ability to charge the Class Vehicles, consumers cannot not make use of the much-advertised "all-electric" and "e-save" modes. The only practically available mode without plug-in charging capability is "hybrid," which was actually less fuel efficient than the gas-powered 4xe.



*A screenshot of the three powertrain settings of Jeep Wrangler 4xe from FCA's "Electric Boogie" Super Bowl commercial.*[30]

181.   As noted in *Car and Driver*, "[t]o get the full fuel-economy benefit [of the 2021 Wrangler 4xe], you'll have to stay close to home and plug in often. . . . Once the battery has been depleted, the 4xe actually gets worse fuel economy than a Wrangler powered by the turbo four with none of the plug-in-hybrid hardware (20

---

[30] Ex. 20.

versus 22 mpg combined). Blame the extra 800 pounds that the 4xe carries wherever it goes."[31]

182. Ironically, after extensively advertising the Class Vehicle as a fuel-efficient, environmentally-friendly alternative since launch, the Wrangler 4xe—weighed down by its underutilized electric motors and battery—is actually slightly less fuel efficient than its lighter, gas-powered cousin. The Grand Cherokee 4xe with an unutilized HV Battery suffers from the same issues. The promise of FCA's various advertisements was thereby left unrealized. Certainly, FCA never disclosed in these numerous commercials or on its website that the Class Vehicles would consume more fuel (or about the same amount of fuel) than its significantly less expensive gas-powered equivalent if the Class Vehicles' hybrid and electric features could not be used as intended.

### 5. FCA's marketing advertised the enhanced safety features of the Class Vehicles, but failed to disclose the danger of fire or explosion while charging.

183. FCA touted the array of safety features in the Class Vehicles, but never disclosed that the HV Battery presented a fire risk. For example, the vehicle brochure for the 2022 Jeep Wrangler 4xe highlighted its "advanced safety & security systems"

---

[31] Ex. 26, Eric Tingwall, Car & Driver, *Tested: 2021 Jeep Wrangler 4xe Complicates a Simple Machine* (Jul. 1, 2021), https://www.caranddriver.com/reviews/a36906094/2021-jeep-wrangler-unlimited-rubicon-4xe-by-the-numbers/.

and states, "when it comes to your well-being on the road Jeep Wrangler is ready and willing to stand as a constant guardian." [32]



184.   FCA also used the moniker "4xFortress" to describe the Wrangler 4xe's safe design. According to FCA, the Wrangler 4xe's "high-strength superstructure helps protect every occupant and is filled with features that add peace of mind."[33]

---

[32] Ex. 27, FCA, 2022 Wrangler Buying Guide at 7 ( https://www.auto-brochures.com/makes/Jeep/Wrangler/Jeep_US%20Wrangler_2022.pdf last visited June 27, 2024)

[33] *Id*. at 27.



185.  FCA made similar representations of safety about the 2022 Grand Cherokee 4xe vehicle brochure as well; this time it used a double entendre to project safety and the value of environmental protection simultaneously. In the 2022 Grand Cherokee brochure, FCA depicts the vehicle driving down a winding mountain road with the tagline: "This is a protected area." It also claims that the Grand Cherokee 4xe has "more standard and available safety and security features than ever before."[34]

---

[34] Ex. 28, https://cdn.dealereprocess.org/cdn/brochures/jeep/2022-grandcherokee.pdf (last visited Nov. 24, 2025).



186.    FCA used a similar double entendre in describing other safety features; this time it depicted the superstructure of the 2022 Grand Cherokee 4xe atop a clear, blue lake, representing that it was, "[a] sanctuary for true peace of mind."[35]

---

[35] *Id.*



187. But even as FCA consistently and pervasively promoted the Class Vehicles' many road safety features, it also conspicuously omitted any disclosure of the Fire Risk Defect or any risk that the vehicles' battery might explode unexpectedly while plugged in at home. This glaring omission would naturally lead a potential buyer or lessee to believe that their Class Vehicle was a safe "4xFortress" or "sanctuary for true peace of mind" that was more than capable of withstanding day-to-day charging at home.

**6.    FCA's representations regarding safety, emissions, performance, all-electric mode, and other key features were consistent and pervasive.**

188. FCA's marketing described herein was pervasive throughout the United States during the time the Class Vehicles were purchased and leased. Such pervasive

marketing— including online advertising; television ads, including one during the Super Bowl; vehicle brochures; manuals in Class Vehicles; and broadly disseminated press releases and other public statements by FCA—repeatedly represented and/or implied that Class Vehicles could be charged safely and were more powerful, more capable, and more fuel-efficient than gas-alternatives.

189.   In fact, the very naming of the Jeep Wrangler 4x*e* and Grand Cherokee 4x*e* emphasized the "*e*" or hybrid-electric functionality of the Class Vehicles, and warranted that the Class Vehicles were in fact able to be used as hybrid-electric vehicles at the time of sale or lease.

190.   FCA's extensive marketing regarding the ruggedness and enhanced performance of the Class Vehicles, including their ability to traverse in difficult terrain and extreme conditions, also conveyed, or at least implicitly represented that they would be safe for normal driving. Certainly, it was directly implied in all of FCA's marketing that the Class Vehicles would be safe inside of a garage.

191.   Yet, despite its extensive marketing efforts and representations to Plaintiffs and consumers, FCA failed to disclose the potential danger and loss of use caused by the Fire Risk Defect.

**7.      Unable or Unwilling to Remedy the Fire Risk Defect, FCA Abruptly Discontinues the Jeep Wrangler 4xe and Jeep Grand Cherokee 4xe**

192.   FCA's pervasive and "all-in" marketing efforts described above helped launch the Jeep Wrangler 4xe and Jeep Grand Cherokee 4xe into the top-selling PHEV models in the United States, with more than 320,000 Class Vehicles sold (and subsequently recalled).

193.   For instance, for the period of January-June 2025, the Jeep Wrangler 4xe and Jeep Grand Cherokee 4xe were far and away the best-selling PHEV models in the United States:[36]



194.   The extraordinary success of these models made it all the more surprising when FCA suddenly announced that it would no longer sell either 4xe

---

[36] Ex. 29, AutoVista24, *Which models led the US EV market in the first half of 2025?* (Aug. 28, 2025), https://autovista24.autovistagroup.com/news/which-models-led-the-us-ev-market-in-the-first-half-of-2025/.

model. Analysts expected to continue to see substantial growth even taking into account the regulatory changes regarding hybrid vehicles.[37] The ongoing issues with the Fire Risk Defect likely factored into FCA's discontinuation of the 4xe lineup.

**B.     The Fire Risk Defect is likely the result of defective high-voltage lithium-ion battery systems.**

195.   FCA failed to adequately research, design, test, and manufacture the Class Vehicles before warranting, advertising, promoting, marketing, and selling the Class Vehicles as suitable and safe for use in an intended and reasonably foreseeable manner.

196.   One of the generally-acknowledged risks posed by the use of lithium-ion batteries stems from fires and explosions caused by a phenomenon known as "thermal runaway." A lithium-ion cell can heat up and catastrophically fail in one of several scenarios: a manufacturing or design defect in a cell; improper electrical charging and/or discharging; mechanical damage associated with significant bending or puncturing of a cell (such as design flaws); or thermal abuse, wherein the cell is subjected to high temperatures by, for example, inappropriate use parameters in the programmed control modules. All of these scenarios generate local heating in the cell. This local heating induces locally high temperatures, which accelerate

---

[37] Ex. 77, Goldman Sachs, *Hybrid Adoption to Rise as Electric Vehicle Momentum Slows* (Sept. 11, 2025), https://www.goldmansachs.com/insights/articles/hybrid-adoption-to-rise-as-electric-vehicle-momentum-slows.

additional chemical reactions that can promote the degradation of the organic liquid electrolytes in the cell. Those electrolytes and their decomposition products are volatile and flammable at high temperatures.[38]

197.   Catastrophic failure occurs when multiple cells become engaged in thermal runaway. Thermal runaway has been estimated to cause as many as 80% of lithium-ion battery fires.[39]

198.   The high-voltage batteries in the Class Vehicles (both the Wrangler 4xe and Grand Cherokee 4xe) are 400-volt, 17-kwh, 96-cell lithium-ion NMC batteries made by Samsung. The HV battery in the Wrangler 4xe at one point had an MSRP of $16,910.00.[40] After the third successive 2025 68C Recall, Mopar's website now reflects that the HV Battery in the Wrangler 4xe is unavailable. FCA and Samsung

---

[38] Ex. 31, Heekyon Yang, *Explainer: Are lithium-ion batteries in EVs a fire hazard?*, REUTERS (Aug. 23, 2021), https://www.reuters.com/business/autos-transportation/are-lithium-ion-batteries-evs-fire-hazard-2021-08-23/#:~:text=Lithium%2Dion%20batteries%2C%20whether%20they,battery%20is%20not%20designed%20correctly (last visited March 3, 2024).

[39] *See* Ex. 32, Adreesh Ghoshal, *How Lithium Ion Batteries in EVs Catch Fire*, MEDIUM (Aug. 16, 2020), https://medium.com/the-innovation/how-lithium-ion-batteries-in-evs-catch-fire-9d166c5b3af1 (last visited March 3, 2024); *see also* Ex. 33, Ryan Fogelman, *April 2020 Fire Report: How & Why Do Lithium-Ion Batteries Fail, Insight from the Jedi Master of Lithium Power!*, WASTE360 (May 5, 2020), https://www.waste360.com/safety/april-2020-fire-report-how-why-do-lithium-ion-batteries-fail-insight-jedi-master-lithium (last visited March 3, 2024).

[40] Ex. 34, Hybrid Battery Kit - MOPAR, MYMOPARPARTS, https://www.mymoparparts.com/oem-parts/mopar-mild-hybrid-motor-generator-unit-mgu-battery-pack-68488244aa (last visited March 3, 2024); *see also* Ex. 35, Hybrid Battery Kit, US, MYMOPARPARTS, https://store.mopar.com/oem-parts/mopar-hybrid-battery-kit-us-68540591aa? (last visited Oct. 30, 2025).

SDI have ramped up production of these defective HV Batteries, recently promoting a $2.5 billion joint venture in manufacturing these battery packs in Kokomo, Indiana.[41]

199.   Samsung SDI also manufactured the cells contained in batteries that allegedly caused fires in certain BMW and Ford models that have been recalled and subject to litigation.[42] Those Ford and BMW recalls occurred in 2020, and upon information and belief, were caused by similar defective attributes as present here. According to BMW, the fires that led to recall of their PHEVs were caused by "thermal events" in the Samsung batteries.[43] These facts make it overwhelmingly likely that the Fire Risk Defect is in fact the result of defectively designed, manufactured, installed, and/or controlled HV battery or battery systems.

---

[41] Ex. 36, Stellantis and Samsung SDI to Invest Over $2.5 Billion in Joint Venture for Lithium-Ion Battery Production Plant in United States, STELLANTIS PRESS RELEASE (May 24, 2022), https://www.stellantis.com/en/news/press-releases/2022/may/stellantis-and-samsung-announce-battery-plant-in-kokomo?adobe_mc_ref=. (last visited March 3, 2024).

[42] Ex. 37, Gustavo Henrique Ruffo, *Samsung SDI Might Be The Root of Ford And BMW PHEV Recalls*, INSIDEEVS (Oct. 16, 2020), https://insideevs.com/news/449322/samsung-sdi-root-ford-bmw-phev-recalls/ (last visited March 3, 2024).

[43] Ex. 38, *Burbank et al. v. BMW of N. Am.*, No. 2:21-cv-01711 (D.N.J.) (Dkt. No. 1, at ¶ 15) (Dec. 3, 2020).

**C.    FCA knew or should have known of the Fire Risk Defect long before it disclosed the problem to Plaintiffs.**

200.    As set forth below, FCA knew of the risk of the Fire Risk Defect from various sources, including: the well-documented risks of runaway propagation in lithium-ion batteries; NHTSA warnings of safety risks for lithium-ion batteries; the well-known risks of violent combustion from the NMC batteries used in the Class Vehicles; the rigorous pre-launch testing FCA must have done on the Class Vehicles' HV Battery and hybrid propulsion system; consumer complaints lodged with NHTSA, FCA, and publicized online; and similar battery fire issues in other hybrid electric vehicles, including FCA's Chrysler Pacifica PHEVs, and BMW and Ford-manufactured vehicles that use Samsung batteries for electric propulsion.

201.    Through FCA's accumulated knowledge both prior to launch and the introduction of each model year, FCA would have been aware of the serious danger of the Fire Risk Defect by the time it released the Class Vehicles into the market, and certainly well before it issued each successive recall between 2023 and 2025.

### 1. Lithium-ion batteries are dangerous without appropriate safeguards.

202. Most electric and hybrid-electric vehicles, like the Class Vehicles, use lithium-ion batteries because of their "high power-to-weight ratios, high energy efficiency, good high-temperature performance, and low self-discharge."[44]

203. However, lithium-ion batteries carry well-documented risks of combustion if they are improperly used by an auto manufacturer or placed in vehicles that are defectively designed or manufactured. Safety concerns related to unexpected fires connected with lithium-ion batteries are well-documented and were known to FCA at the time it designed, manufactured, and sold the Class Vehicles.[45] Even before NHTSA released its comprehensive report on lithium-ion battery safety issues in 2017, many scientific and engineering articles discussed the thermal-runaway-related safety concerns of lithium-ion cells and battery packs and proposed solutions.[46]

---

[44] Ex. 39, *Batteries for Hybrid and Plug-In Electric Vehicles*, U.S. DEP'T OF ENERGY, https://afdc.energy.gov/vehicles/electric_batteries.html (last visited March 3, 2024).

[45] *See* Ex. 2, 2017 NHTSA Report at 2-24 through 2-27, 3-9-3 through 3-11 (discussing fire risks of high-voltage lithium-ion batteries in vehicles).

[46] Ex. 40, Wen, Jianwu, et al., A Review on Lithium-Ion Batteries Safety Issues: Existing Problems and Possible Solutions, AMERICAN SCIENTIFIC PUBLISHERS (2012); Ex. 41, Feng, Xuning, et al., Thermal runaway mechanism of lithium ion battery for electric vehicles: A review, SCIENCEDIRECT, 2015, https://www.sciencedirect.com/science/article/abs/pii/S2405829716303464, (last visited March 3, 2024).

204.   Like other batteries, lithium-ion batteries are made up of multiple power-generating compartments called "cells."[47] Each cell contains the basic functional components of a simple battery: a positive electrode, a negative electrode, and an electrolyte.[48] In addition, each cell contains a separator designed to keep the positive electrode from contacting and discharging into the negative electrode.[49]

205.   A battery cell discharges energy in the form of electricity when lithium ions flow from the negative electrode, or anode, to the positive electrode, or cathode.[50] The active materials (either cathode or anode) store the lithium, and the electrolyte carries lithium ions between electrodes.[51] When the cell is charging, those ions flow in the opposite direction, or from cathode to anode.[52]

206.   Of course, a single cell cannot store nearly enough energy to power an automobile, so cells are grouped into modules and packs. Those modules and packs, together with control systems, constitute the complete battery.[53]

---

[47] Ex. 42, Chris Woodford, *Lithium-ion batteries*, EXPLAINTHATSTUFF! (Nov. 23, 2020), https://www.explainthatstuff.com/how-lithium-ion-batteries-work.html (last visited March 3, 2024).

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] Ex. 2, 2017 NHTSA Report, § 4.

207. A module ordinarily contains an array of cells, sensors, controls, mounts, communications capabilities, protective safety devices, and cooling elements or cooling provisions.[54]

208. Beyond this, there are various methods of: (i) arranging the cells into arrays within the module; (ii) managing the flow of electrical current to and from the module or arrays within the module; and (iii) monitoring and managing the temperature of the cells within the module. Finally, there are various other necessary safety features, and integration with the vehicle also plays an important role in the safety of the lithium-ion battery system.[55]

209. Importantly, it is well-established that lithium-ion batteries (and individual cells) should not be subjected to improper electrical charge and/or discharge conditions, as doing so can cause rapid battery degradation and fire risk.

210. The Class Vehicles (both the Wrangler 4xe and Grand Cherokee 4xe) include an extremely powerful 32-amp onboard charger that can accept up to 7.7 kw of electrical current, in contrast to most PHEVs which only include 16-amp 3.7kw onboard chargers.[56] Jeep boasts in its marketing materials and vehicle manuals that

---

[54] *Id.* § 4.1.1.
[55] *Id.*, Ch. 4.
[56] Ex. 43, *Everything You Need to Know About Charging the Jeep Wrangler 4xe*, INSIDE EVS (Aug. 2, 2021), https://insideevs.com/news/523845/how-to-charge-jeep-4xe/.

the Jeep Wrangler 4xe can fully charge in approximately two (2) hours[57] or about six times faster than a level one charger[58]:



211.   Indeed, for these very batteries at issue, the U.S. Department of Transportation ("DOT") considers them so inherently dangerous that FCA had to obtain a special permit from the DOT to transport them.[59] Notably, those special permits require FCA to keep them at a state of charge of no more than thirty percent during transport.

---

[57] Ex. 44, https://www.jeep.com/ev/technology.html#:~:text=turn%20it%20off.-,RECHARGE,of%20fully%20electric%20daily%20commutes (last visited June 25, 2024); Ex. 26 at 22.
[58] Ex. 21, https://www.jeep.com/grand-cherokee/grand-cherokee-4xe.html (last visited Oct. 17, 2024).
[59] Ex. 45, https://www.phmsa.dot.gov/hazmat/documents/offer/SP21084.pdf/2022094501/SP 21084 (last visited June 25, 2024).

212.   FCA confirmed the danger associated with the batteries in Class vehicles in an August 10, 2022 Technical Service Bulletin, which states: "Beginning April 1, 2022, a $5,000 penalty will be assessed to dealers who return any visually damaged battery to the supplier. Improper handling of damaged lithium ion batteries can cause[] *property damage, serious injury or even death*."[60]

213.   It is critical, especially in automotive applications, to have sophisticated control modules and safety monitoring features regarding lithium-ion battery systems. These include parameters that place limits on the state-of-charge, battery and individual cell voltage, current, and cell temperature, among other things to protect battery integrity.

**2.      FCA knew or should have known that the Nickel-Magnesium-Cobalt (NMC) batteries that it used in Class Vehicles are at greater risk of separator damage and violent explosion.**

214.   The HV Battery Systems placed in the Class Vehicles by FCA are nickel-manganese-cobalt compositions. Importantly, "Ni[ckel]-rich NMC cathode materials are known to be susceptible to certain safety issues, such as thermal runaway and the risk of triggering battery fires."[61] Thus, especially for NMC battery

---

[60] Ex. 46, Technical Service Bulletin, GPOP - Issue Review System, Part Number: 68488244A$ ,68488244G$ (Aug. 10, 2022), https://static.nhtsa.gov/odi/tsbs/2022/MC-10225305-9999.pdf (emphasis added).
[61] Ex. 47, Farish I. Saaid et al., Ni-rich lithium nickel manganese cobalt oxide cathode materials, 10 Heliyon e23968 (Jan. 2024), https://www.sciencedirect.com/science/article/pii/S2405844023111765.

systems, it is imperative to set appropriate controls regarding maximum and minimum state of charge, maximum and minimum cell and/or overall voltage, appropriate current limitations, as well as robust cell temperature monitoring features.

215. In particular, NMC batteries are particularly susceptible to "lithium plating," a dangerous phenomenon that causes damage to the separator and increases the thermal runaway risks posed by lithium-ion batteries. Lithium plating occurs when metallic lithium deposits on the anode surface form tree-like structures called "dendrites." Those tree-like structures can then penetrate and damage the separator into the cathode and cause short circuiting, which in turn sparks a battery fire.



*An illustration of tree-like dendrite formations piercing*
*the separator in a lithium-ion battery.*[62]

216.   Dendrite formation—a form of internal physical damage to the battery—can occur as a result of repeated use and/or charging of the battery or its cells outside of manufacturer specifications. The effect of dendrite formation that leads to increased risk of short-circuit and thermal runaway is therefore cumulative; it increases as the battery or its cells are repeatedly subjected to improper use and/or charging conditions.

217.   Significantly, the documented fires in the Class Vehicles do not appear to be the result of external damage or misuse by the consumer. Upon information and belief, all reported fires to date have resulted from internal battery failure while the cars are parked and turned off, which points to either improper programming or internal issues within the battery, such as dendrite formation.[63]

218.   Indeed, although FCA reveals little in any of its three successive recalls between 2023-2025, the little it does say seems to confirm that dendrite formation is at issue. For instance, FCA's 2024 Recall Part 573 Safety Recall Report noted that

---

[62] Ex. 48, Julian Long, *Guide to Lithium Plating in Lithium-Ion Batteries* (Dec. 7, 2022), https://www.accure.net/battery-knowledge/blog-guide-to-lithium-plating-in-lithium-ion-batteries.

[63] *See* Ex. 49, Guillaume Rivard, *Jeep Wrangler 4xe Recalled Following Eight Fires*, The Car Guide (Nov. 22, 2023), https://www.guideautoweb.com/en/articles/72779/jeep-wrangler-4xe-recalled-following-eight-fires/ (last visited March 3, 2024).

"[i]n August of 2024, Samsung SDI communicated to FCA US that the most likely root cause of [the 2023 recall] is due to *separator damage* combined with other complex interactions within the cell."[64] FCA's 2025 Recall Part 573 reiterates that working assumption: "Samsung SDI has stated the most likely root cause is separator damage combined with other complex interactions within the cell. FCA US and Samsung SDI continue to investigate potential factors relating to root cause."[65]

219.   While FCA continues to say that a root cause has yet to be identified and is still under investigation in its latest 2025 Recall, FCA's acknowledgment that "separator damage" is the likely root cause of the Fire Risk Defect, the increasing number and frequency of incidents, and the significant expansion of the recall to include vehicles that use the same battery pack all appears to confirm as much.[66]

220.   Critically, if separator damage is the root cause, the latent internal physical damage to the battery has already been done or will be done *after* FCA declares the Class Vehicles are once again safe to charge after yet another dubious software update; it is unclear how the risk of fire will be resolved if the battery pack is not redesigned and replaced entirely. The futility of these software remedies have been made clear through FCA's acknowledged failures of the previous two software

---

[64] Ex. 30 at 3, NHTSA, Part 573 Safety Recall Report 24V-720.
[65] Ex. 78 at 3, Part 573 Safety Recall Report 25V-741.
[66] *Id*.

updates. It is also unclear whether FCA is even making a good faith attempt to resolve the Fire Risk Defect, or if this is part of a delay and deflect strategy.

221.   The chemical composition of a lithium-ion battery may affect how violently the battery combusts if it fails. Nickel manganese cobalt ("NMC") batteries, the specific type of lithium-ion battery used in Class Vehicles, are uniquely susceptible to thermal runaway due to the heat transfer properties of their chemical composition.[67]

222.   As shown in the chart below, nickel has the highest heat transfer properties of the common elements used in lithium-ion batteries, with cobalt coming in second and manganese third. Phosphate has the lowest heat transfer properties by far, so it carries the lowest risk of combustion. [68]

---

[67] Ex. 50, Stellantis Media, New Jeep® Wrangler 4xe Joins Renegade and Compass 4xe Models in Brand's Global Electric Vehicle Lineup (Sept. 3, 2020), https://media.stellantisnorthamerica.com/newsrelease.do?id=22016 (notes "400-volt, 17-kWh, 96-cell lithium-ion, nickel manganese cobalt battery pack").
[68] *See* John Nguyen & Chas Taylor, Valence Technology, Safety Performance for Phosphate Based Large Format Lithium-Ion Battery (2004).



FIGURE 1
PHOSPHATE HAS LOWEST HEAT FLOW

223.   The unique heat transfer properties of these chemicals means that when high-nickel and high-cobalt batteries fail, they tend to fail catastrophically and burn at far higher temperatures than similar batteries. This in turn leads to higher risk of combustion and thermal runaway. Meanwhile, lithium-phosphate batteries, have much lower heat transfer properties. Thus, when these lithium-phosphate batteries fail, they reach far lower temperatures, as shown below:[69]

---

[69] *Id.*



**FIGURE 3**
**ROUND BAR CRUSH TEST RESULTS**

Lab results comparing the temperature of combustion of lithium-cobalt batteries (left) and lithium-phosphate (right) following abuse testing.[70]

224.   The heat transfer propensity of these chemicals has been known for decades and is the result of the stability of oxygen bonds within each battery. As explained in a 2004 research article:

> The thermal instability of lithium-cobalt is directly related to the ease of liberating oxygen in LiCo02 [the chemical composition of lithium-cobalt batteries]. This oxide bond is relatively weak and can be broken at relatively low temperatures. In the case of a thermal runaway situation, the oxygen being released by a lithium-cobalt cell provides fuel to the exothermic reaction when the electrolyte is decomposing due to an overcharge. Hence

---

[70] *Id.*

> upon abuse, a lithium-cobalt cell will continue to burn until its oxygen supply is gone.
>
> On the other hand, LiFePOj [the chemical composition of lithium-phosphate batteries] has extremely strong oxygen bonds with Psi, resulting in a very stable oxygen structure. Lithium-phosphate does not easily liberate oxygen, thereby providing a much more thermally stable battery cell.[71]

225.   Despite this long-standing, established science regarding battery composition, FCA did not choose to use lithium-phosphate batteries. Instead, FCA chose high-nickel, high-cobalt NMC batteries with the highest heat transfer properties of practically any chemical composition. Indeed, as noted above, FCA has increased its production of these batteries through a joint venture with Samsung SDI.

226.   Despite the known fire risk of the particular composition of these HV Batteries, FCA's design of the Jeep Wrangler 4xe and the Jeep Grand Cherokee 4xe placed the HV Battery directly inside the passenger compartment of the vehicle underneath the rear seat bench.[72] The location of the battery within the cabin means that the combustion of the battery and outgassing of toxic chemicals occurs in the

---

[71] *Id*.

[72] Ex. 51, https://www.youtube.com/watch?v=xBuIhfEORWQ (Youtube video showing factory installation of HV Battery on Grand Cherokee 4xe underneath rear passenger bench).

cabin of the Class Vehicles, which at least one firefighting expert has described as a "terrible idea in my mind."[73]

227. The safe operation of an HV battery requires battery control systems and monitoring systems to set careful parameters that regulate the battery's voltage, current, and temperature ranges, among other things.[74] For example, setting low and high-end state of charge buffers prevents overcharging and/or over-discharging of batteries. In addition, appropriate controls to prevent individual cells from exceeding their maximum voltage can mitigate thermal runaway risk.

228. While an HV battery itself may be manufactured separately by a third-party supplier like Samsung SDI, the programming of the battery control system is made by the vehicle manufacturer. The programmed safety margins or modules that FCA implemented in its design of the HV Battery system in Class Vehicles were

[73] Ex. 52, YouTube, StacheD Training, Electric Car Explosions Worldwide (Nov. 16, 2023), https://www.youtube.com/watch?v=aLtkTp4GVuE (see 4:20 of the video onward for quotation).

[74] *See* Ex. 2, 2017 NHTSA Report at 6-5–6-6 ("While the failure phenomena have been discussed extensively in previous chapters, here we summarize these phenomena in terms related to the [battery] control systems and their actions. . . . Several approaches [in battery control systems] are used to overcome this problem. The first is empirically setting the allowable voltage, current, and temperature ranges to maintain a sufficient margin with respect to undesired behavior. The second is to use a model, combined with data, to infer the operating margin more carefully. Models may be simple or complex; the various types are discussed briefly in this chapter.").

inadequate to protect against premature battery degradation, lithium plating, and thermal runaway in the Class Vehicles.

229. Just as important as the design and safety features used in a lithium-ion battery pack is rigorous pre-launch testing.[75] The use of better safety systems and more rigorous testing would have prevented the reported battery fire incidents in the Class Vehicles and the significant cost and inconvenience now visited upon Plaintiffs and Class Members.

> **3. NHTSA issued warnings about lithium-ion battery safety and the dangerous risk of thermal runaway and the industry was aware of how to control this risk.**

230. In 2017, NHTSA released a report on lithium-ion battery safety issues, which documented well-known battery fire risks, cited to the vast body of academic and engineering studies on those risks, and recommended rigorous design and testing protocols to protect against those risks. All of this would have been known to FCA at the time it launched the Class Vehicles.

231. NHTSA reiterated that all car manufacturers have a duty "to conduct their own due diligence safety testing and analysis, while the industry is working to develop a consensus."[76] Unfortunately for Plaintiffs and the putative Class

---

[75] *Id.*, Ch. 8.
[76] *Id.* at xx.

Members, FCA recklessly or intentionally breached this duty to beat competitors to market and better pad its profits.

232. A central focus of the NHTSA Report is the fire risk associated with the use of lithium-ion batteries, and recommended protection methods and rigorous testing required to mitigate that risk.[77] The major cause of these fires is the propagation of thermal runaway, including but not limited to lithium plating-caused thermal runaway.

233. According to the NHTSA Report, thermal runaway "is a phenomenon in which the lithium-ion cell enters an uncontrollable, self-heating state."[78] If a cell short-circuits (*e.g.*, from reaching an inappropriately high maximum voltage or due to separator damage) the cell electrolyte can combust as pressure in the cell rapidly increases until the cell bursts and releases the flammable electrolyte and other flammable and toxic gases. These flammable and toxic gases include hydrogen gas and carbon monoxide. The temperature of the ruptured cell, particularly in an NMC

---

[77] *See id.* at xvi; *see also id.* at Ch. 6 (management and control systems), 8-10 (testing, "gap assessments," and "hazards, risks and risk mitigation strategies").
[78] Ex. 53, *What is Thermal Runaway?*, UNDERWRITERS LABORATORIES (Aug. 24, 2021), https://ul.org/what-we-do/electrochemical-safety/getting-started-electrochemical-safety/what-thermal-runaway#:~:text= (last visited March 3, 2024).

HV Battery such as those used by FCA, can increase to above 1,832 degrees Fahrenheit.[79]

234.    As the NHTSA Report stresses:

> [T]hermal runaway of a Lithium-ion cell is one of the fundamental failure mechanisms leading to safety hazards from Lithium-ion batteries. Cell heating is normal, but temperatures must be maintained within a predetermined safe operating level. Thermal runaway is most likely to be realized when an event occurs that results in rapid heating of the cell that outpaces the rate of heat dissipation by the cell. Rapid heating may be caused by internal or external short circuits, overcharging, and general use [among other things.] [80]

As the Report further notes, "[t]he thermal and mechanical design of a cell strongly influences its ability to control and dissipate heat, thereby influencing its safety performance."[81]

235.    When thermal runaway spreads from one cell to adjacent cells in the module, the result is what appears to be happening in the Class Vehicles (as FCA recognized in its 2024 and 2025 Recalls)—thermal runaway propagation, causing combustion even when the cars are parked. In other words, "the rapid and extreme rise in temperature (thermal runaway) can easily propagate to nearby cells in a

---

[79] Ex. 54, Alysha Liebscher and Gary Gayman, *Preventing Thermal Runaway in Electric Vehicle Batteries*, MACHINE DESIGN (Dec. 26, 2018), https://www.machinedesign.com/materials/article/21837402/preventing-thermal-runaway-in-electric-vehicle-batteries (last visited March 3, 2024).
[80] Ex. 2, 2017 NHTSA Report at 3.2.
[81] *Id.*

domino effect that has been dubbed thermal runaway propagation."[82] Fires and explosions then result.

236. Given the extreme hazards of runaway propagation in high-voltage lithium-ion batteries such as those used in the Class Vehicles, it is incumbent upon manufacturers to incorporate strong safety measures and rigorous testing.

237. As the 2017 NHTSA report noted in a statement that has been prophetic for Plaintiffs and all other owners and lessees of the Class Vehicles, as of 2017, car manufacturers were not adequately designing and testing electric and plug-in-hybrid electric systems powered by highly volatile lithium-ion batteries. Indeed, the "safety standards" employed by car manufactures such as FCA appeared "to trail—rather than lead—technology development."[83]

238. As of 2017, there were a good number of standards and testing protocols designed to guide manufacturers in constructing lithium-ion battery systems to be safely used in electric and plug-in hybrid electric vehicles, and many safety technologies and testing protocols existed at the time of the launch of the Class Vehicles.[84]

239. Appropriate safety measures to prevent thermal runaway at the cellular level included a range of "electrical components and subsystems to prevent heating

---

[82] Ex. 54.
[83] Ex. 2, 2017 NHTSA Report at 1-3.
[84] *See id.* at 3-9 through 3-11, Ch. 8.

and overpressure to the cell by opening the circuit, increasing resistance, or changing the chemical composition of the cell."[85]

240.  Protection technology at the module level also existed, including technologies for "charge and discharge management," designed to limit the electric current to and from the battery module or cellular arrays within a module. Such technologies also protect against the potential for abnormal discharge caused by failures, such as short circuiting due to separator damage, which can trigger thermal runaway and ultimately runaway propagation.[86]

241.  Also at the module level, manufacturers must ensure adequate thermal management to monitor and prevent the spikes in temperature associated with thermal runaway. "Thermal management functions at the module level include, first monitoring, then cooling," and various available technologies serve this function.[87] Thermal management must also occur at the battery pack level in order to maintain "an average temperature within the battery's specifications, and with even temperature distribution throughout the pack."[88] Cooling and thermal barrier separation between cells can reduce the rate of thermal runaway propagation and can stop cell-to-cell propagation for properly sized cells and cooling systems.

---

[85] *Id.* at 3-10.
[86] *Id.* at 4-6.
[87] *Id.* at 4-10 through 4-15.
[88] *Id.* at 4-24.

242. Safety features at the module level include "interlock circuits, pressure sensors, and communication architecture that allows the battery status to be monitored by the automobile electronic control unit."[89] Other available safety measures operate at the battery pack level, including (but not limited to) thermal management; an array of communication, control, and reporting functions;[90] and the appropriate integration of the battery pack with the vehicle.[91]

243. On information and belief, any number of combinations of the above-referenced safety protocols, in combination with effective safety testing, would have rendered the Class Vehicles safe and fit for their intended purpose of operating as plug-in hybrid electric vehicles.

244. The dilemma facing electric and plug-in hybrid electric vehicles is that incorporating adequate safety measures is not only expensive, but also "is likely to reduce the vehicle's range because any protective materials means less space for the electricity-storing cells."[92] On information and belief, FCA skimped on available protection measures in order to promote the high electric mode range and overall range, speed of charging, and other desirable features, of the Class Vehicles—all to

---

[89] *Id.* at 4-16 through 4-19.
[90] *Id.* at 4-28.
[91] *Id.* at 4-34.
[92] Ex. 54.

the benefit of FCA's bottom line and to the detriment of owners and lessees of the Class Vehicles.

245. Regardless of the safety measures incorporated in the battery and related components designed to prevent runaway propagation, before launching an electric or plug-in hybrid electric vehicle, propagation testing is of the utmost importance.[93]

246. In addition to the 2017 NHTSA report, at the time of the launch of the Class Vehicles, there were a wide array of standards and safety testing procedures for lithium-ion batteries and vehicles that use them, including those promulgated by the Society for Automotive Engineers (SAE), the International Organization for Standardization, Underwriters Laboratories, the Institute for Electrical and Electronics Engineers, the United Nations Economic Commission for Europe, and Sandia National Laboratories for the FreedomCAR program.[94]

247. Many of these standards and testing protocols protect against runaway propagation and the resulting catastrophe for vehicle owners and anyone or anything in their vicinity.[95]

---

[93] Ex. 2, 2017 NHTSA Report at 3-9 (discussing propagation testing *circa* 2014).
[94] *Id.* at 8-1.
[95] *See id.* at Ch. 8.

248.   These standards and testing protocols provided FCA with a wide range of guidelines on design and laboratory testing considerations to ensure the safety of lithium-ion batteries in the Class Vehicles.

249.   On information and belief, any adequate testing of the Class Vehicle would have revealed the lithium-ion batteries' propensity to combust as the result of runaway propagation. Either FCA followed these standards and testing protocols and discovered the risk, or it failed to follow these protocols and concealed these failures.

**4.      FCA had notice of the Fire Risk Defect before any Class Vehicle was sold because of its accumulated knowledge regarding the Samsung-manufactured HV Battery in Class Vehicles and similar defects in FCA's Chrysler Pacifica plug-in.**

250.   FCA accumulated knowledge of the automotive industry's issues with the HV Battery packs it placed in the Class Vehicles. Both the Wrangler 4xe and the Grand Cherokee 4xe utilize 17 kwh high-voltage lithium-ion battery packs, which were manufactured by Samsung SDI America Inc. ("Samsung").

251.   Samsung has a history of issues with its high-voltage EV batteries, of which FCA has had notice of since at least 2020. In August 2020, for instance, Ford recalled its Kuga PHEV due to Fire Risk Defect and, in a familiar refrain, owners were told not to charge the battery. The battery manufacturer was Samsung.[96] Similarly, BMW recalled over 26,000 of its vehicles due to Fire Risk Defect because

---

[96] Ex. 37.

"the battery production process allowed impurities to enter the cells."[97] And around 2022, Samsung recalled more than 1,000 of its EV batteries (including in FCA vehicles) because of poor manufacturing quality.[98]

252. FCA was also on notice of the Fire Risk Defect because it accumulated knowledge of a similar defect in another FCA plug-in hybrid vehicle: the 2017-2018 Chrysler Pacifica plug-in hybrid minivan. Similar to the launch of the Class Vehicles, FCA introduced its Chrysler Pacifica plug-in hybrid in 2016 as "truly a no-compromises minivan, giving customers everything they need or want." The Chrysler Pacifica Plug-in Hybrid was touted as "symboliz[ing] the brand's electrification evolution," which could "deliver an estimated range of 33 miles solely on zero-emissions electric power from a 16-kWh lithium-ion (Li-ion) battery."[99]

253. The next step in FCA's electrification evolution was the Jeep Wrangler 4xe, which was first available in early 2021, with the Grand Cherokee 4xe launching in late 2022. But even before the first Class Vehicle rolled off the lot, FCA began receiving reports of fires related to the HV battery system in Chrysler Pacifica Plug-

---

[97] *Id.*

[98] Ex. 59, Jung Min-Hee, *Samsung SDI Voluntarily Recalls EV Batteries in the U.S.*, BUSINESSKOREA (Feb. 7, 2022), https://www.businesskorea.co.kr/news/articleView.html?idxno=87120.

[99] Ex. 60, Stellantis North America, Press Kit: 2017 Chrysler Pacifica (Jan. 11, 2016), https://media.stellantisnorthamerica.com/newsrelease.do?id=17216&mid=722.

in Hybrid, including a vehicle fire on April 23, 2019.[100] Another occurred on June 15, 2019, where a Chrysler Pacifica exploded in front of a house while plugged in, as pictured below.[101]



---

[100] Ex. 61, NHTSA, Part 573 Safety Recall Report 22V-077 (Feb. 11, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V077-3486.PDF ("As of February 4, 2022, FCA US has identified five customer records, zero warranty claims, and 12 field reports potentially relating to this issue for all markets with dates of receipt ranging from April 23, 2019, to December 14, 2021.").

[101] Ex. 62, Pacifica Forums, Bsmith, A second Pacifica PHEV fire (June 15, 2019), https://www.pacificaforums.com/threads/a-second-pacifica-phev-fire.43545/ (last visited June 21, 2024).

254. The above photo shows flames that appear to originate in the mid-section of the vehicle, where the Chrysler Pacifica's 16-kWh HV battery powers two electric motors are located below the rear seats as pictured below.[102]



255. The design of the particular parts of the Chrysler Pacifica plug-in that are related to the HV battery are similar to the analogous components in the Class Vehicles. Like the Pacifica, the Wrangler 4xe and Grand Cherokee 4xe Class Vehicles' 17 kWh HV battery powers two electric motors and is of a similar size and

[102] Ex. 63, Stellantis, 2017-2021 Chrysler Pacifica Hybrid Emergency Response Guide (Oct. 21, 2021), https://www.mopar.com/content/dam/mopar/images/first-responders/pdf/2021_RU_PHEV_ERG_2017-2021_Final.pdf.

capacity and is placed in a similar location beneath the rear seats as well, as pictured below.[103]



256.   Much like its response to the Fire Risk Defect in the Class Vehicles, FCA's response to the Chrysler Pacifica fires was slow. On August 31, 2021, more than two years after these fires occurred, FCA opened an internal investigation into those fires in response to what it described as "a potential trend in fires in certain Chrysler Pacifica PHEV."[104]

---

[103] Ex. 64, Stellantis, 2021-2022 Jeep Wrangler 4xe Hybrid Emergency Response Guide (Jan. 10, 2022), https://www.mopar.com/content/dam/mopar/images/first-responders/pdf/JL_ERG_2022.pdf.
[104] Ex. 61, NHTSA, Part 573 Safety Recall Report 22V-077 (Feb. 11, 2022), https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V077-3486.PDF.

257.   On February 11, 2022, FCA finally issued a recall for more than 16,700 of its 2017-2018 Chrysler Pacifica plug-in hybrids due to rising reports of fires in those vehicles. It stated that, "[a] vehicle may experience a fire, even with the ignition in the 'OFF' mode," much like the Class Vehicles. And again, much like the Class Vehicles, FCA offered an attempted software fix that it said would resolve the fire risk. FCA later acknowledged in July 2024 that the "remedy is not effective" after Chrysler Pacifica PHEVs that received the remedy nevertheless caught fire, as is the situation here prompting FCA's 2024 and 2025 Recalls.[105]

258.   FCA's knowledge of the Chrysler Pacifica fires dates as far back as 2019, so the associated battery issues in those vehicles predated its release of the Class Vehicles in 2020 and any sale of the Class Vehicles to Plaintiffs or Class Members. FCA manufactured both of these plug-in hybrid systems and was therefore on notice that similar HV Battery parts were likely to cause fires, especially if they were programmed to be used inconsistently with industry standard safety guidelines.

259.   So at the same time that FCA was investigating and issuing ineffective software remedy recalls for the Chrysler Pacificas for HV Battery fires, it was also fulfilling orders for Jeep Wrangler 4xe and Grand Cherokee 4xe Class Vehicles,

---

[105] *Id*.; *see also* Ex. 65 https://static.nhtsa.gov/odi/rcl/2024/RCLRPT-24V536-8355.PDF (July 18, 2024 Part 573 Safety Recall Report issued by FCA for the Chrysler Pacifica PHEV).

which it advertised as no compromise, high-mileage, high-efficiency SUVs. Indeed, as discussed above, FCA designed and released a Level 2 charger that was advertised as a "quick, seamless charging solution for Jeep 4xe and Chrysler Pacifica Hybrid owners." The simultaneously issued press photos featured a Jeep Wrangler 4xe charging inside a garage, but the Chrysler Pacifica was shown charging just outside of a garage.[106]

 

260.   Unsurprisingly, FCA's ineffective recall procedure for the Chrysler Pacifica (a software update of the Battery Pack Control Module, same as with the 2023 and 2024 Recalls for the Class Vehicles) did not resolve the Fire Risk Defect in the Chrysler Pacifica hybrid; fires related to the hybrid battery not only persisted, but increased as time went on. In one such case, a Missouri family's Chrysler

---

[106] Ex. 66, Stellantis North America, Images for Mopar Introduces New At-home Plug-in Wall Chargers for Jeep® 4xe Models and Chrysler Pacifica, https://media.stellantisnorthamerica.com/image-gallery.do?method=adhoc&mid=1&imageIds=,61956,61954,61955,61953,61951,61950,61952&title=Mopar%20Introduces%20New%20At-home%20Plug-in%20Wall%20Chargers%20for%20Jeep%C2%AE%204xe%20Models%20and%20Chrysler%20Pacifica (last visited June 13, 2024).

Pacifica combusted while plugged into a Mopar-branded charger installed in the family's garage.[107]

261.    On January 16, 2024, NHTSA announced that its Office of Defects Investigation would open an investigation to "to review the effectiveness of the original recall procedure, understand the root cause of the battery fires, investigate additional reports of Pacifica PHEV HV battery fires, and to increase monitoring of the manufacturer root cause investigation." NHTSA decided to review the effectiveness of FCA's recall based on "a recent increase in HV battery thermal events," and noted that "a review of NHTSA complaint data indicated the post-recall HV battery thermal event complaint rate now exceeds pre-recall levels."[108]

262.    FCA's delayed and ultimately ineffective recall experience with the Chrysler Pacifica hybrid would have put it on notice that a similar Fire Risk Defect could emerge in the Class Vehicles. The timing and sequence of fires that began in the Chrysler Pacifica are oddly reminiscent of fires in Class Vehicles; for both vehicles, the timing between the initial vehicle and the release of the vehicle and the first reported fire is about three years. However, FCA seems to have determined even sooner that its 2023 Recall for the Wrangler 4xe was ineffective due to multiple

---

[107] Ex. 67, Betty Lin-Fisher, USA Today, *More EV problems: This time Chrysler Pacifica under recall investigation after fires* (Jan. 24, 2024), https://www.usatoday.com/story/money/cars/2024/01/24/recall-investigation-chrysler-pacifica-plugin-fires/72153451007/.
[108] Ex. 68, NHTSA, ODI Resume, Investigation RQ24001

fires among Class Vehicles that received the attempted recall procedure. As one would expect, even with the admittedly "ineffective" 2023 and 2024 Recall remedies, the frequency of fires among Class Vehicles appears to be increasing dramatically, prompting the 2025 Recall for which there is no remedy, nor does past experience show the possibility of one absent FCA redesigning the HV Battery.

263. The timing of a battery failure could be related to the fact that, as stated in 2017 NHTSA Report, "[l]i-ion failure processes are time-dependent process." For instance, dendrite formation (i.e., lithium plating) occurs over time and the risk caused by it is cumulative, eventually resulting in catastrophic separator damage and thermal runaway propagation. As further stated in the NHTSA report, "While failure can sometimes occur very rapidly after a cell is damaged, damage may also sometimes grow over many years and many duty cycles, causing delayed failure long after damage is initiated."[109]

264. In other words, the likelihood of failure continues to increase as the Class Vehicles' HV Batteries are subjected to more and more duty cycles based on inappropriate use parameters programmed by FCA. The increased likelihood of failure appears to be borne out by the increasing frequency of reports of Fire Risk Defect incidents where, according to FCA, the number of customer-reported incidents has increased to at least 40 such reports, 19 of which have occurred in the

---

[109] Ex. 2, 2017 NHTSA Report at 11-1.

last 10 months since the release of the 2024 95B Recall remedy on or around December 2024.[110]

### 5.    FCA launches the Class Vehicles, and fires result.

265.    After FCA released the Class Vehicles into the market, owners and lessees began complaining that their Class Vehicles suddenly caught fire. According to FCA, between April and November 2023, at least 8 Jeep Wrangler 4xes caught fire all while parked and turned off. According to FCA's 2024 Recall, an additional 13 incidents occurred in Jeep Wrangler and Grand Cherokee 4xe's between April and July 2024. And finally, according to FCA's 2025 Recall, between January 27, 2025 and September 2, 2025, an additional 19 fire incidents have been report, 10 among Class Vehicles that were manufactured outside the scope of the 2024 95B Recall, and 9 among Class Vehicles that received the 2024 95B Recall attempted failed "remedy."[111]

266.    All together, there are at least 40 Class Vehicle fires that FCA has acknowledged in its reports to NHTSA, but there are significant gaps in the time periods that FCA has chosen to report fire incidents—the only periods reported are 4/2023-11/2023, 4/2024-7/2024, and 1/2025-9/2025. And FCA has acknowledged

---

[110] Ex. 78 at 3, NHTSA, Part 573 Safety Recall Report 25V-741.
[111] Ex. 78, NHSA, Part 573 Safety Recall Report 25V-741.

no fires occurring after September 2025 despite NHTSA-reported instances among Class Vehicles that *received* the 68C Recall "remedy."

267.   For example, a NHTSA complaint filed on January 28, 2026 asserts that the vehicle has "undergone three unsuccessful repair attempts," implying that the 2025 68C Recall remedy had already been completed. Nevertheless, the Class Vehicle began emitting smoke and "a burning smell … like met[a]l". As a result, the owner reported that (s)he would not "attempt to start, charge, or drive the vehicle" and that it would have to be towed to the nearest dealership.

268.   On February 12, 2026, another NHTSA contact reported that:

> I have a 2024 Jeep Wrangler Rubicon 4xe that was caught on fire at 2am 2/10/26 when parked in my garage. Jeep issed 68C recall for its defective EV battery, and I had finished the recall on 1/20/26 in Fremont CDJR in CA, but it was still caught on fire.   I have every thing saved, Ring footage and invoices from the dealer about recall. Just want to report that the remedy from Jeep does not help at all.

269.   It is unknown how many other fires FCA may be aware of that it has not explicitly reported to NHTSA. Outside of the 40 fire incidents explicitly acknowledged by FCA, Plaintiffs are also aware of numerous other reported fires, including for multiple named Plaintiffs herein, and as reported in the NHTSA complaint database.

270.   In both the Wrangler 4xe and Grand Cherokee 4xe, the HV Battery is situated below the passenger row of seats. After-action photos of the Jeep Wrangler

4xe involved in the Erie explosion described in the introduction appear to show the most severe charring in that area of the vehicle, which suggests it was the point of origin of the fire.



*The charred backseats of the Jeep Wrangler 4xe that exploded in Erie, Colorado.*[112]

271.   FCA, as a leading auto manufacturer, certainly would have been aware of the Erie, Colorado Wrangler 4xe explosion. This story was reported by local news and the story was viewed 11,000 times on YouTube.[113] Another YouTube video shared by a fire training instructor was viewed over 100,000 times as well.[114]

---

[112] Ex. 1.

[113] Ex. 55, YouTube, FOX31 Denver, Electric Jeep explosion in Erie (Apr. 13, 2023)

[114] Ex. 1.

272. This was not the only reported Jeep Wrangler 4xe fire in 2023 either. On December 11, 2023, a Reddit user from upstate New York reported that his 2021 Jeep Wrangler 4xe, "[s]tarted on fire in my driveway a little over a week ago, so that is the end of my 4XE experiment." [115] It was connected to a 220V charger at the time.[116] According to the user, after the fire FCA "had an independent firm come out and inspect," but "[c]ommunication from Jeep/Stellantis has been basically nonexistent."[117] On February 17, 2024, the user reported that FCA "is buying [their Class Vehicle] back, after some negotiation. The poor thing was totaled. Torched interior, glass smashed from the fire co, plastics burned through by the rear passenger tire which blew the tire."[118]

273. Two plaintiffs in *Frisch et al. v. FCA US LLC*, had fires in their Class Vehicles in April and May of 2024. No. 2:24cv10546 (E.D. Mich.), ECF No. 61 ¶¶ 368-74. These incidents bear many similarities. Both fires occurred while the vehicle was off and plugged in and both fires originated over the backseat where the HV Battery is located.

---

[115] Ex. 56, Reddit, r/4xe, u/dtorgue, "Lurking subs and cross shopping our next leased vehicle, specifically a Hybird…" (Dec. 11, 2023 4:01 a.m. PT), https://www.reddit.com/r/4xe/comments/18f6460/comment/kcw5689/.

[116] Ex. 57, Reddit, r/4xe, u/dtorgue, "My 4XE is affected by the battery recall." (Dec. 2, 2023 3:45 p.m. PT), https://www.reddit.com/r/4xe/comments/188weg2/comment/kbqlwxj/.

[117] Ex. 56.

[118] Ex. 57.



*A Frisch plaintiff's Class vehicle immediately after being extinguished.*



A Frisch plaintiff's Class Vehicle seconds after an explosion, with a visible jet of flame emitting from the area in which the battery is located.

274.   On or about October 30, 2023, a Jeep Wrangler 4xe Sahara exploded in Belgium, as captured in a video posted by a firefighting expert to YouTube.[119] The following still images show another powerful explosion and the state of the battery post-explosion:



*October 30, 2023 explosion of Jeep Wrangler 4xe in Belgium*

---

[119] Ex. 52.



*Image of the HV Battery After October 30, 2023 explosion of Jeep Wrangler 4xe in Belgium*

275. On or about May 1, 2025, the Mountain View California Fire Department responded to a fire in a Class Vehicle that occurred at Google's headquarters. As the below image shows, the fire caused by the Class Vehicle totaled at least two other vehicles parked on either side of it. The Mountain View Fire Department stated that "[t]he origin of the fire was determined to be the Jeep Wrangler EV" and "[t]he cause of the fire was determined to be related to the vehicle's lithium-ion battery charging system."[120]

---

[120] Ex. 79, *Electric Jeep bursts into flames at Google campus charging station*, KRON4 (May 2, 2025), https://www.kron4.com/news/bay-area/electric-jeep-bursts-into-flames-at-google-campus-charging-station/.



(Mountain View Fire Department)

Image provided by Mountain View California Fire Department of aftermath of Class

Vehicle Fire at Google Headquarters on or about May 1, 2025

276.   On or about October 23, 2025, the Contra Costa County, California Fire

Department took this image of a Class Vehicle that caught fire while parked in a

garage:[121]

---

[121] Ex. 80, *Electric Vehicle Fire Prompts 2-Alarm Fire Response in Walnut Creek*, CONTRA COSTA NEWS (Oct. 23, 2025), https://contracosta.news/2025/10/23/electric-vehicle-fire-prompts-2-alarm-fire-response-in-walnut-creek/.



*Image by CONFIRE*

*Contra Costa County, California Fire Department picture of Class Vehicle catching fire while parked in parking garage*

277. These fires have continued, even after three successive recalls. The NHTSA Complaint database is replete with recent reports of fires and explosions among Class Vehicles. One recent report from September 27, 2025 reads as follows and highlights the danger posed by Fire Risk Defect and ignored by FCA:

> JEEP 2024 Wrangler 4XE HYBRID EXPLODED VIN# [XXX]  On [XXX], just before [XXX], our 2024 hybrid vehicle began emitting smoke while parked in our attached garage. Thankfully, our smoke alarm alerted us - my wife discovered it was coming from the garage and immediately called 911.  Police arrived within minutes and were able to push the car out of the garage. Shortly after that, the vehicle caught fire. First responders later told us

- 127 -

that if my wife had not acted quickly, the fire could have easily spread to our home,Äîpotentially [sic] resulting in a total loss, or worse, endangering our lives if it had happened while we were asleep. It took four hours of continuous firefighting to manage the flames. The Hazmat team explained that this was due to thermal runaway, a dangerous chain reaction in lithium-ion batteries where heat builds uncontrollably, leading to fire or even explosions. These types of fires cannot be extinguished conventionally, they must burn out once the chemical reaction is complete. Some Important Context: This vehicle is the same year, make, and model as those recently recalled for hybrid battery fire risks. However, **our VIN was not included in the recall, something we now believe may have been an oversight, as the circumstances appear nearly identical.** Back in June, the car had another serious issue: it shut down completely despite a full gas tank and a 50% EV charge. It had to be towed to the dealership, and was returned to us a day or 2 later, marked as repaired. **After the fire - I reviewed the service paperwork, we found that the specific error code pointed to unstable hybrid battery voltage, a potential sign of a failing battery pack. According to documentation on that error code POB24, complete replacement of the hybrid battery is considered the only safe fix. That repair was never performed, and worse, we were never informed of the severity of the issue. This negligence should be addressed as it almost killed us.** (Emphasis added.)

278. In a NHTSA complaint dated January 9, 2024:

The contact owns a 2024 Jeep Wrangler 4x4E. The contact stated that his wife noticed a fire at the charger while the vehicle was plugged in and charging. The owners were able to extinguish the fire. There were no reported injuries. The vehicle had not been charged. The fire department was called to the scene. While his wife was driving the vehicle, it overheated. There were no warning lights illuminated. The contact called the local dealer, but the

vehicle was not diagnosed or repaired. The manufacturer was not notified of the failure. The failure mileage was approximately 8,500.

Notably, this vehicle would not have been included in the 2023 Recall, because the recall excluded 2024 models.

279. In another NHTSA complaint dated June 5, 2024, a 2021 Jeep Wrangler 4xe owner reported that their "[v]ehicle exploded while parked in the middle of [the] night catching fire causing major damage to the vehicle and a total loss."

280. On July 23, 2024, the owner of a 2022 Jeep Wrangler 4xe complained to NHTSA that, while parked and charging, the vehicle began smoking and the "[e]lectric battery ignited" and the "Jeep caught on fire." The owner also stated that it "[t]ook 3 hours to get the jeep cooled enough to tow it away."

281. On October 1, 2024, the owner of a 2021 Wrangler 4xe noticed that "there was smoke coming out of the back seat where the Hybrid battery is situated" while the vehicle was parked inside his garage and charging.

282. FCA has also left Class Members who have experienced fires with few options to remedy their financial loss. On September 3, 2024, the owner of a 2023 Jeep Wrangler 4xe reported that "while the vehicle was charging at [redacted], it caught fire." The owner specified that they were writing to NHTSA "to formally report a significant safety concern and financial hardship I have experienced as a result of" their Wrangler 4xe. The owner noted that "[t]he vehicle had no pending

services or recalls at the time of the incident," but "[t]o my further dismay, in October 2024, Jeep issued a global recall for this model, citing battery issues." The owner concluded that, "[g]iven the timing of the recall, I believe my incident is directly related to this defect, and the issue raises significant safety concerns."

283. Another 2023 Jeep Wrangler 4xe owner also noted the financial burden that they incurred as a result; the insurance proceeds did not come close to what they had paid for the vehicle only a short time ago. Additionally, it appears that FCA did not provide a rental and that FCA had failed to remedy the issue whatsoever. According to the owner, "despite my efforts" with customer service, "I have yet to receive any meaningful response or resolution from Jeep. This situation has caused not only significant financial strain but also immense mental stress." The owner concluded by "urg[ing] NHTSA to investigate this issue thoroughly and ensure that Jeep takes responsibility for their defective vehicles."

284. The potentially catastrophic results of a the fire risk presented by Class Vehicles have left consumers fearful and with few options about what to do with their vehicle, even where a fire has yet to occur. A 2023 Jeep Wrangler 4xe owner reported on September 6, 2024, that "the vehicle was experiencing difficulty recharging" and that "[t]he contact was no longer attempting to charge the vehicle for fear of starting a fire." The complaint also noted that "[t]he manufacturer was made aware of the failure."

285. On September 3, 2025, a 2024 Wrangler 4xe owner reported yet another fire:

> The contact owned a 2024 Jeep Wrangler. The contact stated that while the vehicle was parked in the driveway and charging, the battery caught on fire. … The contact stated that the fire department and Hazmat arrived. … The vehicle was a total loss. The contact stated that the failure was due to a thermal reaction in the battery. ... The contact stated that the fire department and Hazmat team recommended the vehicle be stored in a container for safety precautions. The manufacturer was made aware of the failure. The contact was informed that there will be an investigation. The failure mileage was approximately 31,000.

286. Another report by a 2024 Wrangler 4xe driver submitted on September 9, 2025 states that the "[b]attery under back seat exploded causing the vehicle fire that destroyed inside of the jeep on 8/31/25 in front of my garage while charging."

287. Even after the third recall, fires have continued. On January 10, 2026, a contact reported that when they had purchased their 2022 Jeep Wrangler 4xe in September 2025, "the dealer did not mention any recalls or safety concerns at the time of purchase nor did [they] receive any notification of a recall". Despite no warning of the potential defect, their "battery caught on fire just like the recall states. Fortunately a neighbor saw the fire prior to it burning down my other jeep and barn."

288. These concerning reports of fires are not limited to the Wrangler 4xe either. On May 3, 2023, the owner of a 2023 Grand Cherokee 4xe told NHTSA:

> When ever I try to charge my Jeep grand Cherokee 4xe summit reserve it fails to charge on a level 1 or level 2 charger and then the[] check engine light comes on and a electrical burning smell from the hybrid battery and says service charging system. When ever you bring it to the dealer they just reset the code and says it works only for the problem to come back it also affects how the jeep drives when this happens the jeep doesn't want to accelerate properly and has other electric system issues like the wipers coming on randomly and the massage seats coming on randomly as well which can distract someone when they are not expecting that to happen the jeep doesn't want to drive. I brought it to the dealer 3 times now and all they keep doing is resetting the code and stating its fine only for it to come back and this is a major problem and needs to be fixed as this is going to cause a major accident or fire since it has to do with the hybrid battery system.

289. The timing of this complaint is notable because this issue was reported to NHTSA almost six months before the 2023 Recall was issued. Of course, the 2023 Recall did not include any model year of Grand Cherokee 4xe, which makes the exclusion of those vehicles from recall until the 2024 Recall more than a full year later bewildering.

290. On October 10, 2024, the owner of a 2023 Grand Cherokee 4xe experienced a fire at their home. They were particularly concerned about the potentially fatal consequences of a fire and FCA's belated recall notice:

> On 10/10/2024, my Jeep Grand Cherokee 4xe (hybrid) had a battery fire at my home. Luckily, the fire department got it controlled before any additional property or any people were harmed, but under slightly different circumstances (middle of the night or parked in the garage) the house would have burned and my entire family could have been

killed. After this incident, I read that Jeep/Stallantis issued a recall for this issue 10/1, but no timely attempt to contact owners was made. The guidance is that these vehicles should not be charged and should not be parked near buildings. Knowing this could have prevented this and any other similar fires, but I did not receive notification of the recall until 10/21 by mail. I receive emails from Jeep/Mopar weekly for useless information such as extended warrantees, so immediate notification should be simple. In fact I even made an appointment for an oil change on the same day as the fire and after a search for recalls, I was given NO information about this. Jeep is now investigating the incident, but Stellantis will not provide me additional information and this process may take months. I am now paying out of pocket for a rental car and still must pay the loan for a car that is totaled. Stellantis should be providing a car in the meantime and replacing my car (in a non hybrid model) as soon as possible, but no one has even contacted me to make sure everyone is ok. They should also be notifying owners affected by the recall by every means possible in order to prevent further damage to property and human injuries or even deaths.

291. This report underlines many of the fears that Class Members have experienced and continue to experience. FCA's delayed recall process has only exacerbated these concerns and placed Class Members at risk.

292. All vehicle manufacturers, including FCA, routinely monitor and analyze NHTSA complaints to determine whether vehicles or components should be recalled due to safety concerns. Thus, on information and belief, FCA has knowledge of all NHTSA complaints filed concerning the vehicles it manufactures, including the Class Vehicles. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

293. It is unknown whether FCA has reported other Class Vehicle fire incidents to NHTSA. What is known is that fires continue to be reported, even among Class Vehicles that received the now admittedly "ineffective" 2023 Recall remedy, which apparently prompted at least in part FCA's vastly expanded 2024 Recall. A search of the database of publicly available database of NHTSA complaints reveals numerous complaints related to the Fire Risk Defect, as described below.[122]

294. In addition to these incidents, FCA also had notice of the Fire Risk Defect through its buyback acquisition of Class Vehicles and subsequent investigation.

295. According to its 2023 Recall Part 573 Safety Recall Report, FCA requested buybacks of seven vehicles and received buybacks of two of those vehicles and disassembled the HV battery packs.

296. According to its Part 573 Recall Report for the 2024 95B Recall, "FCA conducted further analysis of the battery packs from" certain Wrangler 4xe and/or Grand Cherokee 4xe Class Vehicles that caught fire between April and July 2024.

297. Inexplicably, in its 2025 68C Recall, FCA does not report any attempts to buy back any of the 19 vehicles or battery packs for those reported fires, which

---

[122] Ex. 58, This data is available publicly at: NHTSA Datasets and APIs, https://www.nhtsa.gov/nhtsa-datasets-and-apis.

would provide important information on the Fire Risk Defect, particularly when FCA still has not identified the root cause that has prompted these recalls.

298.   FCA now admits knowledge of at least 40 fires in its combined Recalls from 2023, 2024, and 2025. Upon information and belief, further examination of complaints submitted to FCA and to NHTSA via Vehicle Owner Questionnaires ("VOQ") will reveal further instances of Class Vehicles catching on fire. As acknowledged by FCA's 2024 and 2025 Recalls, the frequency of these fires is increasing, consistent with degradation of the HV Batteries as alleged above.

299.   As FCA continues to implement this new and seemingly ineffective "remedy" on the remaining 300,000 Class Vehicles and instructs Class Members their Class Vehicles are safe to charge, there are likely to be a significant number of additional fires in the near future as FCA recklessly endangers its own customers and bystanders.

**6.      FCA was slow to issue the 2023 Recall, deficiently administered the 2023 Recall, and now admits that the 2023 Recall was "ineffective."**

300.   Despite FCA's actual and/or constructive knowledge of the serious risk of explosion and fire in the Class Vehicles, it did nothing to remedy the problem or even warn consumers until many months later in its November 2023 Recall. And, as alleged herein, FCA's "sell first, recall later" strategy of serially issuing recalls followed by flawed "remedies," constitutes fraudulent and/or misleading statements

- 135 -

to potential purchasers, owners, and lessees of the Class Vehicles that FCA had resolved the Fire Risk Defect when that is not the case.

301. As to the initial 2023 B9A Recall, FCA's 2024 95B Recall acknowledges that the initial recall was "ineffective" in addressing the Fire Risk Defect and underinclusive to the tune of 120,000 affected vehicles. Still, a description of the ill-fated 2023 Recall is notable because of its inefficient rollout, deficient administration, and ineffectual nature.

302. According to the 2023 Recall Part 573 Recall Report that FCA sent to NHTSA on November 22, 2023, FCA's Technical Safety and Regulatory Compliance organization began investigating fire risk from the HV battery pack after receiving numerous reports of fires.

303. By October 2023, FCA had conducted "two vehicle buybacks and . . . disassembled the HV battery packs. The modules and cells are undergoing additional analysis." FCA still has not disclosed the results of any such analysis. Finally, on November 22, 2023, FCA's Vehicle Regulations Committee decided "to conduct a voluntary safety recall" of the Class Vehicles. The 2023 Recall, however, did not provide any fix for the Fire Risk Defect. Four months later, FCA announced an

attempted recall procedure in March 2024. But even after those months of delay, FCA admitted that it still had not identified the root cause of the Fire Risk Defect.[123]

304.   Nevertheless, FCA self-servingly predicted in its communications with dealers that, "Very few vehicles [an estimated one percent] are expected to require HV battery replacement."[124] FCA's rosy prediction for its 2023 Recall was off the mark. Class Vehicles failed the recall procedure in unexpectedly high numbers. One online poll on a Jeep 4xe forum found that nearly half of respondents needed a replacement HV battery, with all but one still waiting on their battery at the time they responded to the poll.[125]

305.   According to FCA's final Quarterly Report to NHTSA regarding its 2023 Recall, as of July 26, 2024, roughly half of a "recall population of 32,125" vehicles actually received recall service.[126] Unsurprisingly, given the large number of vehicles that ultimately failed recall service, Class Members reported waiting for months on end for their replacement HV Battery on various Jeep forums. For instance, on April 5, 2024, one commenter on an online forum dedicated to Jeep Wranglers posted that his Jeep 4xe was at the dealership for 76 days waiting for a

---

[123] Ex. 69, NHTSA Safety Recall, https://static.nhtsa.gov/odi/rcl/2023/RCRIT-23V787-2021.pdf.
[124] Id.
[125] Ex. 70, https://www.4xeforums.com/threads/poll-safety-recall-b9a-battery-replaced-or-not.6108/ (last visited June 22, 2024).
[126] Ex. 71, NHTSA, Recall Quarterly Report, 23V-787 (July 26, 2024), https://static.nhtsa.gov/odi/rcl/2023/RCLQRT-23V787-8387.PDF.

replacement HV battery before being returned to him.[127] Another reported six weeks of "total silence" on when (s)he might expect a replacement HV Battery.[128]

306. Another Class Member submitted the following complaint to NHTSA on or about May 3, 2024, regarding their 2021 Jeep Wrangler 4xe that was included in the recall:

> The contract [sic] owns a 2021 Jeep Wrangler. The contact stated that the vehicle was included in NHTSA Campaign Number: 23V787000 (Electrical System), where the high voltage battery pack software and other updates were updated. The contact stated that after receiving the repair the vehicle started to run rough while driving at various speeds. The contact stated that the charging indicator was fluctuating, the RPM was fluctuating, and the check engine warning light was illuminated. The vehicle also ran rough while attempting to accelerate. The power would fail, and the vehicle would restart while driving at various speeds. The vehicle had been taken back to the dealer where it was diagnosed that the battery had failed. The dealer performed more software updates; however, the failure persisted. The dealer stated that the battery pack assembly needed to be replaced. The vehicle had not been repaired due to the dealer waiting for parts to be available. The manufacturer was made aware of the failure. The failure mileage was 34,000.

307. On June 18, 2024, another Class Member submitted this complaint to NHTSA regarding their 2021 Jeep Wrangler 4xe:

---

[127] Ex. 72, https://www.jlwranglerforums.com/forum/threads/4xe-in-shop-for-65-days-and-counting-battery-wont-charge-jeep-cant-figure-out-the-problem-cel-code-p0bbd-00.127362/page-3 (last visited June 22, 2024).
[128] Ex. 73, https://www.wranglerforum.com/threads/hybrid-battery-pack-what's-left-to-do.2470507/ (last visited June 22, 2024).

> Jeep has failed to repair the outstanding recalls--one of which says my Jeep can spontaneously combust on/off, charging/not charging, driving/not driving.  Jeep offered to buy back my Jeep and now has put it into processing hell, essentially reneging its offer to buy back my Jeep, which I have in writing.

308. Given FCA's open acknowledgment of the lack of replacement HV Batteries for the 2023 Recall, it is no wonder that FCA struggled to get Class Members to submit their vehicles for performance of the recall procedure. Class Members either left with the same exact HV Battery being told, dubiously, that it is not in fact prone to catching fire, or their vehicle had to sit with the dealer for an indeterminate amount of time while waiting for a replacement HV Battery System.

309. As FCA floundered in performing the 2023 B9A Recall procedure, it continued to advise the Class Vehicle owners and lessees "to refrain from recharging these vehicles and not to park them inside of buildings or structures, or near other vehicles until the vehicle has the final repair completed."

310. These instructions left Class Vehicle owners with three choices: (i) follow FCA's instructions, if possible, at the great inconvenience of parking far from home and the expense and environmental impact of additional consumption of gasoline (and potentially degrading their HV Batteries further by not charging them as per FCA's use guidelines); (ii) ignore FCA's instructions and risk calamity; or (iii) sell the vehicles at a substantial loss as a result of FCA's conduct.

311. Perhaps more commonly, many owners of Class Vehicles were simply unable to find a "safe" place to park their vehicles at home, work, and/or anywhere else they need to take their vehicles. This is especially true for owners who live in apartments or densely populated urban areas, but also rural wooded areas with high fire risk. Often, owners have no choice but to park them in unsafe locations. Others, faced with spiking fuel costs, simply cannot afford not to re-fuel them.

> **7.** **FCA's admittedly "ineffective" 2023 B9A and 2024 95B Recall remedies and 2025 68C remedy leave Plaintiffs and Class Members with vehicles that continue to pose an unreasonable fire risk.**

312. FCA's original 2023 Recall estimated that there were 32,125 potentially affected 2020-2023 Jeep Wrangler 4xe's. FCA's 2024 Recall significantly expanded the universe of affected Class Vehicles to 154,032 vehicles, including apparently all 2020-2024 Jeep Wrangler 4xe's and 2022-2024 Jeep Grand Cherokee 4xe's.[129] Finally, FCA's recent 2025 68C Recall has more than doubled the number of affected Class Vehicles to 228,221 2020-2025 Jeep Wrangler 4xe's, and 91,844 affected 2022-2026 Jeep Grand Cherokee 4xe Class Vehicles.[130] FCA has also acknowledged 19 new incidents in Class Vehicles related to the Fire Risk

---

[129] Ex. 30 at 1, NHTSA, Part 573 Safety Recall Report 24V-720.
[130] Ex. 78 at 1, NHTSA, Part 573 Safety Recall Report 25V-741.

Defect in the preceding ten or so months,[131] far more than what FCA had previously reported.

313.   Upon information and belief, Plaintiffs assert FCA's recent 2025 68C Recall effectively includes every Jeep Wrangler 4xe and Jeep Grand Cherokee 4xe ever sold or leased up through August 25, 2025 and October 15, 2025, respectively.[132] Notably, this latest recall includes the MY 2026 Jeep Grand Cherokee 4xe, which appears to have been formally announced by Stellantis only days before being recalled and then later discontinued altogether.[133]

314.   Now that FCA has expanded its latest recall to include every single Jeep Wrangler 4xe and Jeep Grand Cherokee 4xe ever sold, it seems FCA has finally reached the conclusion that limiting these successive recalls to specific manufacturing date range is unwarranted and unjustified. Yet, for a third time between 2023-2025, FCA continues to claim that it does not understand the root cause of the HV Battery defect other than unspecified allusions to separator damage. This admission, combined with the fact that FCA has not redesigned the HV Batteries, demonstrates that any date range cutoff for FCA's successive recalls was

---

[131] Ex. 30 at 3, NHTSA, Part 573 Safety Recall Report 24V-720.
[132] Ex. 78 at 1-2, NHTSA, Part 573 Safety Recall Report 25V-741.
[133] Ex. 81, *Press Kit: 2026 Jeep Grand Cherokee*, STELLANTIS (Oct. 28, 2025), https://media.stellantisnorthamerica.com/newsrelease.do?id=27159&mid=1519

- 141 -

never anything more than a sham to allow FCA to resume selling, without disclosure, Class Vehicles bearing the Fire Risk Defect.

315. Notably, all three of FCA's recalls between 2023-2025 were announced at nearly identical points in the calendar year (late October and November) and the 2024 and 2025 Recall timing corresponded to just after completion of FCA's manufacturing run for the latest model years. For instance, the 2025 68C Recall Part 573 Report was submitted on October 30, 2025.[134] FCA states in that same report that the production period for the affected Class Vehicles ended on August 25, 2025 (Jeep Wrangler 4xe) and October 15, 2025 (Jeep Grand Cherokee 4xe), respectively.[135]

316. This strongly suggests that FCA was engaging in a deliberate strategy of sell first, recall later. Three years later, FCA has not identified any root cause, it has not redesigned the HV Battery, and it has not come up with any effective remedy, as there have already been multiple reported fires among the few Class Vehicles that have received the 2025 68C Recall "remedy" attempt.

---

[134] Ex. 78 at 1, NHTSA, Part 573 Safety Recall Report 25V-741.
[135] *Id.*

8.      **FCA knew or should have known that its 2023 and 2024 attempted and failed recall procedures would be ineffective to address the Fire Risk Defect.**

317.   FCA also knew or should have known that its 2023 and 2024 Recall remedy procedures would be ineffective because they did not—indeed could not—address the root cause of the Fire Risk Defect, which appears to be design-related.

318.   In the first instance, FCA's attempted 2023 and 2024 Recall procedures were not a remedy, rather they were merely a diagnostic test. Per FCA's revised 2023 B9A Recall communication to dealers in March 2024, the following is the summary of the "Repair to Be Performed":

> Perform the Battery Pack Control Module (BPCM) Software Update and BPCM Integrity Procedure.
>
> Do not replace the High Voltage battery unless the BPCM Integrity Procedure DTCs indicates a new battery is required.[136]

319.   In other words, the attempted 2023 B9A recall procedure merely updated the software and ran a battery integrity test rather than providing any safer redesign to Class Vehicle's HV Battery systems. At best, a test cannot address the root cause of a defect, it can only ascertain whether the HV Battery is more or less likely to catch fire. In any event, as FCA has acknowledged, all of its tests have been ineffective in detecting the conditions that could lead to a fire in Class Vehicles.

---

[136] Ex. 87, https://static.nhtsa.gov/odi/rcl/2023/RCRIT-23V787-8736.pdf (last visited June 24, 2024).

320. The same is true of FCA's 2024 95B Recall remedy that FCA now admits was likewise "ineffective."[137] Per FCA's 2024 95B Recall communication to dealers in January 2025, the following is the summary of the "Repair to be Performed":

> Perform the Battery Pack Control Module (BPCM) Software Update and Drive Cycle.
>
> Do not replace the High Voltage battery unless DTCs indicates a new battery is required.[138]

321. These diagnostic tests that were designed to detect HV Batteries most at risk of a fire does not and could never have addressed the underlying root cause, which FCA still has not identified specifically, even after its recent 2025 68C Recall. Describing these tests as a "fix" or "remedy" seems to only serve the purpose of mislead current and potential owners and lessees regarding the safety risks of these vehicles. As shown by the reports of fires following purported software "remedies" and continued sales of tens and thousands of these vehicles, this appears to have lulled owners and lessees into a false sense of security.

322. It is also unclear how a programming fix could remedy battery failure, as internal damage caused by overcharging and undercharging the battery increases the risk of battery failure, which may not emerge until long after the damage has

---

[137] Ex. 78 at 3, NHTSA, Part 573 Safety Recall Report 25V-741.
[138] Ex. 82, at 1, January 2025 FCA US LLC 95B Recall Remedy Instructions.

already occurred.[139]  There is no software that can remedy physical changes within the battery. These physical battery changes include damage to the separator, which FCA has twice acknowledged as "the most likely root cause."[140]

323.   The fact that the HV Battery in some Class Vehicles may not yet have degraded to a degree that FCA deems worthy of replacement does not mean that those HV Battery systems are safe from the Fire Risk Defect. As discussed above, HV Battery degradation, separator damage, and the risk of fire, increase over time and presently "safe" HV Batteries can degrade rapidly as the battery is charged and discharged without appropriate safeguards. This reality is demonstrated by Class Vehicles that have caught fire that "passed" the B9A and/or 95B Recall remedy diagnostic testing without needing replacement. For instance, FCA's recent 2025 68C Recall admits receiving reports of at least 10 fires among Class Vehicles that underwent the 2024 95B Recall attempted remedy.

324.   The 2023 and 2024 Recall testing procedures plainly cannot, nor could they, solve physical damage to the HV Battery. Moreover, even if FCA earnestly believed that its 2023 and/or 2024 Recall Procedures could detect such physical damage and that it could replace all of the affected HV Batteries, the plan was always to replace the HV Battery with an *identical* HV Battery. Given what is known about

---

[139] Ex. 2, 2017 NHTSA Report at 11-1.
[140] Ex. 30 at 3, NHTSA, Part 573 Safety Recall Report 24V-720.

the Fire Risk Defect, it seems likely that these new *identical* HV Batteries, if subjected to the same FCA-programmed usage and charging specifications, will develop a similar risk of combustion in the future. If anything, FCA's unwillingness to proactively replace and redesign the dangerous HV Battery systems in the Class Vehicles appears to show that its recall "fixes" are nothing more than a delay tactic or cost-cutting measure, rather than a good faith attempt to address the safety issue. The cost of this delay is measurable in terms of loss of use, and the loss of the plug-in hybrid utility of a vehicle owners paid for.

325.   FCA also received direct notice of the ineffective nature of the 2023 Recall remedy from vehicle fires that occurred even after the recall remedy was performed. As FCA has acknowledged, "[f]rom June 2024 to July 2024, [it] received [at least] three reports of fires originating in the HV battery in Jeep Wrangler PHEVs *which received the [2023 Recall] remedy software*." (Emphasis added.) Yet as with its underinclusive scope, FCA waited until late September of 2024 to acknowledge that the remedy was "ineffective at detecting certain abnormalities within the HV battery which may lead to a fire."[141]

326.   The same is true for the ineffective 2024 Recall. Plaintiffs repeatedly put FCA on notice of reported fires among Class Vehicles that received the 95B

---

[141] Ex. 30 at 3, NHTSA, Part 573 Safety Recall Report 24V-720.

Recall remedy as early as February 2025.[142] Inexplicably, FCA waited until just after the production runs ended for those model years and tens of thousands more of the unrecalled 2025 model year vehicles were sold to issue its latest 2025 68C Recall.

> **9.      FCA's expanded 2025 Recall seems likely to face the same issues of ineffectiveness and underinclusiveness as the 2023 and 2024 Recalls, and has already prompted complaints from Class Vehicle owners.**

327.   FCA's 2025 68C Recall "remedy" attempt is yet another software flash, and until the remedy is completed, Plaintiffs and Class Members are yet again (some for the third year in a row) being given the burdensome instruction not to recharge their *plug-in hybrid* Class Vehicles and to park them away from structures or other vehicles (*i.e.*, in a field or desert).

328.   Additionally, while FCA has significantly expanded the scope of potentially involved Class Vehicles, FCA again appears to define the scope in a misleading and self-serving manner. In its 2025 68C Recall, FCA again claims that it has identified a "Production Dates" range of affected vehicles through August 25, 2025 (Wrangler 4xe) and October 15, 2025 (Grand Cherokee 4xe), respectively, based on when "the last vehicle with a suspect HV battery was built."[143] But as with

---

[142] *See* ECF 36, at 14 (filed February 17, 2025) (stating "there are numerous reports of Class Vehicles catching fire and/or exploding even after receiving the 2024 Recall 'remedy'" and detailing some of those reports)

[143] Ex. 78 at 1, NHTSA, Part 573 Safety Recall Report 25V-741.

its 2023 and 2024 Recalls, FCA completely fails to substantiate how it could limit the population of recalled vehicles by the date of battery manufacture.

329. Troublingly, owners are also reporting that the new 68C software update is worse than useless; installation has actually created *even more* safety issues for owners of Class Vehicles than existed before. For example, the owner of a 2021 Jeep Wrangler reported the following on January 23, 2026:

> ***I just had the 68C recall done to my Jeep Wrangler 4XE recently. Before the recall, it was running fine.*** But now, every time I go uphill in electric only mode, the car would suddenly lose power (eg. slowing down from 50 MPH to 20 MPH). Pressing the accelerator does nothing, until I fully depress it, at which point the gas engine would start and the car jerks forward. ***It's very dangerous with the sudden slow down and speed up for no reason.***

330. Reports of increased safety risks posed by the new 68C recall are not isolated. For example, one owner in Dublin, Ohio reported that after the 68C recall was performed on their 2022 Jeep Wrangler 4xe, the owner observed that the Class Vehicle was now "[s]luggish in both hybrid and electric modes." On February 27, 2026, the owner reported that they experienced a "[c]omplete and total loss of power while driving on the highway. ***Major safety issue and a near crash***."

331. FCA continues to impose an array of bad choices on owners and lessors. As stated above, fires have continued in spite of the numerous proposed "remedies" so there is little reason to believe this latest 68C remedy will work. On the other

hand, the latest recall appears to create an additional safety risk with loss of power that did not exist before.

332.   The frustration of owners and lessees is understandable. For three years, FCA has floundered and failed at providing an effective remedy for the Fire Risk Defect. Class Members have been instructed to park the Class Vehicles they bought far away from their homes and that they cannot recharge them, depriving Class Members of the main value proposition of the Class Vehicles compared to their drastically less expensive non-hybrid equivalents. In the meantime, Class Members have paid for leases without a fully functional vehicle.

**10.      FCA's 2024 and 2025 Recall understated the widespread nature of the Fire Risk Defect and misled the public regarding the Fire Risk Defect**

333.   FCA's 2024 and 2025 Recall understated the widespread nature of the Fire Risk Defect. This is best exemplified by FCA's inconsistent statements to regulators and the public.

334.   In its 2024 95B Recall Part 573 Report, FCA reported that only one-percent of vehicles had the defect. Suspiciously, this is exactly the same proportion of vehicles it estimated as defective in its 2023 Recall Part 573 Report. FCA provided no evidence for why only one-percent of recalled vehicles are defective, but regardless of its justification, one-percent of 154,032 vehicles recalled in 2024

is a substantially larger number than the one-percent of 32,125 vehicles recalled in 2023.[144]

335. Now, in October 2025, FCA estimates that five percent (5%) of the Class Vehicles contain the Fire Risk Defect. Even if we could take FCA at its word, five percent of 320,065 vehicles recalled in 2025 is orders of magnitude larger than the previous one-percent estimates on much smaller recall populations.[145] For owners, this means that there is a one in twenty chance that their Class vehicles could catch fire while off, which is hardly a risk worth taking. For the public at large, this means there are 16,000 potential bombs in garages, driveways, and parking lots around the country.

336. To be clear, regardless of whether the estimate is one-percent or five-percent, FCA's assertions that some of the Class Vehicles do not possess the Fire Risk Defect is false. All are subject to the Fire Risk Defect.

337. Troublingly, FCA continued to sell the Class Vehicles despite its knowledge of the risk posed by the Fire Risk Defect. When FCA issued a "stop sale" for 30,000 Class Vehicles subject to its November 2023 Recall, it did not also issue a "stop sale" for the more than 120,000 Class Vehicles that it knew or should have known should not be sold, which later became subject to its November 2024 Recall.

---

[144] Ex. 30 at 1, NHTSA, Part 573 Safety Recall Report 24V-720.
[145] Ex. 78 at 1, NHTSA, Part 573 Safety Recall Report 25V-741.

Instead, it only issued a "stop sale" for 2024 model year vehicles in November 2024,[146] which of course allowed for brisk sales of the unrecalled vehicles (such as the 2024 Jeep Wrangler 4xe and the 2022-2024 Jeep Grand Cherokee 4xe) throughout most of 2024.

338.  With each successive recall, the number of affected vehicles has increased and the overall number of Class Vehicles has now ballooned to 320,065 in the 2025 68C Recall. A large proportion of these sales were made long after the first 2023 recall, and were facilitated by FCA's declarations that the newest model year productions were safe despite neither understanding the root cause nor redesigning the HV Battery system in any way.

339.  On the very same day it issued its latest 2025 68C Recall, Stellantis provided a Q3 2025 Investor Presentation boasting that U.S. sales were up 6% year-over-year "largely driven by Jeep® Wrangler" sales, and that Jeep® brand sales were up 11% year-over-year.[147]

340.  FCA's abrupt discontinuation of sales of Class Vehicles has done nothing for Plaintiffs and the Proposed Class who either still possess Class Vehicles

---

[146] Ex. 83, FCA, New Safety Recall Advanced Communication – B9A (Nov. 23, 2023).

[147] Ex. 84, Stellantis Shipments and Revenues Q3 2025 Presentation (Oct. 30, 2025), https://www.stellantis.com/content/dam/stellantis-corporate/investors/events-and-presentations/presentations/Stellantis-Q32025-Shipments-and-Revenues-Presentation.pdf.

or paid for use of Class Vehicles under the pretense of being able to use it for the purpose it was inteded for—as a safe and functional plug-in hybrid vehicle.

## VI.   FRAUDULENT CONCEALMENT

341.   Plaintiffs' claims arise out of FCA's fraudulent concealment of the Fire Risk Defect and its repeated and continuing representations or omissions about the quality, safety, uses, features and and benefits of, and comfort of the Class Vehicles.

342.   Plaintiffs allege that at all relevant times, including specifically at the time they and other Class Members purchased or leased their Class Vehicles, FCA knew or should have known of the Fire Risk Defect; FCA was under a duty to disclose the Fire Risk Defect based upon its exclusive knowledge and concealment of it; and FCA never disclosed the Fire Risk Defect to Plaintiffs, Class Members, or the public at any time or place or in any manner other than inadequate and admittedly ineffective recalls arbitrarily limited to certain subsets of the Class Vehicles.

343.   Plaintiffs make the following specific fraud allegations with as much specificity as possible absent access to the information necessarily available only to FCA:

   a.   *Who:* FCA, as manufacturer and seller of the Class Vehicles.

   b.   *What:* As described above, FCA knew, or was deliberately indifferent to knowledge of the Fire Risk Defect because of the cumulative notice provided by each of the following sources: (1) general industry knowledge of fire

risk in plug-in hybrid vehicles, as described in the 2017 NHTSA Report; (2) FCA's accumulation of knowledge regarding similarly defective parts related to the HV Battery in the Chrysler Pacifica and other hybrid vehicles using HV batteries manufactured by Samsung SDI; (3) several Class Vehicles that FCA investigated or had the opportunity to investigate prior to FCA's ineffective and underinclusive 2023 Recall, 2024 Recalls, and 2025 Recalls; (4) subsequent Class Vehicle fires that occurred after FCA's ineffective and underinclusive 2023, 2024, and/or 2025 Recalls; (5) the highly specific notice of the Fire Risk Defect as stated in Plaintiffs' complaints filed in this matter; and (6) that even a single incident of unexpected vehicle explosion can and should draw immediate and intense scrutiny.

        c.     ***When:*** FCA concealed material information regarding the Fire Risk Defect at all times continuing through the present and made representations about the quality, safety, and comfort of the Class Vehicles, starting no later than 2019, when it accumulated requisite knowledge of the Fire Risk Defect based on its extensive industry knowledge and fires in similarly defective parts of the HV Battery of the Chrysler Pacifica hybrid plug-in. This was prior to sale of a Class Vehicle to any member of the Class. FCA still has not disclosed the truth about the full scope of the Fire Risk Defect in the Class Vehicles to anyone outside of FCA, and continues to sell Class Vehicles with the Fire Risk Defect without disclosure.

d.      FCA also concealed its knowledge that its 2023 and 2024 Recalls would be ineffective to address HV Battery damage caused by physical damage to the HV Battery and refused to address the root cause. FCA also never intended to replace sufficient amounts of HV Batteries to ever make good on the 2023 or 2024 Recalls. And FCA knew that replacing defective HV Batteries with *the same* defective HV Batteries would not comprehensively address the Fire Risk Defect, only serving as a cost-cutting diversion and delay tactic. Not until the 2024 Recall was issued in September 2024 did FCA ever take action to inform consumers about the true nature of the Fire Risk Defect in Class Vehicles, finally divulging that while "root cause investigation continues[,]" FCA and Samsung claim that the HV Batteries develop damage to the separator along with other unexplained phenomena.

e.      FCA's 2025 Recall re-affirms that suspicion of root cause, but apparently has nothing further to add to the public's understanding of the defect after what should have been two years of diligent investigation. There is already growing evidence that the 2025 68C Recall "remedy" is similarly ineffective, as this Complaint describes multiple fires among Class Vehicles that received the 68C attempted remedy.

f.      ***Where:*** FCA concealed material information regarding the true nature of the Fire Risk Defect in every communication it had with Plaintiffs and Class Members, including in the pervasive marketing described herein, and

- 154 -

including by making or omitting material representations about the quality, safety, comfort, and features of the Class Vehicles. Plaintiffs are aware of no document, communication, or other place or thing, in which FCA disclosed the truth about the full scope of the Fire Risk Defect in the Class Vehicles to anyone outside of FCA. Such information is not adequately disclosed in any sales documents, displays, stickers, advertisements, warranties, owner's manuals, on FCA's website, or by any salesperson at an FCA dealership.

g.     FCA has also actively and repeatedly misrepresented, and concealed material information regarding, the true nature of the Fire Risk Defect in its 2023, 2024, and 2025 Recall notifications, first by emphasizing that it was a limited manufacturing defect in the 2023 Recall and that a software flash would be an effective remedy when FCA knew or was deliberately indifferent to whether that was true. Second, in the 2024 Recall, FCA continued to misrepresent that a software remedy followed by replacement with yet another defective *identical* HV Battery will be effective to address the Fire Risk Defect. Finally, in its 2025 68C Recall, FCA again declares the Class Vehicles safe following its latest "remedy," despite knowledge of multiple fires among Class Vehicles that received the supposed "remedy." Third, in all its recall announcements from 2023-2026, FCA has emphasized that the Fire Risk Defect was only present in affected vehicles manufactured through a date certain. But as shown in successively expanding

recalls, this arbitrary and self-serving declaration misrepresented that the Fire Risk Defect would not be present in future vehicles when FCA knew that was not true. Fourth, by misleading the public and regulators who are responsible for ensuring vehicle safety through annual renewal of its recalls followed by inadequate remedies to resolve this major safety risk.

h.      *How:* By concealing the truth about the existence, scope, and nature of the Fire Risk Defect from Plaintiffs and Class Members at all times, even though it knew about the Fire Risk Defect and knew that information about the Fire Risk Defect would be material to a reasonable consumer. Also, by promising and implying in its marketing materials that the Class Vehicles were safe, dependable, high performing, and had features and attributes they did not actually have. Additionally, by representing that vehicles were safe to use as hybrid vehicles after recall "fixes" that did nothing to resolve the underlying issue of the Fire Defect.

i.      *Why:* FCA actively concealed material information about the Fire Risk Defect in the Class Vehicles, and made representations conveying and implying that the Class Vehicles were safe, dependable, high performing, and had attributes they did not actually have, for the purpose of inducing Plaintiffs and Class Members to purchase and/or lease Class Vehicles, rather than purchasing and/or leasing competitors' vehicles. Had FCA disclosed the truth—for example, in its advertisements, materials or communications with the public or regulators—

Plaintiffs and Class Members (all reasonable consumers) would have been aware of it, and would not have bought or leased the Class Vehicles or would have paid less for them. FCA also continued to conceal this information regarding older models to sell (and later recall) similarly designed new model year vehicles that it knew or should have known were defective based on the design.

## VII.   DISCOVERY RULE TOLLING OF THE STATUTE OF LIMITATIONS

344.   At the time that they purchased or leased their Class Vehicles, Plaintiffs and Class Members could not have discovered through the exercise of reasonable diligence the existence of the Fire Risk Defect or FCA's conduct as complained of herein.

345.   FCA concealed its knowledge regarding the existence of the Fire Risk Defect, and Class Members had no way of knowing about the Fire Risk Defect until November 2023 at the earliest, when FCA issued a recall for the Fire Risk Defect.

346.   Plaintiffs and the other Class Members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that FCA did not report information within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that FCA had concealed information about the Fire Risk Defect.

347.   For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Class Vehicles.

- 157 -

## VIII.  **CLASS ALLEGATIONS**

348.  Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class and subclasses:

**Nationwide Class**: All persons or entities who purchased or leased one or more model year 2020-2025 Jeep Wrangler 4xe and/or 2022-2026 Jeep Grand Cherokee 4xe plug-in hybrid electric vehicles (the "Class Vehicles").

**Florida Subclass:** All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Florida.

**Illinois Subclass:** All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Illinois.

**Maryland Subclass:** All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Maryland.

**Massachusetts Subclass:** All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Massachusetts.

**Missouri Subclass:** All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Missouri.

**New York Subclass:** All persons or entities who purchased or leased one or more of the Class Vehicles in the State of New York.

**North Carolina Subclass:** All persons or entities who purchased or leased one or more of the Class Vehicles in the State of North Carolina.

**Oregon Subclass:** All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Oregon.

**Pennsylvania Subclass:** All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Pennsylvania.

**Tennessee Subclass:** All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Tennessee.

**Utah Subclass:** All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Utah.

**Washington Subclass:** All persons or entities who purchased or leased one or more of the Class Vehicles in the State of Washington.

349. Plaintiffs assert claims under the laws of each state as set forth below.

350. Excluded from the definitions of each Class and Subclass are any personal injury or property damages claims resulting from the fires or explosions caused by the Class Vehicles. Also excluded from the Class and Subclasses are FCA and its subsidiaries and affiliates; all persons who make a timely election to be excluded from this action; governmental entities; the judge(s) to whom this case is assigned and their immediate family; and Plaintiffs' Counsel. Plaintiffs reserve the right to revise the Class and Subclass definitions based upon information learned through discovery.

351. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide

basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

352. This action has been brought and may be properly maintained on behalf of the Class and Subclasses proposed herein under Federal Rule of Civil Procedure 23.

### A.      Numerosity

353. Federal Rule of Civil Procedure 23(a)(1): The members of each Class and Subclass are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. For purposes of this complaint, Plaintiffs allege that there are estimated to be over 320,065 Class Vehicles in the Nationwide Class. The precise number of Class and Subclass Members is unknown to Plaintiffs but may be ascertained from FCA's books and records. Class and Subclass Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

### B.      Commonality and Predominance

354. Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class and Subclass Members, including, without limitation:

      a.      Whether FCA engaged in the conduct alleged herein;

b.      Whether the Fire Risk Defect creates an unreasonable risk of fires in the Class Vehicles;

c.      When FCA first knew about the Fire Risk Defect;

d.      Whether FCA designed, manufactured, marketed, and distributed the Class Vehicles with defective high-voltage battery packs;

e.      Whether any future FCA purported recall "repair" is a *bona fide* repair of the faulty battery packs;

f.      Whether FCA's conduct renders it liable for breach of warranties;

g.      Whether FCA has been unjustly enriched at the expense of Plaintiffs and the Class and Subclasses;

h.      Whether Plaintiffs and the other Class and Subclass Members overpaid for their vehicles at the point of sale; and

i.      Whether Plaintiffs and the other Class and Subclass Members are entitled to damages and other monetary relief and, if so, in what amount.

### C.    Typicality

355.   Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class and Subclass Members' claims because, among other things, all Class and Subclass Members were comparably injured through FCA's wrongful conduct as described above.

### D.      Adequacy

356.    Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class and Subclass representatives because their interests do not conflict with the interests of the other members of the Class and Subclasses they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Class and Subclasses' interests will be fairly and adequately protected by Plaintiffs and their counsel.

### E.      Superiority

357.    Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class and Subclass Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against FCA, so it would be impracticable for the members of the Class and Subclasses to individually seek redress for FCA's wrongful conduct. Even if Class and Subclass Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and

provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## IX. NATIONWIDE CLAIMS

### COUNT I
### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *et seq.*)
### (Alleged by all Plaintiffs on behalf of the Nationwide Class
### or, in the alternative, the State Subclasses)

358. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

359. Plaintiffs bring this claim on behalf of the Nationwide Class.

360. This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

361. The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). Plaintiffs and Nationwide Class Members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

362. FCA is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

363. 15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

- 163 -

364. FCA provided Plaintiffs and Nationwide Class Members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As part of the implied warranty of merchantability, FCA warranted that the Class Vehicles engines were fit for their ordinary purpose as safe plug-in hybrid electric motor vehicles and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

365. FCA breached its implied warranties, as alleged herein and in more detail above, and is therefore liable to Plaintiffs pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of combustion, causing an unreasonable risk of death, serious bodily harm, and/or property damage to lessees and owners of the Class Vehicles as well as their homes, passengers, and bystanders. This defect rendered the Class Vehicles, when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of hybrid driving. In fact, as a result of the defect, FCA specifically advised owners and lessees not to charge their batteries and not to drive the Class Vehicles in electric mode.

366. As discussed above, on information and belief, FCA skimped on available safety technologies that would have precluded the Fire Risk Defect, and, through the sort of testing that any responsible vehicle manufacturer would have done prior to launching the Class Vehicles, FCA knew or should have known of the defect. Yet, to pad its bottom line and launch the first-ever plug-in hybrid electric vehicle with the highest possible electric and overall range, FCA intentionally or recklessly foisted the outrageously dangerous Class Vehicles on unwitting Class Members.

367. Any effort by FCA to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

368. Any limitations FCA might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between FCA and Plaintiffs, as, at the time of purchase and lease, Plaintiffs had no other options for purchasing warranty coverage other than directly from FCA.

369. Any limitations FCA might seek to impose on its warranties are substantively unconscionable. FCA knew that the Class Vehicles were defective and that the Class Vehicles could ignite when used as intended long before Plaintiffs and the Class. FCA failed to disclose this defect to Plaintiffs and the Class. Thus,

- 165 -

enforcement of the durational limitations on the warranties is harsh and would shock the conscience.

370. Plaintiffs have had sufficient direct dealings with FCA and its authorized dealerships to establish privity of contract between FCA and Plaintiffs. Nonetheless, privity is not required here because Plaintiffs are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of FCA's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the aforementioned defect, as fires present an unreasonable risk of death, serious bodily harm, and/or property damage to lessees and owners of the Class Vehicles as well as their homes, other nearby structures and vehicles, passengers, and bystanders.

371. Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give FCA notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

372. Plaintiffs would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because FCA

will not acknowledge any revocation of acceptance and immediately return any payments made, Plaintiffs have not re-accepted their Class Vehicles by retaining them.

373. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of all other Nationwide Class Members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the Nationwide Class Members in connection with the commencement and prosecution of this action.

374. Plaintiffs also seek the establishment of an FCA-funded program for Plaintiffs and Nationwide Class Members to recover their damages arising from the Fire Risk Defect.

## X.   STATE-SPECIFIC CLAIMS

### A.   Florida

**COUNT II**
**VIOLATION OF FLORIDA'S**
**DECEPTIVE & UNFAIR TRADE PRACTICES ACT**
**(Fla. Stat. § 501.201, *et seq.*)**
**(Alleged by Plaintiffs Jocelyn and Daniel Grenier on behalf of the Florida**
**Subclass)**

375.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

376.   Plaintiffs Jocelyn and Daniel Grenier ("Plaintiffs," for purposes of the Florida claims) bring this claim on behalf of themselves and the Florida Subclass ("Subclass," for purposes of the Florida claims).

377.   Plaintiffs and the Subclass are "consumers" within the meaning of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Florida Statutes § 501.203(7).

378.   FCA engaged in "trade or commerce" within the meaning of Florida Statutes § 501.203(8).

379.   The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce .…" Fla. Stat. § 501.204(1). By concealing the Fire Risk Defect in the Class Vehicles, FCA participated in unfair and deceptive trade practices that violated the FDUTPAas described herein.

- 168 -

380.  FCA's actions, as set forth above, occurred in the conduct of trade or commerce.

381.  In the course of its business, FCA concealed and/or failed to disclose the Fire Risk Defect in the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

382.  By failing to disclose and/or actively concealing the Fire Risk Defect in the Class Vehicles, which it marketed as safe, reliable, of high quality, and fit for use as plug-in hybrid electric vehicles, FCA engaged in unfair and deceptive business practices in violation of the FDUTPA.

383.  In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risks posed by the defects in the Class Vehicles.

384.  FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and Subclass Members, about the true safety and reliability of their vehicles.

385.  FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead Plaintiffs and the Subclass.

- 169 -

386. FCA knew or should have known that its conduct violated the FDUTPA.

387. As alleged above, FCA made material statements about the safety and reliability of the Class Vehicles when operating as plug-in hybrid electric vehicles that were either false or misleading.

388. FCA owed Plaintiffs and the Subclass a duty to disclose the true safety and reliability of the Class Vehicles because FCA:

    a.    Possessed exclusive knowledge about the Fire Risk Defect;

    b.    Intentionally concealed the foregoing from Plaintiffs and the Subclass;

    c.    Made incomplete representations about the safety and reliability of the Class Vehicles, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and fix the defect.

389. Because FCA fraudulently concealed the Fire Risk Defect, as well as the true nature of the Class Vehicles, Plaintiffs and Class Members were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Had Plaintiffs and the other

Subclass Members been aware of the defect in their Class Vehicles, they would not have bought or leased the Class Vehicles or would have paid less for them.

390. FCA's concealment of the defects in the Class Vehicles was material to Plaintiffs and the Subclass.

391. Plaintiffs and the Subclass suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose the Fire Risk Defect. Plaintiffs and Subclass Members either would have paid less for the Class Vehicles or would not have purchased or leased them at all.

392. FCA's violations present a continuing risk to Plaintiffs and the Subclass as well as to the general public. In particular, and as alleged herein, FCA has yet to offer any effective remedy for the Class Vehicles. FCA's unlawful acts and practices complained of herein affect the public interest.

393. As a direct and proximate result of FCA's violations of the FDUTPA, Plaintiffs and the Subclass have suffered injury-in-fact and/or actual damage as alleged above.

394. Plaintiffs and the Subclass are entitled to recover their actual damages under Florida Statutes § 501.211(2) and attorneys' fees under Florida Statutes § 501.2105(1).

395.    Plaintiffs also seek an order enjoining FCA's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FDUTPA.

## COUNT III
## BREACH OF IMPLIED WARRANTY OF
## MERCHANTABILITY UNDER FLORIDA LAW
### (Fla. Stat. § 672.314)
### (Alleged by Plaintiffs Jocelyn and Daniel Grenier on behalf of the Florida Subclass)

396.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

397.    Plaintiffs Jocelyn and Daniel Grenier ("Plaintiffs," for purposes of the Florida claims) bring this claim on behalf of themselves and the Florida Subclass ("Subclass," for purposes of the Florida claims).

398.    FCA is a "merchant" within the meaning of Florida Statutes § 672.104, and a "seller" of motor vehicles within the meaning of Florida Statutes § 672.103(d).

399.    Under Florida law, an implied warranty of merchantability attaches to the Class Vehicles. Fla. Stat. § 672.314.

400.    The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles are all afflicted by the Fire Risk Defect, which,

- 172 -

among other things, makes the vehicles susceptible to battery combustion and poses an unreasonable risk of death, serious bodily harm, and/or property damage to Plaintiffs and Subclass Members. This dangerous latent defect renders the Class Vehicles unmerchantable and unfit for their ordinary use of driving.

401.    As a result of the Fire Risk Defect, and per FCA's instructions, Plaintiffs and Subclass Members had to limit their use and/or charging of the Class Vehicles, and were unable to rely on their Class Vehicles to provide safe transportation. Notably, FCA's recall notice instructed Plaintiffs and Subclass Members to refrain from charging their Class Vehicles or parking inside of buildings or structures, which deprived Plaintiffs and Subclass Members of using their vehicles' hybrid electric driving features, regardless of whether they experienced a battery fire.

402.    Plaintiffs have had sufficient direct dealings with FCA, its authorized dealers, or its agents to establish privity of contract with FCA. Nonetheless, privity is not required here because Plaintiffs and the Subclass are the intended third-party beneficiaries of agreements between FCA and its dealers regarding sales and leases of the Class Vehicles, including FCA's implied warranties. *See* Fla. Stat. § 672.318. Furthermore, privity is also not required because the Class Vehicles are inherently dangerous and defective due to the Fire Risk Defect, which presents a hidden and

unreasonable risk of death, serious bodily harm, and/or property damage to Plaintiffs and Subclass Members.

403. It was reasonable to expect that Plaintiffs and the Subclass would use, consume, or be affected by the Class Vehicles.

404. FCA was provided notice of these issues within a reasonable time of Plaintiffs' knowledge of the non-conforming or defective nature of the Class Vehicles by correspondence from Plaintiffs' counsel to FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, the filing of the related *Frisch* Complaint, 2:24cv10546-BRM (Mar. 4, 2024), ECF No. 1, and/or by the allegations contained in this Complaint.

405. Alternatively, Plaintiffs and Subclass Members were excused from providing FCA with notice and an opportunity to cure the breach of warranty because it would have been futile. FCA did not have a repair available when it announced the recall for the Fire Risk Defect, and it still has not identified the root cause of the Fire Risk Defect or provided an effective recall remedy to address the actual cause of the defect. As a result, Plaintiffs and Subclass Members had no reason to believe that FCA would have repaired the Fire Risk Defect if they presented their Class Vehicles to FCA for repair.

406.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and Subclass Members have been damaged in an amount to be determined at trial.

## COUNT IV
## UNJUST ENRICHMENT
### (Common Law)
### (Alleged by Plaintiff Jocelyn and Daniel Grenier on behalf of the Florida Subclass)

407.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

408.   Plaintiffs Jocelyn and Daniel Grenier ("Plaintiffs," for purposes of the Florida claims) bring this claim on behalf of themselves and the Florida Subclass ("Subclass," for purposes of the Florida claims).

409.   Pursuant to Federal Rule of Civil Procedure 8(d)(2) and (3), Plaintiffs plead this claim separately and in the alternative to their claims for breach of implied warranty and violation of the Magnuson Moss Act because if Plaintiffs' claims for damages are dismissed or judgment is entered in favor of FCA, Plaintiffs and the Subclass will have no adequate legal remedy.

410.   FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the lithium-ion batteries that it installed in the Class Vehicles, but nevertheless marketed them for sale to consumers, and

- 175 -

misled Plaintiffs and the Subclass Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

411. FCA failed to adequately research, design, test, and manufacture the Class Vehicles before warranting, promoting, selling and distributing the Class Vehicles as suitable and safe for reasonably foreseeable uses.

412. At the expense of Plaintiffs and the Subclass Members, FCA received and retained a benefit from Plaintiffs and Subclass Members and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Class Vehicles to Plaintiffs and the Subclass Members for more than they were worth as a result of FCA's conduct.

413. Plaintiffs and the Subclass Members would not have purchased or leased the Class Vehicles, or would have paid less for them, had they known of the Fire Risk Defect at the time of purchase or lease. Therefore, FCA profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiffs and the Subclass.

414. Thus, Plaintiffs and the Subclass conferred tangible and material economic benefits upon FCA when they purchased or leased the Class Vehicles.

415. FCA knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of FCA acting in its pecuniary interest at the

expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

416. As a licensed distributor of new motor vehicles, FCA sells Class Vehicles to Plaintiffs and the subclass through its numerous vehicle dealers across the United States. FCA therefore profits from sales of Class Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms.

417. Plaintiffs and the Subclass were not aware of the true facts about the Class Vehicles when they acquired them and did not benefit from FCA's conduct.

418. Plaintiffs and Subclass Members are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return Plaintiffs and Subclass Members to the position they occupied prior to dealing with FCA, with such amounts to be determined at trial.

**B.    Illinois**

**COUNT V**
**BREACH OF IMPLIED WARRANTY OF**
**MERCHANTABILITY UNDER ILLINOIS LAW**
**(810 ILCS 5/2-314 and 5/2A-212)**
**(Alleged by Plaintiff William Dennis on behalf of the Illinois Subclass)**

419. Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

420. Plaintiff William Dennis ("Plaintiff," for purposes of the Illinois claims) brings this claim on behalf of himself and the Illinois Subclass ("Subclass," for the purposes of Illinois claims).

421. FCA is a "merchant" with respect to motor vehicles under 810 ILCS 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under 810 ILCS 5/2-103(1)(d).

422. Under Illinois law, an implied warranty of merchantability attaches to the Class Vehicles pursuant to 810 ILCS 5/2-314 and 5/2A-212.

423. The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles are all afflicted by the Fire Risk Defect, which, among other things, makes the vehicles susceptible to battery combustion and poses an unreasonable risk of death, serious bodily harm, and/or property damage to Plaintiff and Subclass Members. This dangerous latent defect renders the Class Vehicles unmerchantable and unfit for their ordinary use of driving.

424. Plaintiff has had sufficient direct dealings with FCA, its authorized dealers, or its agents to establish privity of contract with FCA. Nonetheless, privity is not required here because Plaintiff and the Subclass are the intended third-party

- 178 -

beneficiaries of agreements between FCA and its dealers regarding sales and leases of the Class Vehicles, including FCA's implied warranties. Furthermore, privity is also not required because the Class Vehicles are inherently dangerous and defective due to the Fire Risk Defect, which presents a hidden and unreasonable risk of death, serious bodily harm, and/or property damage to Plaintiff and Subclass Members.

425. It was reasonable to expect that Plaintiff and the Subclass would use, consume, or be affected by the Class Vehicles.

426. FCA was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Class Vehicles by correspondence from Plaintiff's counsel to FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, the related *Frisch* Complaint, 2:24cv10546-BRM (Mar. 4, 2024), ECF No. 1, and/or by the allegations contained in this Complaint.

427. Alternatively, Plaintiff and Subclass Members were excused from providing FCA with notice and an opportunity to cure the breach of warranty because it would have been futile. FCA did not have a repair available when it announced the recall for the Fire Risk Defect, and it still has not identified the root cause of the Fire Risk Defect or provided an effective recall remedy to address the actual cause of the defect. As a result, Plaintiff and Subclass Members had no reason

to believe that FCA would have repaired the Fire Risk Defect if they presented their Class Vehicles to FCA for repair.

428. As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and the Subclass have been damaged in an amount to be determined at trial.

## COUNT VI
## VIOLATION OF THE ILLINOIS CONSUMER FRAUD
## AND DECEPTIVE BUSINESS PRACTICES ACT
## (815 ILCS § 505/1 *et seq.*)
## (Alleged by Plaintiff William Dennis on behalf of the Illinois Subclass)

429. Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

430. Plaintiff William Dennis ("Plaintiff," for purposes of the Illinois claims) brings this Illinois Consumer Fraud Act ("ICFA") claim on behalf of himself and the Illinois Subclass ("Subclass," for purposes of the Illinois claims).

431. FCA is a "person" as defined in 815 ILCS 505/1(c).

432. Plaintiff and the Subclass are "consumers" as defined in 815 ILCS 505/1(e).

433. The Class Vehicles are "merchandise" within the meaning of 815 ILCS 505/1(b).

434. FCA's marketing, distribution, and sale of the Class Vehicles constitutes "trade" and "commerce" within the meaning of the 815 ILCS 505/1(f).

- 180 -

435. The ICFA prohibits "unfair or deceptive acts or practices, including, but not limited to, the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

436. FCA engaged in unfair or deceptive acts or practices within the meaning of the ICFA.

437. In the course of its trade or commerce, FCA exhibited the "use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act," approved August 5, 1965 within the meaning of the IFCA. 815 ILCS 505/2.

438. Specifically, FCA concealed and/or failed to disclose the Fire Risk Defect in the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of a material fact with intent that others rely

- 181 -

upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

439.   By failing to disclose and/or actively concealing the Fire Risk Defect in the Class Vehicles, which it marketed as safe, reliable, of high quality, and fit for use as plug-in hybrid electric vehicles, FCA engaged in unfair and deceptive acts or practices in violation of the ICFA.

440.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risks posed by the defects in the Class Vehicles.

441.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Subclass Members, about the true safety and reliability of their vehicles.

442.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead Plaintiff and the Subclass.

443.   FCA knew or should have known that its conduct violated the IFCA.

444.   As alleged above, FCA made material statements about the safety and reliability of the Class Vehicles when operating as plug-in hybrid electric vehicles that were either false or misleading.

445.   FCA owed Plaintiff and the Subclass a duty to disclose the true safety and reliability of the Class Vehicles because FCA:

    a.    Possessed exclusive knowledge about the Fire Risk Defect;

- 182 -

b.      Intentionally concealed the foregoing from Plaintiff and the Subclass;

c.      Made incomplete representations about the safety and reliability of the Class Vehicles, while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations; and/or

d.      Had duties under the TREAD Act and related regulations to disclose and fix the defect.

446.   Because FCA fraudulently concealed the Fire Risk Defect, as well as the true nature of the Class Vehicles, Plaintiff and Subclass Members were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from defects. Had Plaintiff and the other Subclass Members been aware of the defect in their Class Vehicles, they would not have bought or leased the Class Vehicles or would have paid less for them.

447.   FCA's concealment of the defects in the Class Vehicles was material to Plaintiff and the Subclass.

448.   Plaintiff and the Subclass suffered actual damages caused by FCA's misrepresentations and its concealment of and failure to disclose the Fire Risk Defect. Had they known the truth about the Class Vehicles, Plaintiff and Subclass Members either would have paid less for the Class Vehicles or would not have purchased or leased them at all. FCA's violations present a continuing risk to

- 183 -

Plaintiff and the Subclass as well as to the general public. In particular and as alleged herein, FCA has yet to offer any effective remedy for the Class Vehicles. FCA's unlawful acts and practices complained of herein affect the public interest. As a direct and proximate result of FCA's violations of the ICFA, Plaintiff and the Subclass have suffered injury-in-fact and/or actual damage as alleged above. Pursuant to 815 ILCS 505/10a(a), Plaintiff seeks monetary relief against FCA in the amount of actual damages, as well as punitive damages because FCA acted with fraud and/or malice and/or was grossly negligent.

449. Plaintiff also seeks an order enjoining FCA's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1 *et seq*.

**COUNT VII**
**UNJUST ENRICHMENT**
**(Common Law)**
**(Alleged by Plaintiff William Dennis on behalf of the Illinois Subclass)**

450. Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

451. Plaintiff William Dennis ("Plaintiff," for purposes of the Illinois claims) brings this claim on behalf of himself and the Illinois Subclass ("Subclass," for purposes of the Illinois claims).

452. Pursuant to Federal Rule of Civil Procedure 8(d)(2) and (3), Plaintiff pleads this claim separately and in the alternative to his claims for breach of implied

warranty and violation of the Magnuson Moss Act because if Plaintiff's claims for damages are dismissed or judgment is entered in favor of FCA, Plaintiff and the Subclass will have no adequate legal remedy.

453.   FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the lithium-ion batteries that it installed in the Class Vehicles, but nevertheless marketed them for sale to consumers, and misled Plaintiff and the Subclass Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

454.   FCA failed to adequately research, design, test, and manufacture the Class Vehicles before warranting, promoting, selling and distributing the Class Vehicles as suitable and safe for reasonably foreseeable uses.

455.   At the expense of Plaintiff and the Subclass Members, FCA received and retained a benefit from Plaintiff and Subclass Members and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Class Vehicles to Plaintiff and the Subclass Members for more than they were worth as a result of FCA's conduct.

456.   Plaintiff and the Subclass Members would not have purchased or leased the Class Vehicles, or would have paid less for them, had they known of the Fire Risk Defect at the time of purchase or lease. Therefore, FCA profited from the sale

and lease of the Class Vehicles to the detriment and expense of Plaintiff and the Subclass.

457. Thus, Plaintiff and the Subclass conferred tangible and material economic benefits upon FCA when they purchased or leased the Class Vehicles.

458. FCA knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of FCA acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

459. As a licensed distributor of new motor vehicles, FCA sells Class Vehicles to Plaintiff and the subclass through its numerous vehicle dealers across the United States. FCA therefore profits from sales of Class Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms.

460. Plaintiff and the Subclass were not aware of the true facts about the Class Vehicles when they acquired them and did not benefit from FCA's conduct.

461. Plaintiff and Subclass Members are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return Plaintiff and Subclass Members to the position they occupied prior to dealing with FCA, with such amounts to be determined at trial.

C.     **Maryland**

**COUNT VIII**
**VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT**
**(Md. Code Ann., Com. Law § 13-101, *et seq.*)**
**(Alleged by Plaintiff Darren Wolberg on behalf of the Maryland Subclass)**

462.   Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

463.   Plaintiff Darren Wolberg (for the purposes of this section, "Plaintiff") brings this action on behalf of himself and the Maryland Subclass (for the purposes of this section, "Subclass") against FCA.

464.   FCA and Plaintiff are "persons" within the meaning of Md. Code Com. Law § 13-101(h).

465.   The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale or lease of any consumer good. Md. Code Ann., Com. Law § 13-303. FCA participated in misleading, false, or deceptive acts that violated the Maryland CPA as defined in Md. Code Ann., Com. Law § 13-301. By concealing the Fire Risk Defect in Plaintiff's vehicles, FCA engaged in deceptive business practices prohibited by the Maryland CPA.

466.   FCA's actions, as set forth above, occurred in the conduct of trade or commerce.

- 187 -

467.   In the course of its business, FCA concealed the Fire Risk Defect in Class Vehicles, as well as the true nature of the Class Vehicles, and its failure to adequately design and test the vehicles to ensure their safety as described herein, and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

468.   By failing to disclose and by actively concealing the defect in Class Vehicles, which it marketed as safe, reliable, and of high quality, FCA engaged in unfair and deceptive business practices in violation of the Maryland CPA.

469.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the defects in Class Vehicles.

470.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the Subclass, about the true safety and reliability of their vehicles.

471.   FCA intentionally and knowingly misrepresented material facts regarding the Fire Risk Vehicles with the intent to mislead Plaintiff and Subclass members.

472. FCA knew or should have known that its conduct violated the Maryland CPA.

473. As alleged above, FCA made material statements about the safety and reliability of the Fire Risk Vehicles and their ability to operate as plug-in hybrid vehicles that were either false or misleading.

474. FCA owed Plaintiff and Subclass members a duty to disclose the true safety and reliability of the Class Vehicles because FCA:

      a.    Possessed exclusive knowledge about the defects in the Fire Risk Vehicles;

      b.    Intentionally concealed the foregoing from Plaintiff and Subclass members;

      c.    Made incomplete representations about the safety and reliability of the Fire Risk Vehicles, while purposefully withholding material facts from Plaintiff and Subclass members that contradicted these representations; and/or

      d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defects well prior to the issue of its confounding recall notice in 2022.

475. Because FCA fraudulently concealed the Fire Risk Defect, as well as the true nature of Class Vehicles, Plaintiff and members of the Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth

less than they would have been if they were free from the known serious safety defect. Had Class Vehicle owners been aware of the defects in their vehicles, they would have either not have bought their vehicles or would have paid less for them.

476. FCA's concealment of the defects in the Fire Risk Vehicles was material to Plaintiff and Subclass Members.

477. Plaintiff and Subclass members suffered ascertainable loss caused by FCA's misrepresentations and its concealment of and failure to disclose the Spontaneous Fire Risk.

478. FCA's violations present a continuing risk to Plaintiff and Subclass members as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

479. As a direct and proximate result of FCA's violations of the Maryland CPA, Plaintiff and Subclass members have suffered injury-in-fact and/or actual damage as alleged above.

480. As a result of FCA's conduct, Plaintiff seeks to recover from Defendant, all actual, economic damages incurred in the past, economic damages that continue to accrue into the future, reasonable attorneys' fees, and any other just and proper relief, as authorized by Md. Code Ann., Com. Law § 13-408, and other provisions of the Maryland CPA, Md. Code Ann., Com. Law § 13-101, *et seq.*

- 190 -

## COUNT IX
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## UNDER MARYLAND LAW
### (Md. Code Ann., Com. Law § 2-314)
### (Alleged by Plaintiff Darren Wolberg on behalf of the Maryland Subclass)

481.   Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

482.   Plaintiff Darren Wolberg (for the purposes of this section, "Plaintiff") brings this action on behalf of himself and the Maryland Subclass (for the purposes of this section, "Subclass") against FCA.

483.   FCA is a "merchant" of motor vehicles within the meaning of Md. Code Ann., Com. Law § 2-104(1).

484.   Under Md. Code Ann., Com. Law § 2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and the Subclass purchased or leased their Class Vehicles.

485.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles are all afflicted by the Fire Risk Defect, which, among other things, makes the vehicles susceptible to battery combustion and poses an unreasonable risk of death, serious bodily harm, and/or property damage to

Plaintiff and Subclass Members. This dangerous latent defect renders the Class Vehicles unmerchantable and unfit for their ordinary use of driving.

486. As a result of the Fire Risk Defect, and per FCA's instructions, Plaintiff and Subclass Members had to limit their use and/or charging of the Class Vehicles, and they were unable to rely on their Class Vehicles to provide them with safe transportation. Notably, FCA's B9A Recall and 95B Recall notices instructed Plaintiff and Subclass Members to refrain from charging their Class Vehicles or parking inside of buildings or structures, which deprived Plaintiff and Subclass Members of using their vehicles' hybrid electric driving features, regardless of whether they experienced a battery fire.

487. It was reasonable to expect that Plaintiff and the Subclass would use, consume, or be affected by the Class Vehicles.

488. As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and the Subclass have been damaged in an amount to be determined at trial.

## COUNT X
## UNJUST ENRICHMENT
### (Common Law)
### (Alleged by Plaintiff Darren Wolberg on behalf of the Maryland Subclass)

489. Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

490. Plaintiff Wolberg ("Plaintiff," for purposes of the Maryland claims) brings this claim on behalf of himself and the Maryland Subclass ("Subclass," for the purposes of Maryland claims).

491. Pursuant to Federal Rule of Civil Procedure 8(d)(2) and (3), Plaintiff pleads this claim separately and in the alternative to his claims for breach of implied warranty and violation of the Magnuson Moss Act because if Plaintiff's claims for damages are dismissed or judgment is entered in favor of FCA, Plaintiff and the Subclass will have no adequate legal remedy.

492. FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the lithium-ion batteries that it installed in the Class Vehicles, but nevertheless marketed them for sale to consumers, and misled Plaintiff and the Subclass Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

493. FCA failed to adequately research, design, test, and manufacture the Class Vehicles before warranting, promoting, selling and distributing the Class Vehicles as suitable and safe for reasonably foreseeable uses.

494. At the expense of Plaintiff and the Subclass Members, FCA received and retained a benefit from Plaintiff and Subclass Members and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Class Vehicles to

Plaintiff and the Subclass Members for more than they were worth as a result of FCA's conduct.

495.   Plaintiff and the Subclass Members would not have purchased or leased the Class Vehicles, or would have paid less for them, had they known of the Fire Risk Defect at the time of purchase or lease. Therefore, FCA profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiff and the Subclass.

496.   Thus, Plaintiff and the Subclass conferred tangible and material economic benefits upon FCA when they purchased or leased the Class Vehicles.

497.   FCA knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of FCA acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

498.   As a licensed distributor of new motor vehicles, FCA sells Class Vehicles to Plaintiff and the subclass through its numerous vehicle dealers across the United States. FCA therefore profits from sales of Class Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms.

499.   Plaintiff and the Subclass were not aware of the true facts about the Class Vehicles when they acquired them and did not benefit from FCA's conduct.

500.   Plaintiff and Subclass Members are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return Plaintiff and Subclass Members to the position they occupied prior to dealing with FCA, with such amounts to be determined at trial.

### D.   Massachusetts

**COUNT XI**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**UNDER MASSACHUSETTS LAW**
**(Mass. Gen. Laws Ann. ch. 106, § 2-314)**
**(Alleged by Plaintiff Kelly Gaudreau on behalf of the Massachusetts Subclass)**

501.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

502.   Plaintiff Kelly Gadreau (for the purposes of this section, "Plaintiff") brings this action on behalf of herself and the Massachusetts Subclass (for the purposes of this section, "Subclass") against FCA.

503.   FCA is a "merchant" of motor vehicles within the meaning of Mass. Gen. Laws Ann. ch. 106, § 2-104(1).

504.   Under Mass. Gen. Laws Ann. ch. 106, § 2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and the Subclass purchased or leased her Class Vehicles.

505.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were

defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles are all afflicted by the Fire Risk Defect, which, among other things, makes the vehicles susceptible to battery combustion and poses an unreasonable risk of death, serious bodily harm, and/or property damage to Plaintiff and Subclass Members. This dangerous latent defect renders the Class Vehicles unmerchantable and unfit for their ordinary use of driving.

506. As a result of the Fire Risk Defect, and per FCA's instructions, Plaintiff and Subclass Members had to limit their use and/or charging of the Class Vehicles, and they were unable to rely on their Class Vehicles to provide them with safe transportation. Notably, FCA's B9A Recall and 95B Recall notices instructed Plaintiff and Subclass Members to refrain from charging their Class Vehicles or parking inside of buildings or structures, which deprived Plaintiff and Subclass Members of using their vehicles' hybrid electric driving features, regardless of whether they experienced a battery fire.

507. It was reasonable to expect that Plaintiff and the Subclass would use, consume, or be affected by the Class Vehicles.

508. As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and the Subclass have been damaged in an amount to be determined at trial.

## COUNT XII
## UNJUST ENRICHMENT
### (Common Law)
### (Alleged by Plaintiff Kelly Gaudreau on behalf of the Massachusetts Subclass)

509. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

510. Plaintiff Kelly Gadreau (for the purposes of this section, "Plaintiff") brings this action on behalf of herself and the Massachusetts Subclass (for the purposes of this section, "Subclass") against FCA.

511. Pursuant to Federal Rule of Civil Procedure 8(d)(2) and (3), Plaintiff pleads this claim separately and in the alternative to her claims for breach of implied warranty and violation of the Magnuson Moss Act because if Plaintiff's claims for damages are dismissed or judgment is entered in favor of FCA, Plaintiff and the Subclass will have no adequate legal remedy.

512. FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the lithium-ion batteries that it installed in the Class Vehicles, but nevertheless marketed them for sale to consumers, and misled Plaintiff and the Subclass Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

513.   FCA failed to adequately research, design, test, and manufacture the Class Vehicles before warranting, promoting, selling and distributing the Class Vehicles as suitable and safe for reasonably foreseeable uses.

514.   At the expense of Plaintiff and the Subclass Members, FCA received and retained a benefit from Plaintiff and Subclass Members and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Class Vehicles to Plaintiffs and the Subclass Members for more than they were worth as a result of FCA's conduct.

515.   Plaintiffs and the Subclass Members would not have purchased or leased the Class Vehicles, or would have paid less for them, had they known of the Fire Risk Defect at the time of purchase or lease. Therefore, FCA profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiffs and the Subclass.

516.   Thus, Plaintiffs and the Subclass conferred tangible and material economic benefits upon FCA when they purchased or leased the Class Vehicles.

517.   FCA knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of FCA acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

518. As a licensed distributor of new motor vehicles, FCA sells Class Vehicles to Plaintiffs and the subclass through its numerous vehicle dealers across the United States. FCA therefore profits from sales of Class Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms.

519. Plaintiffs and the Subclass were not aware of the true facts about the Class Vehicles when they acquired them and did not benefit from FCA's conduct.

520. Plaintiffs and Subclass Members are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return Plaintiffs and Subclass Members to the position they occupied prior to dealing with FCA, with such amounts to be determined at trial.

E. **Missouri**

**COUNT XIII**
**VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT**
**(Mo. Rev. Stat. § 407.010, *et seq*.)**
**(Alleged by Plaintiffs Michael and Kathy Hartweger**
**on behalf of the Missouri Subclass)**

521. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

522. Plaintiffs Michael and Kathy Hartweger ("Plaintiffs," for purposes of the Missouri claims) bring this claim on behalf of themselves and the Missouri Subclass ("Subclass," for purposes of the Missouri claims).

- 199 -

523. Plaintiffs are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5), who purchased the Class Vehicles (i.e., merchandise) for personal, family, or household uses, Mo. Rev. Stat. § 407.020 & 025.

524. The Missouri Merchandising Practices Act ("MMPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020.

525. In purchasing or leasing the Class Vehicles, Plaintiffs and the Subclass were deceived by FCA's failure to disclose the Fire Risk Defect.

526. Plaintiffs and the Subclass reasonably relied upon FCA's material omissions and false misrepresentations. They had no way of knowing that FCA's representations were false and gravely misleading. As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiffs and the Subclass did not, and could not, unravel FCA's deception on their own.

527. FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

528. FCA intentionally and knowingly failed to disclose and misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiffs and the Subclass.

529.   FCA knew or should have known that its conduct violated the MMPA, and its conduct meets any requirement that the defendant's conduct be under egregious or aggravating circumstances.

530.   FCA owed Plaintiffs and the Subclass a duty to disclose the truth about its Class Vehicles because FCA:

       a.     Possessed exclusive knowledge of the Fire Risk Defect;

       b.     Intentionally concealed the foregoing from Plaintiffs; and/or

       c.     Made incomplete representations while purposefully withholding material facts from Plaintiffs that contradicted these representations; and/or

       d.     Had duties under the TREAD Act and related regulations to disclose and fix the defects well before it issued the confounding recall notice in 2023.

531.   FCA had a duty to disclose the Fire Risk Defect, because, having volunteered to provide information to Plaintiffs, FCA had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiffs and the Subclass relied on FCA's material omissions and representations that the Class Vehicles they were purchasing were safe and free from defects.

532.   Plaintiffs and the Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of

the concealed and/or suppressed facts, in that they would not have purchased the Class Vehicles manufactured by FCA, would have paid less, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs and the Subclass's actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public or Plaintiffs.

533.   FCA's conduct proximately caused injuries to Plaintiffs and the Subclass.

534.   Plaintiffs and the Subclass were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the Subclass overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

535.   FCA's violations present a continuing risk to Plaintiffs and the Subclass as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

536.   Plaintiffs and the Subclass seek an order for actual damages, costs of Court, attorneys' fees, and any other just and proper relief available under the Missouri MPA.

537.   Plaintiffs and the Subclass also seek punitive damages against FCA because FCA's conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith. Mo. Rev. Stat. § 407.025.

**COUNT XIV**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**UNDER MISSOURI LAW**
**(Mo. Stat. § 400.2-314)**
**(Alleged by Plaintiffs Michael and Kathy Hartweger**
**on behalf of the Missouri Subclass)**

538.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

539.   Plaintiffs Michael and Kathy Hartweger ("Plaintiffs," for purposes of the Missouri claims) brings this claim on behalf of themselves and the Missouri Subclass ("Subclass," for purposes of the Missouri claims).

540.   FCA is a "merchant" with regard to motor vehicles and the Class Vehicles are "goods" under Missouri law. Mo. Stat. §§ 400.2-104, 400.2-105.

541.   Under Missouri law, an implied warranty of merchantability attaches to the Class Vehicles pursuant to Mo. Stat. § 400.2-314.

542.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles are all afflicted by the Fire Risk Defect, which,

among other things, makes the vehicles susceptible to battery combustion and poses an unreasonable risk of death, serious bodily harm, and/or property damage to Plaintiffs and Subclass Members. This dangerous latent defect renders the Class Vehicles unmerchantable and unfit for their ordinary use of driving.

543.   As a result of the Fire Risk Defect, and per FCA's instructions, Plaintiffs and Subclass Members had to limit their use and/or charging of the Class Vehicles, and they were unable to rely on their Class Vehicles to provide them with safe transportation. Notably, FCA's recall notice instructed Plaintiffs and Subclass Members to refrain from charging their Class Vehicles or parking inside of buildings or structures, which deprived Plaintiffs and Subclass Members of using their vehicles' hybrid electric driving features, regardless of whether they experienced a battery fire.

544.   Privity of contract is not required to pursue a breach of implied warranty claim under Missouri law.

545.   Plaintiffs and the Subclass have had sufficient direct dealings with FCA, its authorized dealers, or its agents to establish privity of contract with FCA. Nonetheless, privity is not required here because Plaintiffs and the Subclass are the intended third-party beneficiaries of agreements between FCA and its dealers regarding sales and leases of the Class Vehicles, including FCA's implied warranties. Furthermore, privity is also not required because the Class Vehicles are

inherently dangerous and defective due to the Fire Risk Defect, which presents a hidden and unreasonable risk of death, serious bodily harm, and/or property damage to Plaintiffs and Subclass Members.

546. It was reasonable to expect that Plaintiffs and the Subclass would use, consume, or be affected by the Class Vehicles.

547. Pre-suit notice is not required to pursue a breach of implied warranty claim under Missouri law.

548. Nevertheless, FCA was provided notice of these issues within a reasonable time of Plaintiffs' knowledge of the non-conforming or defective nature of the Class Vehicles by correspondence from Plaintiffs' counsel to FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, the related *Frisch* Complaint, 2:24cv10546-BRM (Mar. 4, 2024), ECF No. 1, and/or by the allegations contained in this Complaint.

549. Alternatively, Plaintiffs and Subclass Members were excused from providing FCA with notice and an opportunity to cure the breach of warranty because it would have been futile. FCA did not have a repair available when it announced the recall for the Fire Risk Defect, and it still has not identified the root cause of the Fire Risk Defect or provided an effective recall remedy to address the actual cause of the defect. As a result, Plaintiffs and Subclass Members had no

reason to believe that FCA would have repaired the Fire Risk Defect if they presented their Class Vehicles to FCA for repair.

550.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and Subclass Members have been damaged in an amount to be determined at trial.

## COUNT XV
## UNJUST ENRICHMENT
### (Common Law)
### (Alleged by Plaintiffs Michael and Kathy Hartweger
### on behalf of the Missouri Subclass)

551.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

552.   Plaintiffs Michael and Kathy Hartweger ("Plaintiffs," for purposes of the Missouri claims) bring this claim on behalf of themselves and the Missouri Subclass ("Subclass," for purposes of the Missouri claims).

553.   Pursuant to Fed. R. Civ. P. 8(d)(2) and (3), Plaintiffs plead their claims in the alternative to claims for breach of implied warranty and violation of the Magnuson Moss Act to the extent necessary.

554.   FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the lithium-ion batteries that it installed in the Class Vehicles, but nevertheless marketed them for sale to consumers.

- 206 -

555. FCA failed to adequately research, design, test, and manufacture the Class Vehicles before warranting, promoting, selling and distributing the Class Vehicles as suitable and safe for reasonably foreseeable uses.

556. At the expense of Plaintiffs and Subclass Members, FCA received and retained a benefit from Plaintiffs and Subclass Members and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Class Vehicles to Plaintiffs and the Subclass Members for more than they were worth as a result of FCA's conduct.

557. Plaintiffs and Subclass Members overpaid for the Class Vehicles and have been forced to pay other costs. Plaintiffs and the Subclass Members did not intend to overpay for the Class Vehicles.

558. Thus, Plaintiffs and the Subclass conferred a measurable benefit on FCA.

559. FCA knowingly accepted the benefits of its unjust conduct.

560. It is unjust for FCA to retain these benefits without paying for them.

561. As a licensed distributor of new motor vehicles, FCA sells them to numerous vehicle dealers across the United States. On information and belief, FCA tracks and accounts for its revenue from each dealer for each model of vehicle it sells to its dealers, including the Class Vehicles. Similarly, FCA must track and record the production costs for each model of vehicle it manufactures and sells to its dealers.

Therefore, FCA knew or reasonably should have known the additional profitability of the Class Vehicles it sold to its dealers, intending the Class Vehicles would be sold to consumers like Plaintiffs and the other Class Members. Accordingly, FCA knowingly accepted the benefits of its unjust conduct.

562. Plaintiffs and the Subclass were not aware of the true facts about the Class Vehicles and did not benefit from FCA's conduct.

563. As a result of FCA's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

**F.    New York**

**COUNT XVI**
**VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349**
**(N.Y. Gen. Bus. Law § 349 et seq.)**
**(Alleged by Plaintiff Gregory DeAngelo**
**on behalf of the New York Subclass)**

564. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

565. Plaintiff Gregory DeAngelo (for the purposes of this section, "Plaintiff") brings this action on behalf of himself and the New York Subclass (for the purposes of this section, "Subclass") against FCA.

566. FCA, Plaintiff, and the Subclass Members are "persons" within the meaning of N.Y. Gen. Bus. Law § 349.

567.   The New York Deceptive Acts and Practices Act ("NY DAPA") makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349.

568.   In the course of their business, FCA, through its agents, employees, and/or subsidiaries, violated N.Y. Gen. Bus. Law § 349 as detailed above. Specifically, in developing and installing defective HV Battery systems in Class Vehicles that it concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unfair or deceptive acts or practices as prohibited by N.Y. Gen. Bus. Law § 349:

a.   Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

b.   Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

c.   Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

d.   Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

e.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

f.      Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

569.   FCA's scheme and concealment of the true characteristics of the Fire Risk Defect in Class Vehicles was material to Plaintiff and Subclass Members, as FCA intended.  Had they known the truth, Plaintiff and Subclass Members would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell— would have paid significantly less for them.

570.   Plaintiff and Subclass Members had no way of discerning that FCA's representations were false and misleading, or otherwise learning the facts that FCA had concealed or failed to disclose, because FCA's HV Battery systems are highly sophisticated technology and their physical and software characteristics are closely guarded secrets. Plaintiff and Subclass Members did not, and could not, unravel FCA's deception on their own.

571.   FCA had an ongoing duty to Plaintiff and Subclass Members to refrain from unfair and deceptive practices under N.Y. Gen. Bus. Law § 349 in the course of its business, including by disclosing the defective nature of the Class Vehicles.

Specifically, FCA owed Plaintiff and Subclass Members a duty to disclose all the material facts concerning the Fire Risk Defect and the defective HV Battery systems because they possessed superior and exclusive knowledge, they intentionally concealed it from Plaintiff and Subclass Members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

572.   FCA still has not revealed the extent of its knowledge, the true nature of the Fire Risk Defect, or the results of its examination and testing of Class Vehicles. FCA has not disclose all material facts regarding the defective nature of the Class Vehicles, so it has breached its duty to Plaintiff and Subclass Members to refrain from unfair and deceptive practices under N.Y. Gen. Bus. Law § 349 in the course of its business.

573.   Plaintiff and Subclass Members suffered ascertainable loss and actual damages as a direct and proximate result of FCA's concealment, misrepresentations, and/or failure to disclose material information.

574.   FCA's violations present a continuing risk to Plaintiff and Subclass Members, as well as to the general public.  FCA's unlawful acts and practices complained of herein affect the public interest.

- 211 -

575. Plaintiff and Subclass Members seek an order enjoining FCA's unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

## COUNT XVII
## VIOLATION OF NEW YORK GENERAL BUSINESS LAW
## § 350 (N.Y. Gen. Bus. Law § 350, *et seq.*)
## (Alleged by Plaintiff Gregory DeAngelo
## on behalf of the New York Subclass)

576. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

577. Plaintiff Gregory DeAngelo (for the purposes of this section, "Plaintiff") brings this action on behalf of himself and the New York Subclass (for the purposes of this section, "Subclass") against FCA.

578. FCA are engaged in the "conduct of business, trade or commerce," within the meaning of N.Y. Gen. Bus. Law § 350.

579. N.Y. Gen. Bus. Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity …." N.Y. Gen. Bus. Law § 350-a(1).

- 212 -

580. FCA caused to be made or disseminated through New York and the United States, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including Plaintiff and Subclass Members.

581. FCA concealed and/or failed to disclose the Fire Risk Defect in the Class Vehicles, as well as true nature of the Class Vehicles, and its failure to adequately design and test the vehicles to ensure their safety from risk of a fire caused by the HV Battery as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

582. At a minimum, FCA knew or should have known that its conduct violated N.Y. Gen. Bus. Law § 350 by:

    a.    representing that the Class Vehicles had characteristics, uses, benefits, and qualities which they do not have;

    b.    representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

    c.    advertising Class Vehicles with the intent not to sell or lease them as advertised;

    d.    engaging in other conduct creating a likelihood of confusion or of misunderstanding; and

e.     employing concealment, suppression, or omission of material facts in connection with the advertisement and sale of the Class Vehicles.

583.   Plaintiff and the Subclass reasonably relied on FCA's false and misleading representations and omissions. Had Plaintiffs and the Subclass Members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

584.   Plaintiff and Subclass Members have suffered an injury in fact, including the loss of money or property, because of FCA's deceptive advertising. In purchasing or leasing their Class Vehicles, Plaintiff and Subclass Members relied on FCA's misrepresentations and omissions regarding the safety, reliability, and functionality of the vehicles. FCA's representations and omissions were untrue because the Class Vehicles were sold or leased with a defective hybrid propulsion system. Had Plaintiff and the Subclass Members known this, they would not have purchased or leased their Class Vehicles or paid as much for them. Accordingly, Plaintiff and the Subclass Members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

585.   All the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of FCA's business. FCA's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in New York and nationwide.

- 214 -

586. Pursuant to N.Y. Gen. Bus. Law § 350-e, Plaintiff and Subclass Members seek injunctive relief, as well as monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial, and (b) statutory damages in the amount of $500 each for New York State Class Member. Because Defendants' conduct was committed willingly and knowingly, Plaintiff and the New York State Class are entitled to recover three times actual damages, up to $10,000.

**COUNT XVIII**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(N.Y. U.C.C. §§ 2-314 and 2A-212)**
**(Alleged by Plaintiff Gregory DeAngelo on behalf of the New York Subclass)**

587. Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

588. Plaintiff Gregory DeAngelo (for the purposes of this section, "Plaintiff") brings this action on behalf of himself and the New York Subclass (for the purposes of this section, "Subclass") against FCA.

589. FCA was at all relevant times a "merchant" with respect to motor vehicles under N.Y. UCC § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

590. With respect to leases, FCA was at all relevant times a "lessor" of motor vehicles under N.Y. UCC § 2A-103(1)(p).

591.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC §§ 2-105(1) and 2A-103(1)(h).

592.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.Y. UCC §§ 2-314 and 2A-212.

593.   Under N.Y. UCC § 2-314(2), goods must "at least" meet the following to be considered "merchantable" within the meaning of the implied warranty of merchantability:

    a.   Pass without objection in the trade under the contract description.

    b.   Are fit for the ordinary purposes for which such goods are used.

    c.   Are adequately contained, packaged, and labeled.

    d.   Conform to the promises or affirmations of fact made on the container or label.

594.   The Class Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to combustion and pose an unreasonable risk of fires due to the Fire Risk Defect as described herein. Without limitation, the Class Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of combustion, causing an unreasonable risk of death, serious bodily harm, and/or property damage to lessees and owners of the Class Vehicles as well as their homes, passengers, and

bystanders. This defect renders the Class Vehicles when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries, not to drive the Class Vehicles in electric mode, and not to park the vehicles in the vicinity of their homes or other vehicles.

595. FCA breached the implied warranty of merchantability by selling Class Vehicles containing defects leading to the sudden combustion of the vehicles during ordinary operating conditions, or while parked. This defect has deprived Plaintiff and the Subclass Members of the benefit of their bargain.

596. FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty because, among other things, the Class Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of combustion, causing an unreasonable risk of death, serious bodily harm, and/or property damage to lessees and owners of the Class Vehicles as well as their homes, passengers, and bystanders. This defect renders the Class Vehicles when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries, not to drive the Class Vehicles in electric mode, and not to park the vehicles in the vicinity of their homes or other vehicles.

597.   Notice of breach is not required because Plaintiff and the Subclass did not purchase their automobiles directly from FCA. Regardless, Plaintiffs' counsel sent notification to FCA prior to filing this Complaint.

598.   Plaintiff and the other Subclass Members were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiff and Subclass Members.

599.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and the Subclass Members received goods whose dangerous condition now renders them at least partially inoperable and substantially impairs their value. Plaintiff and the Subclass Members have been damaged as they overpaid for their vehicles, and now suffer the partial or complete loss of use of their Class Vehicles.

600.   FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiff and Subclass Members. The amount of damages due will be proven at trial.

### G.    North Carolina

**COUNT XIX**
**VIOLATION OF NORTH CAROLINA UNFAIR AND**
**DECEPTIVE TRADE PRACTICES ACT**
**(N.C. Gen. State §§ 75-1.1, *et seq.*)**
**(Alleged by Plaintiff Veronica Pettis on behalf of the North Carolina Subclass)**

601.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

602.    Plaintiff Veronica Pettis ("Plaintiff," for purposes of the North Carolina claims) bring this claim on behalf of themselves and the North Carolina Subclass ("Subclass," for the purposes of the North Carolina claims), and Plaintiff and the Subclass suffered injuries in the State of North Carolina.

603.    FCA engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1(b).

604.    The North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). In the course of FCA's business, it willfully failed to disclose and actively concealed the Fire Risk Defect. Accordingly, FCA engaged in unfair and deceptive trade practices because its practices (1) have the capacity or tendency to deceive, (2) offend public policy, (3) are immoral, unethical, oppressive or unscrupulous, or (4) cause substantial injury to consumers.

- 219 -

605. In purchasing or leasing the Class Vehicles, Plaintiff and the Subclass were deceived by FCA's failure to disclose the Fire Risk Defect.

606. Plaintiff and the Subclass reasonably relied upon FCA's material omissions and false misrepresentations. They had no way of knowing that FCA's representations were false and gravely misleading. As alleged herein, FCA engaged in extremely sophisticated methods of deception. Plaintiff and the Subclass did not, and could not, unravel FCA's deception on their own.

607. FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

608. FCA intentionally and knowingly failed to disclose and misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Subclass.

609. FCA knew or should have known that its conduct violated the UDTPA, and its conduct meets any requirement that the defendant's conduct be under egregious or aggravating circumstances.

610. FCA owed Plaintiff and the Subclass a duty to disclose the truth about its Class Vehicles because FCA:

      a.    Possessed exclusive knowledge of the Fire Risk Defect;

      b.    Intentionally concealed the foregoing from Plaintiff; and/or

- 220 -

c.     Made incomplete representations while purposefully withholding material facts from Plaintiff that contradicted these representations; and/or

d.     Had duties under the TREAD Act and related regulations to disclose and fix the defects well before it issued the confounding recall notice in 2023.

611.  FCA had a duty to disclose the Fire Risk Defect, because, having volunteered to provide information to Plaintiff, FCA had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiff and the Subclass relied on FCA's material omissions and representations that the Class Vehicles they were purchasing were safe and free from defects.

612.  Plaintiff and the Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Class Vehicles manufactured by FCA, would have paid less, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiff and the Subclass's actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public or Plaintiff.

613.  FCA's conduct proximately caused injuries to Plaintiff and the Subclass.

- 221 -

614. Plaintiff and the Subclass were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiff and the Subclass overpaid for their Class Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

615. FCA's violations present a continuing risk to Plaintiff and the Subclass as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

616. Plaintiff and the Subclass seek an order for treble their actual damages, costs of Court, attorneys' fees, and any other just and proper relief available under the UDTPA, N.C. Gen. Stat. § 75-16.

617. Plaintiff and the Subclass also seek punitive damages against FCA because FCA's conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith.

## COUNT XX
## BREACH OF IMPLIED WARRANTY OF
## MERCHANTABILITY UNDER NORTH CAROLINA LAW
### (N.C. Gen. Stat. §§ 25-2-314 and 25-2A-212)
### (Alleged by Plaintiff Veronica Pettis on Behalf of
### the North Carolina Subclass)

618. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

619.   Plaintiff Veronica Pettis ("Plaintiff," for purposes of the North Carolina claims) brings this claim on behalf of herself and the North Carolina Subclass ("Subclass," for the purposes of the North Carolina claims).

620.   FCA is a "merchant" of the Class Vehicles within the meaning of N.C. Gen. Stat. § 25-2-104 (1), and the Class Vehicles are "goods" under N.C. Gen. Stat. § 25-2A-103(1)(h). With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under N.C. Gen. Stat. § 25-2A-103(1)(p).

621.   Under North Carolina law, an implied warranty of merchantability attaches to the Class Vehicles pursuant to N.C. Gen. Stat. §§ 25-2-314 and 25-2A-212.

622.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles are all afflicted by the Fire Risk Defect, which, among other things, makes the vehicles susceptible to battery combustion and poses an unreasonable risk of death, serious bodily harm, and/or property damage to Plaintiff and Subclass Members. This dangerous latent defect renders the Class Vehicles unmerchantable and unfit for their ordinary use of driving.

623.   As a result of the Fire Risk Defect, and per FCA's instructions, Plaintiff and Subclass Members had to limit their use and/or charging of the Class Vehicles, and they were unable to rely on their Class Vehicles to provide them with safe transportation. Notably, FCA's recall notice instructed Plaintiff and Subclass Members to refrain from charging their Class Vehicles or parking inside of buildings or structures, which deprived Plaintiff and Subclass Members of using their vehicles' hybrid electric driving features, regardless of whether they experienced a battery fire.

624.   Plaintiff have had sufficient direct dealings with FCA, its authorized dealers, or its agents to establish privity of contract with FCA. Nonetheless, privity is not required here because Plaintiff and the Subclass are the intended third-party beneficiaries of agreements between FCA and its dealers regarding sales and leases of the Class Vehicles, including FCA's implied warranties. Furthermore, privity is also not required because the Class Vehicles are inherently dangerous and defective due to the Fire Risk Defect, which presents a hidden and unreasonable risk of death, serious bodily harm, and/or property damage to Plaintiff and Subclass Members.

625.   It was reasonable to expect that Plaintiff and the Subclass would use, consume, or be affected by the Class Vehicles.

626.   FCA was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Class

Vehicles by correspondence from Plaintiff's counsel to FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, the related *Frisch* Complaint, 2:24cv10546-BRM (Mar. 4, 2024), ECF No. 1, and/or by the allegations contained in this Complaint.

627.   Alternatively, Plaintiff and Subclass Members were excused from providing FCA with notice and an opportunity to cure the breach of warranty because it would have been futile. FCA did not have a repair available when it announced the recall for the Fire Risk Defect, and it still has not identified the root cause of the Fire Risk Defect or provided an effective recall remedy to address the actual cause of the defect. As a result, Plaintiff and Subclass Members had no reason to believe that FCA would have repaired the Fire Risk Defect if they presented their Class Vehicles to FCA for repair.

628.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and the Subclass have been damaged in an amount to be determined at trial.

**COUNT XXI**
**UNJUST ENRICHMENT**
**(Common Law)**
**(Alleged by Plaintiff Veronica Pettis on behalf of the North Carolina Subclass)**

629.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

- 225 -

630.   Plaintiff Veronica Pettis ("Plaintiff," for purposes of the North Carolina claims) brings this claim on behalf of herself and the North Carolina Subclass ("Subclass," for the purposes of the North Carolina claims).

631.   Pursuant to Federal Rule of Civil Procedure 8(d)(2) and (3), Plaintiffs pleads this claim separately and in the alternative to their claims for breach of implied warranty and violation of the Magnuson Moss Act because if Plaintiff's claims for damages are dismissed or judgment are entered in favor of FCA, Plaintiff and the Subclass will have no adequate legal remedy.

632.   FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the lithium-ion batteries that it installed in the Class Vehicles, but nevertheless marketed them for sale to consumers, and misled Plaintiff and the Subclass Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

633.   FCA failed to adequately research, design, test, and manufacture the Class Vehicles before warranting, promoting, selling and distributing the Class Vehicles as suitable and safe for reasonably foreseeable uses.

634.   At the expense of Plaintiff and the Subclass Members, FCA received and retained a benefit from Plaintiff and Subclass Members and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Class Vehicles to

Plaintiff and the Subclass Members for more than they were worth as a result of FCA's conduct.

635. Plaintiff and the Subclass Members would not have purchased or leased the Class Vehicles, or would have paid less for them, had they known of the Fire Risk Defect at the time of purchase or lease. Therefore, FCA profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiffs and the Subclass.

636. Thus, Plaintiff and the Subclass conferred tangible and material economic benefits upon FCA when they purchased or leased the Class Vehicles.

637. FCA knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of FCA acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

638. As a licensed distributor of new motor vehicles, FCA sells Class Vehicles to Plaintiff and the subclass through its numerous vehicle dealers across the United States. FCA therefore profits from sales of Class Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms.

639. Plaintiff and the Subclass were not aware of the true facts about the Class Vehicles when they acquired them and did not benefit from FCA's conduct.

640. Plaintiff and Subclass Members are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return Plaintiff and Subclass Members to the position they occupied prior to dealing with FCA, with such amounts to be determined at trial.

**H.     Oregon**

**COUNT XXII**
**VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT**
**(Or. Rev. Stat. §§ 646.605, *et seq.*)**
**(Alleged by Plaintiff Michael Balzer on behalf of the Oregon Subclass)**

641. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

642. Plaintiff Michael Balzer (for the purposes of this section, "Plaintiff") brings this action on behalf of himself and the Oregon Subclass ("Subclass," for purposes of the Oregon claims) against all Defendants.

643. FCA, Plaintiff, and the members of the Subclass are "persons" within the meaning of Or. Rev. Stat. § 646.605(4).

644. FCA is engaged in "trade" or "commerce" within the meaning of Or. Rev. Stat. § 646.605(8).

645. The Oregon Unlawful Trade Practices Act ("Oregon UTPA") prohibits "unlawful practice . . . in the course of . . . business." Or. Rev. Stat. § 646.608(1).

646. In the course of their business, Defendant FCA, through its agents, employees, and/or subsidiaries, violated the Oregon UTPA.  Specifically, in

developing and installing HV Battery systems affected by the Fire Risk Defect in the Class Vehicles that it concealed from regulators and consumers alike, and in marketing, offering for sale, and selling the defective Class Vehicles, Defendants engaged in one or more of the following unlawful practices as defined in Or. Rev. Stat. § 646.608(1):

a. Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

b. Representing that the Class Vehicles have approval, characteristics, uses, benefits, or qualities that they do not have;

c. Representing that the Class Vehicles are of a particular standard, quality and grade when they are not; and/or

d. Advertising the Class Vehicles with the intent not to sell or lease them as advertised.

647. FCA's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the Subclass, as FCA intended. Had they known the truth, Plaintiff and the Subclass would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, and the Vehicles rendered legal to sell—would have paid significantly less for them.

648.   Plaintiff and Subclass Members had no way of discerning that FCA's representations were false and misleading, or otherwise learning the facts that FCA had concealed or failed to disclose, because FCA's HV Battery systems are highly sophisticated technology and their physical and software characteristics are closely guarded secrets. Plaintiff and Subclass Members did not, and could not, unravel FCA's deception on their own.

649.   FCA had an ongoing duty to Plaintiff and Subclass Members to refrain from unfair and deceptive practices under the Oregon UTPA in the course of its business, including by disclosing the defective nature of the Class Vehicles. Specifically, FCA owed Plaintiff and Subclass Members a duty to disclose all the material facts concerning the defective HV Battery systems because they possessed superior and exclusive knowledge, they intentionally concealed it from Plaintiff and Subclass Members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

650.   FCA still has not revealed the extent of its knowledge, the true nature of the Fire Risk Defect, or the results of its examination and testing of Class Vehicles. FCA has not disclose all material facts regarding the defective nature of the Class Vehicles, so it has breached its duty to Plaintiff and Subclass Members to refrain from unfair and deceptive practices under the Oregon UTPA in the course of its business.

- 230 -

651. Plaintiff and Subclass Members suffered ascertainable loss and actual damages as a direct and proximate result of FCA's concealment, misrepresentations, and/or failure to disclose material information.

652. FCA's violations present a continuing risk to Plaintiff and members of the Subclass, as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

653. Pursuant to Or. Rev. Stat. § 646.638, Plaintiff, on behalf of himself and Subclass Members, seeks an order enjoining Defendants' unfair and/or deceptive acts or practices, and awarding damages, punitive damages, and any other just and proper relief available under the Oregon UTPA.

## COUNT XXIII
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
#### (Or. Rev. Stat. §§ 72.3140 and 72A.2120)
#### (Alleged by Plaintiff Michael Balzer on behalf of the Oregon Subclass)

654. Plaintiff realleges and incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

655. FCA was at all relevant times a "merchant" with respect to motor vehicles under Or. Rev. Stat. §§ 72.1040(1) and 72A.1030(2)(st), and "sellers" of motor vehicles under § 72.1030(1)(d).

656. With respect to leases, FCA is and at all relevant times was a "lessor" of motor vehicles under Or. Rev. Stat. § 72A.1030(1)(q)..

- 231 -

657.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Or. Rev. Stat. §§ 72.1050(1) and 72A.1030(1)(h).

658.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Or. Rev. Stat. §§ 72.3140 and 72A-2120.

659.   Under Or. Rev. Stat. Ann. § 72.3140(2), goods must "at least" meet the following to be considered "merchantable" within the meaning of the implied warranty of merchantability:

a.   Pass without objection in the trade under the contract description.

b.   Are fit for the ordinary purposes for which such goods are used.

c.   Are adequately contained, packaged, and labeled.

d.   Conform to the promises or affirmations of fact made on the container or label.

660.   The Class Vehicles were not merchantable when sold or leased because their hybrid propulsion systems are prone to combustion and pose an unreasonable risk of fires due to the Fire Risk Defect as described herein. Without limitation, the Class Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of combustion, causing an unreasonable risk of death, serious bodily harm, and/or property damage to lessees and owners of the Class Vehicles as well as their homes, passengers, and

bystanders. This defect renders the Class Vehicles when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries, not to drive the Class Vehicles in electric mode, and not to park the vehicles in the vicinity of their homes or other vehicles.

661. FCA breached the implied warranty of merchantability by selling Class Vehicles containing defects leading to the sudden combustion of the vehicles during ordinary operating conditions, or while parked. This defect has deprived Plaintiff and the Subclass Members of the benefit of their bargain.

662. FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty because, among other things, the Class Vehicles share a common defect in that they are all equipped with a hybrid propulsion system that makes the vehicles susceptible to a risk of combustion, causing an unreasonable risk of death, serious bodily harm, and/or property damage to lessees and owners of the Class Vehicles as well as their homes, passengers, and bystanders. This defect renders the Class Vehicles when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries, not to drive the Class Vehicles in electric mode, and not to park the vehicles in the vicinity of their homes or other vehicles.

663.   Notice of breach is not required because Plaintiff and the Subclass did not purchase their automobiles directly from FCA. Regardless, Plaintiffs' counsel sent notification to FCA prior to filing this Complaint.

664.   Plaintiff and the other Subclass Members were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Class Vehicles to Plaintiff and Subclass Members.

665.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and the Subclass Members received goods whose dangerous condition now renders them at least partially inoperable. Plaintiff and the Subclass Members have been damaged as they overpaid for their vehicles, and now suffer the partial or complete loss of use of their Class Vehicles.

666.   FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiff and Subclass Members. The amount of damages due will be proven at trial.

**COUNT XXIV**
**UNJUST ENRICHMENT**
**(Common Law)**
**(Alleged by Plaintiff Michael Balzer on behalf of the Oregon Subclass)**

667.   Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

- 234 -

668.   Plaintiff Balzer ("Plaintiff," for purposes of the Oregon claims) brings this claim on behalf of himself and the Oregon Subclass ("Subclass," for the purposes of the Oregon claims).

669.   Pursuant to Federal Rule of Civil Procedure 8(d)(2) and (3), Plaintiff pleads this claim separately and in the alternative to his claims for breach of implied warranty and violation of the Magnuson Moss Act because if Plaintiff's claims for damages are dismissed or judgment is entered in favor of FCA, Plaintiff and the Subclass will have no adequate legal remedy.

670.   FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the lithium-ion batteries that it installed in the Class Vehicles, but nevertheless marketed them for sale to consumers, and misled Plaintiff and the Subclass Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

671.   FCA failed to adequately research, design, test, and manufacture the Class Vehicles before warranting, promoting, selling and distributing the Class Vehicles as suitable and safe for reasonably foreseeable uses.

672.   At the expense of Plaintiff and the Subclass Members, FCA received and retained a benefit from Plaintiff and Subclass Members and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Class Vehicles to

Plaintiff and the Subclass Members for more than they were worth as a result of FCA's conduct.

673. Plaintiff and the Subclass Members would not have purchased or leased the Class Vehicles, or would have paid less for them, had they known of the Fire Risk Defect at the time of purchase or lease. Therefore, FCA profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiff and the Subclass.

674. Thus, Plaintiff and the Subclass conferred tangible and material economic benefits upon FCA when they purchased or leased the Class Vehicles.

675. FCA knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of FCA acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

676. As a licensed distributor of new motor vehicles, FCA sells Class Vehicles to Plaintiff and the Subclass through its numerous vehicle dealers across the United States. FCA therefore profits from sales of Class Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms.

677. Plaintiff and the Subclass were not aware of the true facts about the Class Vehicles when they acquired them and did not benefit from FCA's conduct.

678. Plaintiff and Subclass Members are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return Plaintiff and Subclass Members to the position they occupied prior to dealing with FCA, with such amounts to be determined at trial.

## I. Pennsylvania

**COUNT XXV**
**VIOLATION OF THE PENNSYLVANIA UNFAIR**
**TRADE PRACTICES AND CONSUMER PROTECTION LAW**
**(73 Pa. Cons. Stat. § 201-1, *et seq*.)**
**(Alleged by Plaintiff Robson on behalf of the Pennsylvania Subclass)**

679. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

680. Plaintiff Robson ("Plaintiff," for purposes of the Pennsylvania claims) brings this claim on behalf of herself and the Pennsylvania Subclass ("Subclass," for the purposes of Pennsylvania claims).

681. Plaintiff purchased or leased her Class Vehicle primarily for personal, family, or household purposes within the meaning of 73 P.S. § 201-9.2.

682. All of the acts complained of herein were perpetrated by FCA in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

683. The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have … characteristics, …. Benefits or

qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade … if they are of another;" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).

684. FCA engaged in unlawful trade practices, including representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard and quality when they are not; advertising Class Vehicles with the intent not to sell them as advertised; and engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

685. In purchasing or leasing the Class Vehicles, Plaintiff and the Subclass were deceived by FCA's failure to disclose the Fire Risk Defect.

686. Plaintiff and the Subclass reasonably relied upon FCA's material omissions and false misrepresentations. They had no way of knowing that FCA's representations were false and gravely misleading. Plaintiff and the Subclass did not, and could not, unravel FCA's deception on their own.

687. FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

688. FCA intentionally and knowingly failed to disclose and misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Subclass.

689. FCA knew or should have known that its conduct violated the Pennsylvania CPL.

690. FCA owed Plaintiff and the Subclass a duty to disclose the truth about its Class Vehicles because FCA:

a. Possessed exclusive knowledge of the Fire Risk Defect;

b. Intentionally concealed the foregoing from Plaintiff and the Subclass;

c. Made incomplete representations while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations; and/or

d. Had duties under the TREAD Act and related regulations to disclose and fix the defects.

691. FCA had a duty to disclose the Fire Risk Defect, because, having volunteered to provide information to Plaintiff and the Subclass, FCA had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiff and the Subclass relied on FCA's material omissions and representations that the Class Vehicles they were purchasing were safe and free from serious safety defects.

692. Plaintiff and the Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Class Vehicles manufactured by FCA, would have paid less, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and the Subclass Members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, or to Plaintiff and the Subclass.

693. FCA's conduct proximately caused injuries to Plaintiff and the Subclass.

694. Plaintiff and the Subclass were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiff and the Subclass overpaid for their Class Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

695. FCA is liable to Plaintiff and the Subclass for treble their actual damages or $100 each, whichever is greater, and attorneys' fees and costs. 73 P.S. § 201-9.2(a). Plaintiff is also entitled to an award of punitive damages given that FCA's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## COUNT XXVI
## BREACH OF IMPLIED WARRANTY OF
## MERCHANTABILITY UNDER PENNSYLVANIA LAW
## (13 Pa. Cons. Stat. Ann. §§ 2314 and 2A212)
## (Alleged by Plaintiff Robson on behalf of the Pennsylvania Subclass)

696. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

697. Plaintiff Robson ("Plaintiff," for purposes of the Pennsylvania claims) brings this claim on behalf of herself and the Pennsylvania Subclass ("Subclass," for the purposes of Pennsylvania claims).

698. FCA is a "merchant" with respect to motor vehicles under 13 Pa. Cons. Stat. Ann. §§ 2104 and 2A103(c), and "sellers" of motor vehicles under § 2103(a).

699. Under Pennsylvania law, an implied warranty of merchantability attaches to the Class Vehicles pursuant to 13 Pa. Cons. Stat. Ann. §§ 2314 and 2A212.

700. The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles are all afflicted by the Fire Risk Defect, which, among other things, makes the vehicles susceptible to battery combustion and poses an unreasonable risk of death, serious bodily harm, and/or property damage to

- 241 -

Plaintiff and Subclass Members. This dangerous latent defect renders the Class Vehicles unmerchantable and unfit for their ordinary use of driving.

701. As a result of the Fire Risk Defect, and per FCA's instructions, Plaintiff and Subclass Members had to limit their use and/or charging of the Class Vehicles, and they were unable to rely on their Class Vehicles to provide them with safe transportation. Notably, FCA's recall notice instructed Plaintiff and Subclass Members to refrain from charging their Class Vehicles or parking inside of buildings or structures, which deprived Plaintiff and Subclass Members of using their vehicles' hybrid electric driving features, regardless of whether they experienced a battery fire.

702. Plaintiff has had sufficient direct dealings with FCA, its authorized dealers, or its agents to establish privity of contract with FCA. Nonetheless, privity is not required here because Plaintiff and the Subclass are the intended third-party beneficiaries of agreements between FCA and its dealers regarding sales and leases of the Class Vehicles, including FCA's implied warranties. Furthermore, privity is also not required because the Class Vehicles are inherently dangerous and defective due to the Fire Risk Defect, which presents a hidden and unreasonable risk of death, serious bodily harm, and/or property damage to Plaintiff and Subclass Members.

703. It was reasonable to expect that Plaintiff and the Subclass would use, consume, or be affected by the Class Vehicles.

704. FCA was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Class Vehicles by correspondence from Plaintiff's counsel to FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, the related *Frisch* Complaint, 2:24cv10546-BRM (Mar. 4, 2024), ECF No. 1, and/or by the allegations contained in this Complaint.

705. Alternatively, Plaintiff and Subclass Members were excused from providing FCA with notice and an opportunity to cure the breach of warranty because it would have been futile. FCA did not have a repair available when it announced the recall for the Fire Risk Defect, and it still has not identified the root cause of the Fire Risk Defect or provided an effective recall remedy to address the actual cause of the defect. As a result, Plaintiff and Subclass Members had no reason to believe that FCA would have repaired the Fire Risk Defect if they presented their Class Vehicles to FCA for repair.

706. As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and the Subclass have been damaged in an amount to be determined at trial.

## COUNT XXVII
## UNJUST ENRICHMENT
### (Common Law)
### (Alleged by Plaintiff Robson on behalf of the Pennsylvania Subclass)

707. Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

708. Plaintiff Robson ("Plaintiff," for purposes of the Pennsylvania claims) brings this claim on behalf of herself and the Pennsylvania Subclass ("Subclass," for the purposes of Pennsylvania claims).

709. Pursuant to Federal Rule of Civil Procedure 8(d)(2) and (3), Plaintiff pleads this claim separately and in the alternative to her claims for breach of implied warranty and violation of the Magnuson Moss Act because if Plaintiff's claims for damages are dismissed or judgment is entered in favor of FCA, Plaintiff and the Subclass will have no adequate legal remedy.

710. FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the lithium-ion batteries that it installed in the Class Vehicles, but nevertheless marketed them for sale to consumers, and misled Plaintiff and the Subclass Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

711.   FCA failed to adequately research, design, test, and manufacture the Class Vehicles before warranting, promoting, selling and distributing the Class Vehicles as suitable and safe for reasonably foreseeable uses.

712.   At the expense of Plaintiff and the Subclass Members, FCA received and retained a benefit from Plaintiff and Subclass Members and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Class Vehicles to Plaintiff and the Subclass Members for more than they were worth as a result of FCA's conduct.

713.   Plaintiff and the Subclass Members would not have purchased or leased the Class Vehicles, or would have paid less for them, had they known of the Fire Risk Defect at the time of purchase or lease. Therefore, FCA profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiff and the Subclass.

714.   Thus, Plaintiff and the Subclass conferred tangible and material economic benefits upon FCA when they purchased or leased the Class Vehicles.

715.   FCA knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of FCA acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

716. As a licensed distributor of new motor vehicles, FCA sells Class Vehicles to Plaintiff and the subclass through its numerous vehicle dealers across the United States. FCA therefore profits from sales of Class Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms.

717. Plaintiff and the Subclass were not aware of the true facts about the Class Vehicles when they acquired them and did not benefit from FCA's conduct.

718. Plaintiff and Subclass Members are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return Plaintiff and Subclass Members to the position they occupied prior to dealing with FCA, with such amounts to be determined at trial.

**J.    Tennessee**

**COUNT XXVIII**
**VIOLATIONS OF THE TENNESSEE CONSUMER PROTECTION ACT**
**(Tenn. Code Ann. § 47-18-101, *et seq.*)**
**(Alleged by Plaintiff David Aiello on behalf of the Tennessee Subclass)**

719. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

720. Plaintiff David Aiello (for the purposes of this section, "Plaintiff") brings this action on behalf of himself and the Tennessee Subclass (for the purposes of this section, "Subclass") against FCA.

- 246 -

721.   Plaintiff and Subclass Members are "persons" and "consumers" within the meaning of Tenn. Code Ann. § 47-18-103(6) & (18).

722.   FCA is a "person" within the meaning of Tenn. Code Ann. § 47-18-103(18).

723.   FCA's conduct complained of herein affected "trade," "commerce" or "consumer transactions" within the meaning of Tenn. Code Ann. § 47-18-103(24).

724.   The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including but not limited to: "Representing that goods or services have … characteristics, [or] … benefits … that they do not have…;" "Representing that goods or services are of a particular standard, quality or grade… if they are of another;" and "Advertising goods or services with intent not to sell them as advertised." Tenn. Code Ann. § 47-18-104(b). FCA violated the Tennessee CPA by engaging in unfair or deceptive acts, including representing that Class Vehicles have characteristics or benefits that they did not have; representing that Class Vehicles are of a particular standard, quality, or grade when they are of another; and advertising Class Vehicles with intent not to sell them as advertised.

725.   FCA's actions, as set forth above, occurred in the conduct of trade or commerce.

- 247 -

726.   In the course of its business, FCA concealed the Fire Risk Defect in the Class Vehicles, as well as the true nature of the Fire Risk Vehicles, and its failure to adequately design and test the vehicles to ensure their safety as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Class Vehicles.

727.   By failing to disclose and by actively concealing the defect in the Fire Risk Vehicles, which it marketed as safe, reliable, and of high quality, FCA engaged in unfair and deceptive business practices in violation of the Tennessee CPA.

728.   In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risk posed by the Fire Risk Defect in Class Vehicles.

729.   FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and Subclass Members, about the true safety and reliability of their vehicles.

730.   FCA intentionally and knowingly misrepresented material facts regarding the Fire Risk Vehicles with the intent to mislead Plaintiff.

- 248 -

731. FCA knew or should have known that its conduct violated the Tennessee CPA.

732. As alleged above, FCA made material statements about the safety and reliability of the Fire Risk Vehicles and their ability to operate as plug-in hybrid vehicles that were either false or misleading.

733. FCA owed Plaintiff and the Subclass a duty to disclose the truth about its Class Vehicles because FCA:

      a.    Possessed exclusive knowledge of the Fire Risk Defect;

      b.    Intentionally concealed the foregoing from Plaintiff and the Subclass;

      c.    Made incomplete representations while purposefully withholding material facts from Plaintiff and the Subclass that contradicted these representations; and/or

      d.    Had duties under the TREAD Act and related regulations to disclose and fix the defects.

734. FCA had a duty to disclose the Fire Risk Defect, because, having volunteered to provide information to Plaintiff and the Subclass, FCA had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiff and the Subclass relied on FCA's material omissions and representations that the Class Vehicles they were purchasing were safe and free from serious safety defects.

- 249 -

735. Plaintiff and the Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the Class Vehicles manufactured by FCA, would have paid less, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiff and the Subclass Members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, or to Plaintiff and the Subclass.

736. FCA's conduct proximately caused injuries to Plaintiff and the Subclass.

737. Plaintiff and the Subclass were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiff and the Subclass overpaid for their Class Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

738. Pursuant to Tenn. Code Ann. § 47-18-109, Plaintiff seeks monetary relief against FCA measured as actual damages in an amount to be determined at trial, treble damages as a result of FCA's willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

## COUNT XXIX
## BREACH OF IMPLIED WARRANTY OF
## MERCHANTABILITY UNDER TENNESSEE LAW
## (Tenn. Code Ann. §§ 47-2-314, 47-2A-212)
### (Alleged by Plaintiff David Aiello on behalf of the Tennessee Subclass)

739.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

740.   Plaintiff David Aiello (for the purposes of this section, "Plaintiff") brings this action on behalf of himself and the Tennessee Subclass (for the purposes of this section, "Subclass") against FCA.

741.   FCA is a "merchant" with respect to motor vehicles under Tenn. Code Ann. § 47-2-104(1), and a "seller" under Tenn. Code Ann. § 47-2-103(d).

742.   Under Tennessee law, an implied warranty of merchantability attaches to the Class Vehicles pursuant to Tenn. Code Ann. §§ 47-2-314, 47-2A-212.

743.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles are all afflicted by the Fire Risk Defect, which, among other things, makes the vehicles susceptible to battery combustion and poses an unreasonable risk of death, serious bodily harm, and/or property damage to

- 251 -

Plaintiff and Subclass Members. This dangerous latent defect renders the Class Vehicles unmerchantable and unfit for their ordinary use of driving.

744. As a result of the Fire Risk Defect, and per FCA's instructions, Plaintiff and Subclass Members had to limit their use and/or charging of the Class Vehicles, and they were unable to rely on their Class Vehicles to provide them with safe transportation. Notably, FCA's recall notice instructed Plaintiff and Subclass Members to refrain from charging their Class Vehicles or parking inside of buildings or structures, which deprived Plaintiff and Subclass Members of using their vehicles' hybrid electric driving features, regardless of whether they experienced a battery fire.

745. Plaintiff has had sufficient direct dealings with FCA, its authorized dealers, or its agents to establish privity of contract with FCA. Nonetheless, privity is not required here because Plaintiff and the Subclass are the intended third-party beneficiaries of agreements between FCA and its dealers regarding sales and leases of the Class Vehicles, including FCA's implied warranties. Furthermore, privity is also not required because the Class Vehicles are inherently dangerous and defective due to the Fire Risk Defect, which presents a hidden and unreasonable risk of death, serious bodily harm, and/or property damage to Plaintiff and Subclass Members.

746. It was reasonable to expect that Plaintiff and the Subclass would use, consume, or be affected by the Class Vehicles.

747. Alternatively, Plaintiff and Subclass Members were excused from providing FCA with notice and an opportunity to cure the breach of warranty because it would have been futile. FCA did not have a repair available when it announced the recall for the Fire Risk Defect, and it still has not identified the root cause of the Fire Risk Defect or provided an effective recall remedy to address the actual cause of the defect. As a result, Plaintiff and Subclass Members had no reason to believe that FCA would have repaired the Fire Risk Defect if they presented their Class Vehicles to FCA for repair.

748. As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and the Subclass have been damaged in an amount to be determined at trial.

## COUNT XXX
## UNJUST ENRICHMENT
### (Common Law)
### (Alleged by Plaintiff David Aiello on behalf of the Tennessee Subclass)

749. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

750. Plaintiff David Aiello (for the purposes of this section, "Plaintiff") brings this action on behalf of himself and the Tennessee Subclass (for the purposes of this section, "Subclass") against FCA.

751. Pursuant to Federal Rule of Civil Procedure 8(d)(2) and (3), Plaintiff pleads this claim separately and in the alternative to his claims for breach of implied

warranty and violation of the Magnuson Moss Act because if Plaintiff's claims for damages are dismissed or judgment is entered in favor of FCA, Plaintiff and the Subclass will have no adequate legal remedy.

752.   FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the lithium-ion batteries that it installed in the Class Vehicles, but nevertheless marketed them for sale to consumers, and misled Plaintiff and the Subclass Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

753.   FCA failed to adequately research, design, test, and manufacture the Class Vehicles before warranting, promoting, selling and distributing the Class Vehicles as suitable and safe for reasonably foreseeable uses.

754.   At the expense of Plaintiff and the Subclass Members, FCA received and retained a benefit from Plaintiff and Subclass Members and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Class Vehicles to Plaintiff and the Subclass Members for more than they were worth as a result of FCA's conduct.

755.   Plaintiff and the Subclass Members would not have purchased or leased the Class Vehicles, or would have paid less for them, had they known of the Fire Risk Defect at the time of purchase or lease. Therefore, FCA profited from the sale

and lease of the Class Vehicles to the detriment and expense of Plaintiff and the Subclass.

756. Thus, Plaintiff and the Subclass conferred tangible and material economic benefits upon FCA when they purchased or leased the Class Vehicles.

757. FCA knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of FCA acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

758. As a licensed distributor of new motor vehicles, FCA sells Class Vehicles to Plaintiff and the subclass through its numerous vehicle dealers across the United States. FCA therefore profits from sales of Class Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms.

759. Plaintiff and the Subclass were not aware of the true facts about the Class Vehicles when they acquired them and did not benefit from FCA's conduct.

760. Plaintiff and Subclass Members are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return Plaintiff and Subclass Members to the position they occupied prior to dealing with FCA, with such amounts to be determined at trial.

K.      Utah

## COUNT XXXI
## VIOLATIONS OF THE UTAH CONSUMER SALES PRACTICES ACT
(Utah Code Ann. § 13-11-1, *et seq.*)
(Alleged by Plaintiffs Sean Ely and Kristine Ely
on behalf of the Utah Subclass)

761.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

762.    Plaintiffs Sean Ely and Kristine Ely (for the purposes of this section, "Plaintiffs") bring this action on behalf of themselves and the Utah Subclass (for the purposes of this section, "Subclass") against FCA.

763.    FCA is a "supplier" under the Utah Consumer Sales Practices Act ("Utah CSPA"), Utah Code Ann. § 13-11-3.

764.    Plaintiffs and Subclass Members are "persons" under Utah Code Ann. § 13-11-3.

765.    The Utah CSPA makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction" under Utah Code Ann. § 13-11-4. Specifically, "a supplier commits a deceptive act or practice if the supplier knowingly or intentionally: (a) indicates that the subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits, if it has not" or "(b) indicates that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not." Utah Code Ann.

§ 13-11-4(2). The Utah CSPA also provides that "[a]n unconscionable act or practice by a supplier in connection with a consumer transaction" violates the Utah CSPA. Utah Code Ann. § 13-11-5.

766. FCA engaged in unlawful trade practices, including engaging in unconscionable acts, representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Class Vehicles are of a particular standard and quality when they are not; advertising Class Vehicles with the intent not to sell them as advertised; and engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

767. In purchasing or leasing the Class Vehicles, Plaintiffs and the Subclass were deceived by FCA's failure to disclose the Fire Risk Defect.

768. Plaintiffs and the Subclass reasonably relied upon FCA's material omissions and false misrepresentations. They had no way of knowing that FCA's representations were false and gravely misleading. Plaintiffs and the Subclass did not, and could not, unravel FCA's deception on their own.

769. FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

770. FCA intentionally and knowingly failed to disclose and misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiffs and the Subclass.

771. FCA knew or should have known that its conduct violated the Utah CSPA.

772. FCA owed Plaintiffs and the Subclass a duty to disclose the truth about its Class Vehicles because FCA:

     a.    Possessed exclusive knowledge of the Fire Risk Defect;

     b.    Intentionally concealed the foregoing from Plaintiff and the Subclass;

     c.    Made incomplete representations while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations; and/or

     d.    Had duties under the TREAD Act and related regulations to disclose and fix the defects.

773. FCA had a duty to disclose the Fire Risk Defect, because, having volunteered to provide information to Plaintiffs and the Subclass, FCA had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiffs and the Subclass relied on FCA's material omissions and representations that the Class Vehicles they were purchasing were safe and free from serious safety defects.

774. Plaintiffs and the Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the

Class Vehicles manufactured by FCA, would have paid less, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the Subclass Members' actions were justified. FCA was in exclusive control of the material facts, and such facts were not generally known to the public, or to Plaintiffs and the Subclass.

775. FCA's conduct proximately caused injuries to Plaintiffs and the Subclass.

776. Plaintiffs and the Subclass were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of FCA's conduct in that Plaintiffs and the Subclass overpaid for their Class Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of FCA's misrepresentations and omissions.

777. As a result of FCA's conduct, Plaintiffs seek to recover from Defendant, all actual, economic damages incurred in the past, economic damages that continue to accrue into the future, mental anguish damages, civil penalties, and attorney's fees and costs, along with any orders necessary to enjoin Defendant's acts or failures to act, as authorized by Utah Code Ann. § 13-11-19, and other provisions of the Utah CSPA.

**COUNT XXXII**
**BREACH OF IMPLIED WARRANTY OF**
**MERCHANTABILITY UNDER UTAH LAW**
**(Utah Code Ann. § 70A-2-314)**
**(Alleged by Plaintiffs Sean Ely and Kristine Ely**
**on behalf of the Utah Subclass)**

778.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

779.   Plaintiffs Sean Ely and Kristine Ely (for the purposes of this section, "Plaintiffs") bring this action on behalf of themselves and the Utah Subclass (for the purposes of this section, "Subclass") against FCA.

780.   FCA is a "merchant" with respect to motor vehicles under Utah Code Ann. § 70A-2-104, and a "person in the position of a seller" under Utah Code Ann. § 70A-2-707.

781.   Under Utah law, an implied warranty of merchantability attaches to the Class Vehicles pursuant to Utah Code Ann. § 70A-2-314.

782.   The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles are all afflicted by the Fire Risk Defect, which, among other things, makes the vehicles susceptible to battery combustion and poses an unreasonable risk of death, serious bodily harm, and/or property damage to

Plaintiffs and Subclass Members. This dangerous latent defect renders the Class Vehicles unmerchantable and unfit for their ordinary use of driving.

783. As a result of the Fire Risk Defect, and per FCA's instructions, Plaintiffs and Subclass Members had to limit their use and/or charging of the Class Vehicles, and they were unable to rely on their Class Vehicles to provide them with safe transportation. Notably, FCA's recall notice instructed Plaintiffs and Subclass Members to refrain from charging their Class Vehicles or parking inside of buildings or structures, which deprived Plaintiffs and Subclass Members of using their vehicles' hybrid electric driving features, regardless of whether they experienced a battery fire.

784. Plaintiffs have had sufficient direct dealings with FCA, its authorized dealers, or its agents to establish privity of contract with FCA. Nonetheless, privity is not required here because Plaintiffs and the Subclass are the intended third-party beneficiaries of agreements between FCA and its dealers regarding sales and leases of the Class Vehicles, including FCA's implied warranties. Furthermore, privity is also not required because the Class Vehicles are inherently dangerous and defective due to the Fire Risk Defect, which presents a hidden and unreasonable risk of death, serious bodily harm, and/or property damage to Plaintiffs and Subclass Members.

785. It was reasonable to expect that Plaintiffs and the Subclass would use, consume, or be affected by the Class Vehicles.

- 261 -

786. Alternatively, Plaintiffs and Subclass Members were excused from providing FCA with notice and an opportunity to cure the breach of warranty because it would have been futile. FCA did not have a repair available when it announced the recall for the Fire Risk Defect, and it still has not identified the root cause of the Fire Risk Defect or provided an effective recall remedy to address the actual cause of the defect. As a result, Plaintiffs and Subclass Members had no reason to believe that FCA would have repaired the Fire Risk Defect if they presented their Class Vehicles to FCA for repair.

787. As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiffs and the Subclass have been damaged in an amount to be determined at trial.

**COUNT XXXIII**
**UNJUST ENRICHMENT**
**(Common Law)**
**(Alleged by Plaintiffs Sean Ely and Kristine Ely**
**on behalf of the Utah Subclass)**

788. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

789. Plaintiffs Sean Ely and Kristine Ely (for the purposes of this section, "Plaintiffs") bring this action on behalf of themselves and the Utah Subclass (for the purposes of this section, "Subclass") against FCA.

790. Pursuant to Federal Rule of Civil Procedure 8(d)(2) and (3), Plaintiffs pleads this claim separately and in the alternative to her claims for breach of implied warranty and violation of the Magnuson Moss Act because if Plaintiffs' claims for damages are dismissed or judgment is entered in favor of FCA, Plaintiffs and the Subclass will have no adequate legal remedy.

791. FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the lithium-ion batteries that it installed in the Class Vehicles, but nevertheless marketed them for sale to consumers, and misled Plaintiffs and the Subclass Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

792. FCA failed to adequately research, design, test, and manufacture the Class Vehicles before warranting, promoting, selling and distributing the Class Vehicles as suitable and safe for reasonably foreseeable uses.

793. At the expense of Plaintiffs and the Subclass Members, FCA received and retained a benefit from Plaintiffs and Subclass Members and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Class Vehicles to Plaintiffs and the Subclass Members for more than they were worth as a result of FCA's conduct.

794. Plaintiffs and the Subclass Members would not have purchased or leased the Class Vehicles, or would have paid less for them, had they known of the Fire Risk Defect at the time of purchase or lease. Therefore, FCA profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiffs and the Subclass.

795. Thus, Plaintiffs and the Subclass conferred tangible and material economic benefits upon FCA when they purchased or leased the Class Vehicles.

796. FCA knowingly accepted the benefits of its unjust conduct. These benefits were the expected result of FCA acting in its pecuniary interest at the expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

797. As a licensed distributor of new motor vehicles, FCA sells Class Vehicles to Plaintiffs and the subclass through its numerous vehicle dealers across the United States. FCA therefore profits from sales of Class Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms.

798. Plaintiffs and the Subclass were not aware of the true facts about the Class Vehicles when they acquired them and did not benefit from FCA's conduct.

799. Plaintiffs and Subclass Members are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return Plaintiffs and

Subclass Members to the position they occupied prior to dealing with FCA, with such amounts to be determined at trial.

### L.     Washington

**COUNT XXXIV**
**VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT**
**(RCW § 19.86.010, *et seq.*)**
**(Alleged by Plaintiff Christopher Schrobilgen**
**on behalf of the Washington Subclass)**

800.   Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

801.   Plaintiff Christopher Schrobilgen ("Plaintiff," for purposes of the Washington claims) brings this claim on behalf of himself and the Washington Subclass ("Subclass" for the purposes of the Washington claims).

802.   Plaintiff and the Subclass Members are "Persons" pursuant to the Washington Consumer Protection Act ("WCPA"), RCW § 19.86.010, as they were injured in their business or property by FCA's violations of the WCPA. FCA is a proper defendant under the WCPA.

803.   The Class Vehicles are "assets" that were sold in "trade" and "commerce" as defined by the WCPA. RCW § 19.86.010.

804.   FCA violated the WCPA in multiple ways including by engaging in unfair or deceptive acts or practices in its conduct of trade or commerce regarding the Class Vehicles, in violation of RCW § 19.86.020.

- 265 -

805. FCA concealed and/or failed to disclose the Fire Risk Defect in the Class Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of a material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

806. By failing to disclose and/or actively concealing the Fire Risk Defect in the Class Vehicles, which it marketed as safe, reliable, of high quality, and fit for use as plug-in hybrid electric vehicles, FCA engaged in unfair and deceptive acts or practices in violation of the WCPA.

807. In the course of FCA's business, it willfully failed to disclose and actively concealed the dangerous risks posed by the defects in the Class Vehicles.

808. FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and Subclass Members, about the true safety and reliability of their vehicles.

809. FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with the intent to mislead Plaintiffs and the Subclass.

- 266 -

810. FCA's unfair or deceptive acts or practices were injurious to the public interest because FCA's conduct injured other persons, and had and has the capacity to injure other persons, pursuant to RCW § 19.86.093.

811. FCA knew or should have known that its conduct violated the WCPA.

812. As alleged above, FCA made material statements about the safety and reliability of the Class Vehicles when operating as plug-in hybrid electric vehicles that were either false or misleading.

813. FCA owed Plaintiff and Subclass Members a duty to disclose the true safety and reliability of the Class Vehicles because FCA:

      a.     Possessed exclusive knowledge about the Fire Risk Defect;

      b.     Intentionally concealed the foregoing from Plaintiffs and the Subclass;

      c.     Made incomplete representations about the safety and reliability of the Class Vehicles, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations; and/or

      d.     Had duties under the TREAD Act and related regulations to disclose and fix the defect.

814. Because FCA fraudulently concealed the Fire Risk Defect, as well as the true nature of the Class Vehicles, Plaintiff and Subclass Members were deprived of the benefit of their bargain since the vehicles they purchased were worth less than

- 267 -

they would have been if they were free from defects. Had Plaintiff and the other Subclass Members been aware of the defect in their Class Vehicles, they would not have bought or leased the Class Vehicles or would have paid less for them.

815. FCA's concealment of the defects in the Class Vehicles was material to Plaintiff and the Subclass.

816. Plaintiff and the Subclass suffered actual damages caused by FCA's misrepresentations and its concealment of and failure to disclose the Fire Risk Defect. Had they known the truth about the Class Vehicles, Plaintiffs and Subclass Members either would have paid less for the Class Vehicles or would not have purchased or leased them at all.

817. FCA's violations present a continuing risk to Plaintiff and the Subclass as well as to the general public. In particular and as alleged herein, FCA has yet to offer any effective remedy for the Class Vehicles. FCA's unlawful acts and practices complained of herein affect the public interest.

818. As a direct and proximate result of FCA's violations of the WCPA, Plaintiff and Subclass Members have suffered injury-in-fact and/or actual damage as alleged above.

819. As a result of FCA's conduct, Plaintiff seeks to recover from Defendant, all actual, economic damages incurred in the past, economic damages that continue to accrue into the future, mental anguish damages, treble damages, civil

penalties, and attorney's fees and costs, along with any orders necessary to enjoin Defendant's acts or failures to act, as authorized by RCW § 19.86.090, 19.86.140, and other provisions of the WCPA.

## COUNT XXXV
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## UNDER WASHINGTON LAW
## (RCW § 62A.2-314)
## (Alleged by Plaintiff Christopher Schrobilgen
## on behalf of the Washington Subclass)

820. Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

821. Plaintiff Christopher Schrobilgen ("Plaintiff," for purposes of the Washington claims) brings this claim on behalf of himself and the Washington Subclass ("Subclass" for the purposes of the Washington claims).

822. FCA was and is a merchant with respect to motor vehicles under RCW § 62A.2-104.

823. Under RCW § 62A.2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff and the Subclass purchased or leased their Class Vehicles.

824. The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used.

Specifically, the Class Vehicles are all afflicted by the Fire Risk Defect, which, among other things, makes the vehicles susceptible to battery combustion and poses an unreasonable risk of death, serious bodily harm, and/or property damage to Plaintiff and Subclass Members. This dangerous latent defect renders the Class Vehicles unmerchantable and unfit for their ordinary use of driving.

825.   As a result of the Fire Risk Defect, and per FCA's instructions, Plaintiff and Subclass Members had to limit their use and/or charging of the Class Vehicles, and they were unable to rely on their Class Vehicles to provide them with safe transportation. Notably, FCA's B9A Recall and 95B Recall notices instructed Plaintiff and Subclass Members to refrain from charging their Class Vehicles or parking inside of buildings or structures, which deprived Plaintiff and Subclass Members of using their vehicles' hybrid electric driving features, regardless of whether they experienced a battery fire.

826.   Plaintiff has had sufficient direct dealings with FCA, its authorized dealers, or its agents to establish privity of contract with FCA, to the extent required by law. Nonetheless, privity is not required here because Plaintiff and the Subclass are the intended third-party beneficiaries of agreements between FCA and its dealers regarding sales and leases of the Class Vehicles, including FCA's implied warranties. Furthermore, privity is also not required because the Class Vehicles are inherently dangerous and defective due to the Fire Risk Defect, which presents a

hidden and unreasonable risk of death, serious bodily harm, and/or property damage to Plaintiff and Subclass Members.

827. It was reasonable to expect that Plaintiff and the Subclass would use, consume, or be affected by the Class Vehicles.

828. FCA was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Class Vehicles by correspondence from Plaintiffs' counsel to FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, the related *Frisch* Complaint, 2:24cv10546-BRM (Mar. 4, 2024), ECF No. 1, and/or by the allegations contained in this Second Amended Complaint.

829. Alternatively, Plaintiff and Subclass Members were excused from providing FCA with notice and an opportunity to cure the breach of warranty because it would have been futile. FCA did not have a repair available when it announced the B9A Recall for the Fire Risk Defect, and FCA later determined that the B9A Recall was "ineffective" and still does not have a repair available nor has FCA identified the root cause of the Fire Risk Defect or provided an effective recall remedy to address the actual cause of the defect. As a result, Plaintiff and Subclass Members had no reason to believe that FCA would have repaired the Fire Risk Defect if they presented their Class Vehicles to FCA for repair.

830. As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and the Subclass have been damaged in an amount to be determined at trial.

## COUNT XXXVI
### UNJUST ENRICHMENT OR QUASI CONTRACT (Common Law)
**(Alleged by Plaintiff Christopher Schrobilgen on behalf of the Washington Subclass)**

831. Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

832. Plaintiff Christopher Schrobilgen ("Plaintiff," for purposes of the Washington claims) brings this claim on behalf of himself and the Washington Subclass ("Subclass" for the purposes of the Washington claims).

833. Pursuant to Federal Rule of Civil Procedure 8(d)(2) and (3), and only to the extent required by substantive law, Plaintiff pleads this claim separately and in the alternative to her claims for breach of implied warranty and violation of the Magnuson Moss Act because if Plaintiff's claims for damages are dismissed or judgment is entered in favor of FCA, Plaintiff and the Subclass will have no adequate legal remedy.

834. FCA is in the business of manufacturing and marketing motor vehicles, is a merchant in the trade of motor vehicles, and knew or reasonably should have known of the battery fire risks posed by the lithium-ion batteries that it installed in the Class Vehicles, but nevertheless marketed them for sale to consumers, and

- 272 -

misled Plaintiff and the Subclass Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

835.   FCA failed to adequately research, design, test, and manufacture the Class Vehicles before warranting, promoting, selling and distributing the Class Vehicles as suitable and safe for reasonably foreseeable uses.

836.   At the expense of Plaintiff and Subclass Members, FCA has inequitably and unjustly received and retained a benefit from Plaintiff and Subclass Members and inequity has resulted. FCA benefitted from selling, leasing, and distributing the Class Vehicles to Plaintiff and the Subclass Members for more than they were worth as a result of FCA's conduct.

837.   Plaintiff and the Subclass Members would not have purchased or leased the Class Vehicles, or would have paid less for them, had they known of the Fire Risk Defect at the time of purchase or lease. Therefore, FCA profited from the sale and lease of the Class Vehicles to the detriment and expense of Plaintiff and the Subclass.

838.   Thus, Plaintiff and the Subclass conferred tangible and material economic benefits upon FCA when they purchased or leased the Class Vehicles.

839.   FCA knowingly accepted the benefits of its unjust and inequitable conduct. These benefits were the expected result of FCA acting in its pecuniary

- 273 -

interest at the expense of its customers. It is inequitable, unconscionable, and unjust for FCA to retain these benefits.

840.   As a licensed distributor of new motor vehicles, FCA sells Class Vehicles to Plaintiff and Subclass Members through its numerous vehicle dealers across the United States. FCA therefore profits from sales of Class Vehicles, including sales made through its dealership network and sales brokered through its financing and leasing arms.

841.   Plaintiff and the Subclass were not aware of the true facts about the Class Vehicles when they acquired them and did not benefit from FCA's conduct.

842.   Plaintiff and Subclass Members are entitled to restitution of the benefits FCA unjustly retained and/or any amounts necessary to return Plaintiff and Subclass Members to the position they occupied prior to dealing with FCA, with such amounts to be determined at trial.

## XI.   REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class and Subclasses, respectfully request that the Court enter judgment in their favor and against FCA, as follows:

A.   Certification of the proposed Nationwide and State Subclasses, including appointment of Plaintiffs' counsel as Class Counsel;

B.     Restitution, including at the election of Class and Subclass Members, recovery of the purchase price of their Class Vehicles, or the overpayment for their vehicles;

C.     Damages, including punitive damages, costs, and disgorgement in an amount to be determined at trial;

D.     An order requiring FCA to pay both pre- and post-judgment interest on any amounts awarded;

E.     An award of costs and attorneys' fees; and

F.     Such other or further relief as may be appropriate.

## XII.   DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED: April 24, 2026          Respectfully submitted,

/s/ Dennis A. Lienhardt
E. Powell Miller (P39487)
Dennis A. Lienhardt (P81118)
Dana E. Fraser (P82873)
**THE MILLER LAW FIRM PC**
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
epm@millerlawpc.com
dal@millerlawpc.com
def@millerlawpc.com

Roger N. Heller
Phong-Chau G. Nguyen

Nicholas W. Lee
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
rheller@lchb.com
pgnguyen@lchb.com
nlee@lchb.com

John R. Davis
Michael L. Slack
**SLACK DAVIS, LLP**
6001 Bold Ruler Way, Suite 100
Austin, TX 78746
Telephone: (512) 795-8686
jdavis@slackdavis.com
mslack@slackdavis.com

Robert K. Shelquist
**CUNEO GILBERT & LADUCA, LLP**
5775 Wayzata Blvd., Suite 620
St. Louis Park, MN 55416
Telephone: (612) 254-7288
rshelquist@cuneolaw.com

*Attorneys for Plaintiffs and the Proposed Classes*

- 276 -